THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| IDAHO RIVERS UNITED; WASHINGTON WILDLIFE FEDERATION; PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS; INSTITUTE FOR FISHERIES RESOURCES; SIERRA CLUB; FRIENDS OF THE CLEARWATER, <br><br> and <br><br> NEZ PERCE TRIBE, <br><br>                Plaintiffs, <br><br> v. <br><br> UNITED STATES ARMY CORPS OF ENGINEERS, <br><br>                Defendant. | No. 2:14-cv-01800-JLR <br><br> PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION <br><br> NOTE ON MOTIONS CALENDAR: FRIDAY, DECEMBER 19, 2014[1] <br><br> ORAL ARGUMENT REQUESTED |

---

[1] The parties are conferring regarding an accelerated schedule and will promptly present the Court with a stipulated schedule for resolving this motion promptly.

PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION (No. 2:14-cv-01800-JLR)

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340 | Phone*

TABLE OF CONTENTS

INTRODUCTION AND BACKGROUND ................................................................. 1

STANDARD OF REVIEW ...................................................................................... 1

ARGUMENT .......................................................................................................... 2

I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIMS THAT THE CORPS HAS VIOLATED NEPA. ................................................ 2

    A.   The Corps Failed to Consider a Reasonable Range of Alternatives to Dredging in 2014-2015. .................................................................3

        1.   The Corps improperly considered only two alternatives. .....................4

        2.   The Flood Control Act of 1962 does not require the Corps to "reestablish" a 14-foot channel in any specific timeframe. .................6

        3.   The Corps must analyze all reasonable alternatives. ...........................8

    B.   The FEIS Fails to Take a Hard Look at Impacts to Pacific Lamprey ............10

    C.   The EIS Fails to Take a Hard Look at the Impacts of Climate Change. ........13

II.     PLAINTIFFS ARE LIKELY TO PREVAIL ON THEIR CLAIM THAT THE CORPS VIOLATED NEPA BY RELYING UPON A FUNDAMENTALLY MISLEADING ECONOMIC ANALYSIS. ...................... 14

    A.   The Corps is Required to Analyze the Full Costs and Benefits of Its Proposals. ....................................................................................15

    B.   The Corps' Discussion of Economics is Incomplete and Misleading. ...........16

III.   PLAINTIFFS ARE LIKELY TO PREVAIL ON THEIR CLAIM THAT THE DREDGING ACTION VIOLATES THE CLEAN WATER ACT. ............. 21

IV.   THE BALANCE OF HARM AND THE PUBLIC INTEREST REQUIRE AN INJUNCTION PREVENTING DREDGING AND IN-RIVER DISPOSAL PENDING COMPLIANCE WITH NEPA AND THE CWA. ......... 22

    A.   Plaintiffs Will Suffer Irreparable Harm in the Absence of an Injunction. ....................................................................................22

    B.   The Balancing of the Equities and the Public Interest Weigh in Favor of an Injunction to Preserve the Status Quo. ...................................25

CONCLUSION ....................................................................................................... 26

PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION (No. 2:14-cv-01800-JLR)   -i-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340 | Phone*

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alliance for the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011) ...................................................................2

*Amoco Prod. Co. v. Vill. of Gambell*,
   480 U.S. 531 (1987)...............................................................................22

*Blue Mountains Biodiversity Project v. Blackwood*,
   161 F.3d 1208 (9th Cir. 1998) ....................................................2, 10, 11

*Churchill Cnty. v. Norton*,
   276 F.3d 1060 (9th Cir. 2001) ...................................................................2

*Conservation Law Found., v. Pritzker*,
   No. CV 13-821 (JEB), 2014 WL 1338596 (D.D.C. Apr. 4, 2014).........16

*Earth Island Inst. v. U.S. Forest Serv.*,
   442 F.3d 1147 (9th Cir. 2006) .................................................................25

*Forelaws on Bd. v. Johnson*,
   743 F.2d 677 (9th Cir. 1984) .....................................................................8

*Found. on Econ. Trends v. Heckler*,
   756 F.2d 143 (D.C. Cir. 1985) .................................................................12

*Friends of Southeast's Future v. Morrison*,
   153 F.3d 1059 (9th Cir. 1998) ...................................................................3

*Getty v. Fed. Sav. & Loan Ins. Corp.*,
   805 F.2d 1050 (D.C. Cir. 1986)...............................................................10

*Greenpeace Action v. Franklin*,
   14 F.3d 1324 (9th Cir. 1992) .............................................................14, 15

*Hughes River Watershed Conservancy v. Glickman*,
   81 F.3d 437 (4th Cir. 1996) .........................................................15, 19, 20

*Ilio'ulaokalani Coal. v. Rumsfeld*,
   464 F.3d 1083 (9th Cir. 2006) .................................................................10

*Johnston v. Davis*,
   698 F.2d 1088 (10th Cir. 1983) ...............................................................19

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340 | Phone*

*Kern v. BLM*,
    284 F.3d 1062 (9th Cir. 2002) ................................................................2

*The Lands Council v. McNair*,
    537 F.3d 981 (9th Cir. 2008) ................................................................25

*Lands Council v. Powell*,
    395 F.3d 1019 (9th Cir. 2004) ................................................................18

*League of Wilderness Defenders v. Connaughton*,
    752 F.3d 755 (9th Cir. 2014) ................................................................24, 26

*N. Plains Res. Council Inc. v. Surface Transp. Bd.*,
    668 F.3d 1067 (9th Cir. 2011) ................................................................12, 18

*Nat'l Wildlife Fed'n v. Espy*,
    45 F.3d 1337 (9th Cir. 1995) ................................................................25

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
    235 F. Supp. 2d 1143 (W.D. Wash. 2002)................................................................1, 2, 4

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
    C02-2259-L, Order Granting Mot. Prelim. Inj. 2004 ................................................................1

*Natural Res. Def. Council v. U.S. Forest Serv.*,
    421 F.3d 797 (9th Cir. 2005) ................................................................15

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.*,
    137 F.3d 1372 (9th Cir. 1998) ................................................................14

*Nw Res. Info. Ctr. v. Nw Power Planning Council*,
    35 F.3d 1371 (9th Cir. 1994) ................................................................7

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989)................................................................10

*Seattle Audubon Soc'y v. Evans*,
    771 F. Supp. 1081 (W.D. Wash. 1991)................................................................25

*Seattle Audubon Soc'y v. Sutherland*,
    No. 06-1608 MJP, 2007 WL 2220256 (W.D. Wash. Aug. 1, 2007) ................................................................24

*Shell Offshore, Inc. v. Greenpeace, Inc.*,
    709 F.3d 1281 (9th Cir. 2013) ................................................................2

*Sierra Club v. Bosworth*,
    510 F.3d 1016 (9th Cir. 2007) ................................................................24

PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION (No. 2:14-cv-01800-JLR)   -iii-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340 | Phone*

*Sierra Club v. Martin,*
  71 F. Supp. 2d 1268 (N.D. Ga. 1999) ...................................................24

*State of Cal. v. Block,*
  690 F.2d 753 (9th Cir. 1982) .................................................................4

*Van Abbema v. Fornell,*
  807 F.2d 633 (7th Cir. 1986) ...............................................................22

*W. Watersheds Project v. Abbey,*
  719 F.3d 1035 (9th Cir. 2013) .................................................6, 9, 10, 18

*Winter v. Natural Res. Def. Council,*
  555 U.S. 7 (2008) ..............................................................................2, 24

**Statutes**

5 U.S.C. § 706(2)(A) ..............................................................................2

16 U.S.C. § 1538 ...................................................................................24

33 U.S.C. § 1344 ...................................................................................21

42 U.S.C. § 4332(C)(iii) ..........................................................................3

42 U.S.C. § 4332(E) ...............................................................................3

Pub. L. No. 87-874, 76 Stat. 1173 (1962) ...............................................7

Pub. L. No. 79-14, 59 Stat. 10 (1945) .....................................................6

**Regulations**

33 C.F.R. § 320.1(a)(1) .........................................................................21

33 C.F.R. § 320.4(a)(1) ....................................................................21, 22

33 C.F.R. § 320.4(a)(2)(i) .....................................................................21

33 C.F.R. § 336.1(a) .............................................................................21

40 C.F.R. § 1500.1 ...............................................................................15

40 C.F.R. § 1500.1(a) .............................................................................2

40 C.F.R. § 1500.1(b) ...........................................................................10

40 C.F.R. § 1502.14 ................................................................................3

PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION (No. 2:14-cv-01800-JLR)   -iv-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340 | Phone*

40 C.F.R. § 1502.24 ................................................................................................10, 15

40 C.F.R. § 1508.8 ...........................................................................................................15

**Miscellaneous**

79 Fed. Reg. 50,578 (Aug. 25, 2014)..............................................................................10

H.R. Doc. No. 87-403 .......................................................................................................7

H.R. Doc. No. 75-704 ....................................................................................................6, 7

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340 | Phone*

INTRODUCTION AND BACKGROUND

After nine years of study, the Corps released a sediment management plan for the lower Snake River less than a month before it intends to resume a practice this Court has twice enjoined: dredging.  Between 2002 and 2005, the Court twice determined that the Corps had violated the National Environmental Policy Act ("NEPA") with its single-minded proposals to dredge the lower Snake River.  As a result, in 2005, the Corps committed to undertake a study of long-term sediment management alternatives.  It promised to complete that analysis by 2009—before it would again need to address the regular and predictable deposition of sediment in the river.[2]  The Corps finally completed its study and issued final decisions based on it on November 17, 2014.  Notwithstanding its own delay—indeed, because of its delay in taking measures to avoid landing here once again—the Corps intends to immediately dredge the Snake River, starting December after 15, 2014, without fully considering the impacts of its action or alternatives to dredging, just as this Court rejected in 2002.

The agency's narrow focus on dredging leaves Plaintiffs no choice but to once again turn to this Court to require the Corps to comply with NEPA and the Clean Water Act ("CWA") before it takes any action.  The Corps evidently has planned for well over one year to commence dredging on December 15, yet it released its final plan barely a week ago.  Until the Court can address the merits of that last-minute decision, Plaintiffs ask the Court to preserve the status quo and enjoin the Corps from yet again attempting to dredge its way out of a predictable, long-term problem of its own making without fully considering the impacts and alternatives as required by NEPA and the CWA.

STANDARD OF REVIEW

To obtain a preliminary injunction for violations of NEPA and the CWA, plaintiffs must

---

[2] A complete history of this litigation is in Plaintiffs' Complaint for Declaratory and Injunctive Relief ("Compl.").  Plaintiffs thus do not provide an extensive background here.  *See* Compl. at ¶¶ 67-75 (discussion of *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 235 F. Supp. 2d 1143 (W.D. Wash. 2002) and *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, C02-2259-L, Order Granting Mot. Prelim. Inj., Dkt. 107 (W.D. Wash. Nov. 1, 2004)).

PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION (No. 2:14-cv-01800-JLR)   -1-

show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest. *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008). Alternatively, the Ninth Circuit has held that "if a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips *sharply* in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (emphasis in original) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)).[3]

ARGUMENT

I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIMS THAT THE CORPS HAS VIOLATED NEPA.

NEPA is "our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a); *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1215-16 (9th Cir. 1998). It requires agencies to take a "hard look" at environmental consequences in an EIS <u>before</u> deciding to take "major Federal actions significantly affecting the quality of the environment." *Kern v. BLM*, 284 F.3d 1062, 1066-67 (9th Cir. 2002) (internal quotations and citations omitted). The statute "emphasizes the importance of coherent and <u>comprehensive</u> up-front environmental analysis to ensure informed decisionmaking to the end that the agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Churchill Cnty. v. Norton*, 276 F.3d 1060, 1072-73 (9th Cir. 2001) (internal quotations and citation omitted) (emphasis added).

These broad principles have been refined by regulations and court rulings to include the duty to: (1) develop and consider an adequate range of alternatives to the proposed action; (2) take a hard

---

[3] The Court evaluates plaintiffs' underlying substantive claims under the Administrative Procedure Act, which allows courts to set aside only those agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Nat'l Wildlife Fed'n*, 235 F. Supp. 2d at 1151-1152 (W.D. Wash. 2002).

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (No. 2:14-cv-01800-JLR)   -2-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340 | Phone*

look at the impacts of the action; and, (3) fully and accurately disclose and consider the economic information relevant to the action.

A.     The Corps Failed to Consider a Reasonable Range of Alternatives to Dredging in 2014-2015.

According to the Corps, the Final Environmental Impact Statement ("FEIS") for its Lower Snake River Programmatic Sediment Management Plan ("PSMP") is intended to evaluate both the "long-term plan for management of sediment accumulation … and a current immediate need maintenance action consistent with the plan to reestablish the federal navigation channel to congressionally authorized dimensions."  Ex. 9 at 1-3 (FEIS) (emphasis added).  While the Corps acknowledges that it must consider each of the alternatives in its "long-term plan" in future separate NEPA analyses because they will have site-specific impacts, it includes a truncated analysis in the EIS for the immediate, site-specific effects of its proposal to dredge this winter.  *See* Ex. 9 at 1-7 (FEIS).  The Corps' novel attempt to shoehorn analysis of its site-specific 2014-2015 dredging proposal into the programmatic EIS, however, fails to consider a full range of alternatives to the immediate, site-specific dredging proposal which, like other alternatives in the programmatic EIS,[4] is its own major federal action and requires its own analysis of impacts and alternatives.

The discussion of alternatives to the proposed action is "the heart" of the NEPA process and is intended to provide a "clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14.  *See also* 42 U.S.C. § 4332(C)(iii), (E).  NEPA regulations and Ninth Circuit precedent require an agency to "[r]igorously explore and objectively evaluate all reasonable alternatives."  *Id.* § 1502.14(a).  Indeed, the courts have consistently held that a failure to consider an available and reasonable alternative is fatal to an agency's NEPA analysis.  *See, e.g.*, *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1065 (9th Cir. 1998) ("The existence of reasonable but unexamined alternatives renders an EIS inadequate.").  "Judicial review of the range of

[4] *See, e.g.*, Ex. 13 at G-86 to G-87 (FEIS App'x. G—Response to Comment 8691a) (explaining that for all such future actions, the Corps "would identify and evaluate any of the measures that could be used to solve that particular problem" and would review them pursuant to NEPA).

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (No. 2:14-cv-01800-JLR)   -3-

1  alternatives considered by an agency is governed by a rule of reason that requires an agency to set

2  forth only those alternatives necessary to permit a 'reasoned choice.'" *State of Cal. v. Block*,

3  690 F.2d 753, 767 (9th Cir. 1982).

   *1.    The Corps improperly considered only two alternatives.*

4

5         In 2002, this Court examined the Corps' failure to consider an adequate range of alternatives

6  to dredging and found that plaintiffs were likely to prevail on, or had raised serious questions about,

7  the merits of their claims that the Corps failed to adequately consider sediment reduction, sediment

8  flushing, and seasonal light-loading of barges as alternatives to dredging. *NWF*, 235 F. Supp. 2d at

9  1154-58. In that case, the Corps had either summarily dismissed or ignored entirely these

10 alternative measures.[5] *Id.* Just like in 2002, the Corps in its EIS here has simply asserted without

11 any discussion or analysis that nothing other than dredging will satisfy its current needs.

12        The Corps' entire discussion of alternatives for its alleged "immediate need" to reestablish

13 the navigation channel to 14 feet by dredging consists of only two pages of text and presents only

14 two alternatives: (1) dredging or (2) continuing the status quo and not dredging. *See* Declaration of

15 Stephen D. Mashuda, Ex. 9 at 2-41 to 2-44 (FEIS).[6] In a single paragraph, the Corps rejects the

16 second alternative—continuing with current reservoir operations—because this "would not, by

17 itself, reestablish the navigation channel to its congressionally authorized dimensions . . . ." Ex. 9 at

18 2-41 (FEIS).[7] The Corps then considers the dredging measure that is repeated in Alternatives 5 and

19 7 and concludes that only dredging could "re-establish[] the federal navigation channel at its

20 congressionally-authorized dimensions." Ex. 9 at 2-44 (FEIS). *See also id.* at 2-37 ("this would be

21

22 [5] In 2004, this Court examined a more detailed record and preliminarily accepted the agency's more
   "extensive[] consider[ation]" of such measures. *See* Compl. Ex. 1 (*NWF v. NMFS*, C02-2259-L (Order

23 Granting Mot. for Prelim. Inj.) (Nov. 1, 2004) slip op. at 14-18 (citing Corps' 13-page discussion of
   alternatives and detailed explanation of why it rejected certain measures).

24 [6] Unless otherwise specified, all references to "Ex." in this brief refer to the exhibits attached to the
   Mashuda Declaration.

25
   [7] For the reasons discussed below, the Corps' legal conclusion that it is required to maintain a 14-foot

26 channel is erroneous. *See infra* Section I.A.2.

27

28 PLAINTIFFS' MOTION FOR PRELIMINARY              *Earthjustice*
   INJUNCTION (No. 2:14-cv-01800-JLR)   -4-       *705 Second Ave., Suite 203*
                                                   *Seattle, WA  98104-1711*
                                                   *(206) 343-7340 | Phone*

the only measure that would effectively reestablish the congressionally authorized dimensions of the federal navigation channel.").[8]

The Corps concluded that dredging was required in the near-term without even listing, let alone considering, any other sediment management measure or any combination of measures as an alternative.  As highlighted by public comments and the Corps itself, however, there are a host of measures that, alone or in combination, could satisfy the Corps' goal of reestablishing the channel. *See, e.g.*, Ex. 7 (Nez Perce Comments on draft EIS); Ex. 8 at (Conservation Comments on draft EIS); Ex. 9 at (FEIS).  Indeed, elsewhere in the EIS, the Corps explicitly acknowledges that reservoir drawdown to flush sediments, construction of bendway weirs, and sediment agitation each present viable means of addressing existing sediment accumulation, at least in part.  *See* Ex. 9 at 2-18 to 2-20 (FEIS).  Despite these findings, the Corps did not consider whether these actions, alone or in combination, could achieve its stated site-specific goal of a 14-foot navigation channel over any period of time.  Nor did the Corps even mention or give preliminary consideration to seasonal light-loading of barges that would allow for navigation in the short-term (a step it has implemented in the past) in combination with one or more of these other sediment management measures to address accumulated sediment and reestablish a 14-foot channel.[9]  Rather, the Corps dismissed any measures other than dredging with the conclusory assertion that "[o]ther structural and management measures … would not effectively address sediment that has accumulated in the navigation channel." *See* Ex. 9 at 2-41 (FEIS); *id.* at 2-42.  The FEIS contains no further analysis of any alternatives to underpin the Corps' determination that dredging is the only way to meet its narrowly defined and self-serving need to "immediately" reestablish a 14-foot channel.

NEPA's requirement to consider alternatives was designed to prohibit precisely this kind of

---

[8] Alternative 7 includes dredging measures identical to those in Alternative 5.  Ex. 9 at 2-42 (FEIS).

[9] In its response to comments on the DEIS, the Corps excused its refusal to consider this alternative by characterizing light-loading as a reaction by the navigation industry and not an action the Corps itself can take.  Ex. 13 at G-85 (FEIS App'x G—Response to Comment 8691).  While the Corps does not physically load barges or determine how much weight to ship on any individual vessel, the Corps is fully capable and authorized to take action it knows will lead to light-loading.

PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION (No. 2:14-cv-01800-JLR)   -5-

blinders-on approach where all of the alternatives present the same action.  An EIS with "no meaningful difference between the [] alternatives considered in detail" is insufficient; an agency cannot "make an informed decision on a project's environmental impacts when each alternative considered would authorize the same underlying action."  *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1051 (9th Cir. 2013).  Nor can the Corps manipulate the NEPA process by timing its decisions to avoid other viable alternatives.  Any urgency underlying the Corps' single-minded focus on dredging in 2014-2015 is of its own making.  Had the Corps released the PSMP five years ago, as it initially promised, and had it timely implemented non-dredging solutions it now seeks to put off yet again, it would likely have avoided the predictable sediment-buildup it now asserts it needs to "immediately" remedy.  Any "immediate need" is solely a product of the Corps' own delay.  The Corps cannot convert that delay—a delay of over five years—to a basis for circumventing NEPA and rendering all other alternatives impractical.

> 2.    *The Flood Control Act of 1962 does not require the Corps to "reestablish" a 14-foot channel in any specific timeframe.*

The Corps' belief that it must establish a 14-foot channel "immediately"—the key assumption underlying its immediate, site-specific dredging plan—is based on a misinterpretation of the Flood Control Act of 1962 that led the Corps to impermissibly limit the range of alternatives it considered.  Congress did not mandate that the Corps rigidly maintain a 14-foot channel at all times, nor that it act within any particular timeframe to achieve or maintain that channel.

Congress originally authorized the Snake River navigation system in the Rivers and Harbors Act of 1945.  *See* Pub. L. No. 79-14, 59 Stat. 10, 21-22 (1945) (adopting H.R. Doc. No. 75-704 (attached as Ex. 1)).  The authorizing report indicates that the lower Snake River dams would provide navigation on average for ten months a year.  H.R. Doc. No. 75-704, at 9, 39 (attached as Ex. 1).  When later authorizing several new projects via the Flood Control Act of 1962, Congress provided that: "The depth and width of the authorized channel in the Columbia-Snake River barge navigation project shall be established as fourteen feet and two hundred and fifty feet, respectively,

PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION (No. 2:14-cv-01800-JLR)   -6-

*Earthjustice*
705 Second Ave., Suite 203
Seattle, WA  98104-1711
(206) 343-7340 | Phone

1   at minimum regulated flow."  Flood Control Act of 1962, Pub. L. No. 87-874, 76 Stat. 1173, 1193

2   (1962).  The Corps interprets this language to require it to "immediately" reestablish the channel to

3   a depth of fourteen feet, *see* Ex. 9 at 1-7 to 1-8 (FEIS); Ex. 13 at G-83 to G-84 (FEIS App'x G—

4   Response to Comment 8684), notwithstanding its own past and current actions demonstrating the

5   breadth of its discretion.

6           The text of the Flood Control Act of 1962 does not support the Corps' construction.  The

7   statute authorizes dimensions for the lower Snake River navigation channel but does not, as the

8   Corps argues, remove the Corps' discretion to operate at less than fourteen feet if relevant

9   conditions have changed, as they have here, or when necessary to for other purposes.[10]  The text in

10  the statue is based on a letter from the Secretary of the Army communicating the recommendations

11  of the Chief of Engineers that dimensions for the channel "of 14 feet by 250 feet be formally

12  <u>authorized</u>" since that depth could be obtained "at negligible cost over and above the basic lock and

13  dam costs."  *See* H.R. Doc. 87-403 at 15 (emphasis added) (attached as Ex. 2).[11]  The plain language

14  of the statute, like the Corps' letter to Congress that it is based on, merely provides *authorization* for

15  a 14-foot channel; there is nothing indicating the Corps sought to have its hands tied if economic or

16  other realities changed, and there is nothing demonstrating that the Corps is required to act

17  immediately (or within any given timeframe) to maintain a specified depth.[12]  The Ninth Circuit has

18

19  [10] Navigation is not the only—or the primary—use of the Lower Snake River.  The Northwest Power Act,
    for example, places protection of salmon, steelhead, and lamprey "on par" with other uses of the system.

20  *See Nw Res. Info. Ctr. v. Nw Power Planning Council*, 35 F.3d 1371, 1388 (9th Cir. 1994).  Given these
    other mandates, it cannot be credibly maintained that navigation—in a 14-foot channel or otherwise—

21  must always be provided.

    [11] The complete document is *available at* http://goo.gl/Terb6d.

22  [12] Moreover, Congress passed the Flood Control Act of 1962 with full knowledge that navigation on the
    Snake would be unavailable a few months each year since that was the understanding when Congress

23  passed the Rivers and Harbors Act in 1945.  H.R. Doc. No. 75-704, at 9, 39 (adopted by the Rivers and
    Harbors Act of 1945) (attached as Ex. 2).  The Corps has historically exercised its discretion to halt all

24  navigation on the Snake for weeks or even months at a time for other maintenance activities.  *See, e.g.*,
    Press Release, U.S. Army Corps of Engineers, Columbia-Snake lock gate replacement job completed

25  (Mar. 26, 2011), *available at* http://goo.gl/BV2zlN.  In addition, the Columbia River's authorized
    navigation channel depth is 27 feet to the Dalles Dam but the Corps admits it maintains the Columbia

26  navigation channel only to a depth of 17 feet to reflect "the needs of vessels using this reach."  Ex. 3 at

27

28  PLAINTIFFS' MOTION FOR PRELIMINARY
    INJUNCTION (No. 2:14-cv-01800-JLR)   -7-

previously rejected attempts by agencies to interpret their statutory authority narrowly to avoid compliance with NEPA. *See Forelaws on Bd. v. Johnson*, 743 F.2d 677, 683 (9th Cir. 1984) ("NEPA's legislative history reflects Congress's concern that agencies might attempt to avoid any compliance with NEPA by narrowly construing other statutory directives to create a conflict with NEPA.").

As both the plain language and the Corps' actions demonstrate, the Flood Control Act of 1962 cannot be read to restrict the Corps' authority to limit or temporarily affect navigation by operating some portions of the River at less than 14-feet, nor does it provide any justification for the Corps' refusal to consider non-dredging sediment management alternatives that could, alone or in combination, still provide for adequate navigation and achieve the Corps' goal of a 14-foot channel within a reasonable, but not "immediate" time frame.

### 3. The Corps must analyze all reasonable alternatives.

If the Corps were following NEPA rather than trying to push through its site-specific dredging project this winter, it could have issued a programmatic EIS for the PSMP first. It then would have completed a site-specific EIS to take a hard look at the effects of, and the full range of alternatives to, any site-specific proposal to maintain the channel. Indeed, that is precisely what the Corps initially proposed to do. In early 2012, it informed stakeholders of its plan to issue the PSMP Record of Decision ("ROD") by December of 2012, but specifically noted that "signing the ROD will not, however, result in any immediate sediment management actions. The EIS is a programmatic document, and individual sediment management actions will be tiered off the EIS with site-specific environmental review/compliance."[13] Moreover, that is what the Corps intends to do with each of the measures included in its preferred Alternative 7 at some future, unspecified

---

1-4 (U.S. Army Corps of Engineers, Dredged Material Management Plan and Environmental Impact Statement (Final: July 2002)). The Corps cannot rationally claim that Congress's authorization for the Columbia provides discretion regarding channel depth while the authorization for the Snake does not.

[13] Compl. at Ex. 3 (Letter from Lt. Col. David Caldwell, Walla Walla District Commander, to Todd True (Feb. 23, 2012).

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340 | Phone*

time.  *See* Ex. 9 at 1-7 (FEIS) ("Future actions would require project-specific environmental

reviews, including preparation of appropriate NEPA documents tiered off of this programmatic

EIS.").  The importance of future site-specific review for all of the actions in the programmatic EIS

is a point the Corps emphasizes repeatedly.  *See, e.g.*, Ex. 13 at G-86 to G-87 (FEIS App'x. G—

Response to Comment 8691a) (explaining that future site-specific tier-off "analysis would identify

and evaluate any of the measures that could be used to solve that particular problem, including a

cost-effectiveness analysis.  The analysis would also go through the appropriate public and agency

review."); *id.* at G-68 (Response to Comment 8360) (same).

   Likewise, the Corps cannot rely on the consideration of alternatives in the programmatic

EIS to justify immediate, *site-specific* dredging because all of the non-dredging alternative measures

received only *programmatic* consideration.  Ex. 9 at 2-27 to 2-43 (FEIS).  The Corps emphasized

that fact in response to comments:

> This is a programmatic EIS, therefore the <u>environmental effects of the alternatives
> are discussed in broad terms</u>.  A tier-off environmental analysis would be
> performed to <u>evaluate and compare alternative measures or combinations of
> measures</u> to be enacted each time a trigger for action is reached in accordance
> with the PSMP (Appendix A of the EIS).

Ex. 13 at G-156 (FEIS App'x G—Response to Comment 8838) (emphasis added).  The Ninth

Circuit has made clear that a full range of alternatives for a site-specific action must be considered

<u>somewhere</u>.  In *W. Watersheds*, the Court considered two EISs—one programmatic and one site-

specific—concerning management of grazing and other activities in a national monument.

*W. Watersheds*, 719 F.3d. at 1040-1047; 1049-53.  The Court determined that even if the

programmatic "EIS contains sufficient analysis for informed decision-making at the <u>programmatic</u>

level" that analysis "does not reduce or minimize BLM's critical duty to 'fully evaluate[ ]' <u>site-

specific</u> impacts." *Id.* at 1049 (emphasis added); *see also id.* at 1050, 1049 (consideration in

programmatic EIS "does not avoid its critical obligation to consider changes … at the site-specific

PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION (No. 2:14-cv-01800-JLR)   -9-

1   stage.”); *see Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083, 1097 (9th Cir. 2006).[14]   The Corps

2   did not perform the necessary site-specific analysis for its proposed immediate dredging here.[15]

3          By lumping the project-specific action together with the broad-scale analysis in the FEIS,

4   the Corps failed to consider any project-specific level alternatives or impacts, and failed to evaluate

5   whether one or a combination of these measures could meet its needs.  Instead, the *only* alternative

6   the Corps examined for the site-specific "immediate need" action was dredging.  This violates

7   NEPA.

8         **B.**    **The FEIS Fails to Take a Hard Look at Impacts to Pacific Lamprey.**

9          An EIS must rely on accurate and high quality scientific information, 40 C.F.R. § 1500.1(b);

10   40 C.F.R. § 1502.24, and must take a hard look at the affected environment at all the potential

11   adverse impacts of its actions.  General statements about "possible effects" and potential risks do

12   not satisfy the "hard look" requirement without an explanation of why more detailed information

13   was unavailable.  *Blue Mountains Biodiversity Project*, 161 F.3d at 1208.  The Corps failed to

14   satisfy these requirements and take a hard look at the effects of its dredging action on Pacific

---

15

16   [14] The draft Council on Environmental Quality guidance document cited in the Dredging ROD does not
require otherwise.  Ex. 22 at 2 n.2 (Dredging ROD).  As *W. Watersheds* makes clear, the issue is not in
which document the Corps considers a full range of alternatives; the Corps must consider alternatives to
each of its actions <u>somewhere</u>.  The draft guidance specifically notes that a decision to evaluate a site-
specific action in a programmatic EIS does not relax NEPA's requirement to rigorously and objectively
evaluate the impacts and alternatives to both actions.  *See* Draft Guidance, Effective Use of Programmatic
NEPA Reviews, 79 Fed. Reg. 50,578, 50,583 (Aug. 25, 2014) ("It is essential to clearly state the
decisions the agency proposes to make based directly on the …[programmatic]EIS <u>and distinguish the
analysis of impacts and alternatives of the broad programmatic proposals from the project- or site-specific
proposals</u>.") (emphasis added).  Nothing in this guidance excuses the Corps from doing so here.

21   [15] The Corps' eleventh-hour effort to supply the missing consideration in the EIS with several conclusory
statements about alternatives in the ROD does not satisfy NEPA.  *See* Ex. 22 at 4-5 (Dredging ROD)
(asserting, without citation, that the Corps considered whether other measures in combination with
dredging would meet its goals).  The presence of this justification in the ROD proves too much: it merely
highlights that there is no such analysis in the EIS.  *See Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d
1050, 1055, 1057 (D.C. Cir. 1986) ("[s]tating that a factor was considered … is not a substitute for
considering it" and holding that a "conclusory recitation" did not meet statutory requirement that agency
"consider" a specified factor).  This is especially true for NEPA, which requires up-front full disclosure
and consideration to inform both the public and decisonmakers.  *Robertson v. Methow Valley Citizens
Council*, 490 U.S. 332, 349 (1989).  The Corps cannot belatedly manufacture an analysis it failed to
perform in the EIS.

27

28   PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION (No. 2:14-cv-01800-JLR)   -10-

1   lamprey.

2        Pacific lamprey, eel-like anadromous fish that have existed for nearly 450 million years, are

3   one of the foundational species of the Columbia Basin, contributing significantly to the nutrient

4   supply of the basin and the aquatic and terrestrial food web.   Declaration of David Statler ("Statler

5   Decl.") at ¶ 8, 12 (internal citations omitted).   Tragically, these species are in dire status in the Snake

6   and Upper Columbia River Regions.   *Id.* at ¶ 14.   The Pacific lamprey is included as a state sensitive

7   species in Oregon and Washington; is state-listed as an endangered species in Idaho; is a designated

8   tribal trust species; and a "species of special concern" by the U.S. Fish and Wildlife Service.   *Id*

9   *(citing* USFWS 2010).   The Pacific lamprey is also designated as a Forest Service sensitive species

10   in Regions 1 and 4 (which includes north-central Idaho); and is classified as "rangewide/globally

11   imperiled" by the Bureau of Land Management.   *Id.*   The Nez Perce Tribe has initiated Pacific

12   lamprey conservation/restoration as a result of these severe declines in lamprey  abundance.   *Id.* at

13   ¶ 15.

14        The Corps' EIS failed to identify, evaluate or disclose the species' current status in the

15   project area or anywhere in the Snake River Basin.   The EIS also does not identify, evaluate or

16   disclose baseline data for Pacific lamprey.   *Id.* ¶ 36.   While the Tribe repeatedly requested that the

17   Corps conduct monitoring of dredged material before, during, and after dredging activities to gather

18   that data and to guide measures that would protect the species,[16] the Corps declined to commit to

19   additional monitoring for Pacific lamprey as part of its 2014-2015 dredging action.   Ex. 13 at G-140

20   (FEIS App'x G—Response to Comment 8589).   Given the critically imperiled status of Pacific

21   lamprey, this baseline information and monitoring data is necessary to provide a meaningful

22   assessment of project impacts.   The Corps' failure to provide that information in the EIS violates

23

24   [16] The Tribe's request for monitoring is consistent with the U.S. Fish and Wildlife Service's
2010 guidelines related to Pacific lamprey and dredging.   These guidelines include

25   "…conduct[ing] seasonal larval surveys within the entire project footprint ***before***, ***during***, and

26   ***after*** project completion using a systematic sampling design such as that employed by Jolley et
al."  Ex. 17 at 5 (Tribe's FEIS Comments).

27

28   PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION (No. 2:14-cv-01800-JLR)   -11-

1    NEPA. *N. Plains Res. Council Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1083 (9th Cir. 2011)

2    (agency EIS violated NEPA's "hard look" requirement because it did not provide baseline data to

3    assess impacts to species).

4       In comments on the draft and final EISs, the Tribe highlighted studies as well as its own

5    Pacific Lamprey translocation initiative upstream of the Snake-Clearwater confluence indicating

6    that Pacific Lamprey were likely to be present in moderate to high relative densities in the within

7    the project area the Corps proposes to dredge. *See* Compl. at ¶¶ 58-60, 63, 103 (detailing Tribe's

8    comments regarding Pacific lamprey presence the area to be affected by dredging); *see also id.* at

9    ¶32 (Tribe repeatedly requested that the Corps survey and monitor for lamprey before, during, and

10   after the dredging activity). The Corps acknowledged that the lamprey may be present in the area to

11   be dredged in 2014-2015, and "may be impacted during the proposed" dredging *see* Ex. 13 at G-140

12   (FEIS App'x G Response to Comment 8589). The Corps also acknowledged that lamprey may be

13   impacted by the disposal of dredged material at its chosen in-water disposal site. Ex. 9 (FEIS) at 4-

14   11.

15      Despite the Corps' general acknowledgement of potential impacts to Pacific lamprey, and its

16   imperiled status in the Snake and Columbia Rivers, the Corps did not perform any detailed or

17   meaningful evaluation of the severity or extent of the impacts of its actions on Pacific Lamprey..

18   These impacts include, but are not limited to, mortality and harm to individual lamprey present in

19   dredge or disposal areas, and modification of habitat likely used by lamprey. Instead, the Corps

20   arbitrarily dismissed the potential for any significant impacts with unsupported assertions that

21   juvenile lamprey may swim away from the dredge, or may survive being entrained in dredged

22   materials and dumped in another location several hours later. Ex. 13 (FEIS App'x G) at G-140

23   (Response to Comment 8589). The Corps also concluded that "[t]he proposed actions would have

24   no long-term, adverse impacts on important treaty resources." Ex. 9 (FEIS) at 5-8, 5-9. These

25   general dismissals do not satisfy the duty to take a hard look. *See, e.g., Found. on Econ. Trends v.*

26

27

28   PLAINTIFFS' MOTION FOR PRELIMINARY
     INJUNCTION (No. 2:14-cv-01800-JLR)   -12-

*Heckler*, 756 F.2d 143, 154 (D.C. Cir. 1985) ("Simple, conclusory statements of 'no impact' are not enough to fulfill an agency's duty under NEPA").

C.    The EIS Fails to Take a Hard Look at the Impacts of Climate Change.

The EIS arbitrarily dismisses high quality information and fails to take a hard look at the reasonably foreseeable future conditions in the lower Snake River that will be created by climate change. As the EIS itself reveals, increases in forest fires and resulting increases in sediment are expected as temperatures in the Snake River watershed continue to rise. *See, e.g.*, Ex. 9 at 1-19 (FEIS) (noting that fires are responsible for the largest amounts of sediment in this basin). Over the past 40 years, the frequency and severity of these fires has increased, *see id.* at 1-23 to 1-24, and are expected to increase as the climate continues to warm, *id.* at 1-28. The EIS even cites a recent study looking at the likely impacts of climate change on sediment loads in central Idaho, which found that

> sediment yields will likely increase in response to climate change. Within central Idaho recent climate-driven increases in wildfire burn severity and extent have the potential to produce sediment yields roughly 10-times greater than those observed during the 20th century. . . . [T]hese elevated sediment yields are probably outside of the range of expectations for downstream reservoirs, which may have consequences for reservoir management and life expectancy.

Ex. 11 at D-10 (FEIS App'x D) (peer-reviewed study by U.S. Forest Service).

The Corps, despite the strength and relevance of these projections, refused to incorporate these likely future conditions into its consideration of environmental impacts. According to the Corps, "events such as climate change and forest fires should likely not significantly increase the basin's sediment yield since it appears that present basin climactic conditions might already provide the maximum long-term sediment yield conditions." Ex. 13 at G-78 to G-79 (FEIS App'x G—Response to Comment 8461); *see also* Ex. 9 at 4-96 (FEIS) (same). The Corps bases this astonishing contention—that sediment yield will not increase—on its misinterpretation of a single chart in the study included in Appendix D of the FEIS. *See* Ex. 13 at G-92 to G-93 (FEIS App'x G—Response to Comment 8705). That chart, however, demonstrates only that sediment discharge is based on many factors, including rainfall and resisting vegetation force. Ex. 11 at D-3

PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION (No. 2:14-cv-01800-JLR)   -13-

(fig. 1) (FEIS App'x D).  The Corps' own study on sediment yield concluded that "[w]ith the warming trend, proportionally more precipitation will occur as rainfall upon a land surface that is less protected by vegetative cover and snowpack resulting in increased sediment yield." Ex. 12 Pt. 3 at F-175 (FEIS App'x F).  The Corps arbitrarily ignored its own evidence and failed to consider the environmental and economic consequences of these substantial and reasonably foreseeable sediment increases.[17]  This is not the "reasoned evaluation of the relevant factors" that NEPA's hard look requires.  *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1332 (9th Cir. 1992).

II.     PLAINTIFFS ARE LIKELY TO PREVAIL ON THEIR CLAIM THAT THE CORPS VIOLATED NEPA BY RELYING UPON A FUNDAMENTALLY MISLEADING ECONOMIC ANALYSIS.

The primary assumption underlying the Corps' decisions to proceed with either the "immediate need" dredging or the long-term PSMP is that the navigation channel is economically worth maintaining.  *See* Ex. 9 at 3-55 (FEIS).  That assumption, however, goes entirely unexamined in the FEIS or RODs.  It is based on only a terse discussion of economic factors that is inaccurate, incomplete, and misleading.

When public comments highlighted this significant omission, the Corps responded by adding a single—and oversimplified—calculation to the FEIS.  *See* Ex. 9 at 3-55 (FEIS).  This belated discussion of the economic impacts ignores entirely the errors and omissions specified in the detailed public comments, and it falls far short of what NEPA and the agency's own regulations require—a robust discussion based on all of the factors relevant to determining whether the benefits of this major federal action justify its many economic and environmental costs.  The Corps' failure to consider or disclose relevant information about the costs and benefits of channel maintenance is

---

[17] The Corps also did not consider the impacts of its decision to continue maintaining a navigation system that perpetuates harm to salmon, steelhead, and lamprey.  Instead of the robust disclosure and analysis required by law, the EIS offers a cursory declaration that any changes in streamflow from climate change would generally "have implications for the aquatic ecosystem within the LSRP."  Ex. 9 at 4-98 (FEIS).  *See also id.* at 4-83 (effects from continued channel maintenance and FCRPS operation "would generally continue the effects on threatened and endangered fish that have resulted from past and present actions.").  These are precisely the kinds of conclusory statements that courts have rejected as inadequate to satisfy NEPA.  *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998).

PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION (No. 2:14-cv-01800-JLR)   -14-

particularly egregious because consideration of all of these factors would likely undermine and reverse the Corps' unsupported assumption that the benefits of channel maintenance exceed the costs. *See, e.g.*, Ex. 16 Attach. 1 at 2 (NRE FEIS Report) ("Information readily available today indicates that the costs of continued maintenance of the navigation channel far outweigh the benefits.").

A.    The Corps is Required to Analyze the Full Costs and Benefits of Its Proposals.

NEPA's requirement to take a "hard look" at the consequences of an action demands that an agency engage in a "reasoned evaluation of the relevant factors." *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1332 (9th Cir. 1992).  An agency's failure to include and analyze information that is important, significant, or essential renders an EIS inadequate.  40 C.F.R. § 1500.1.  These fundamental NEPA principles apply to both economic and environmental analyses in an EIS. *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 446 (4th Cir. 1996); 40 C.F.R. §§ 1502.24, 1508.8 ("effects" an EIS must evaluate include economic impacts).

In order to ensure that the economic analysis is sound—and that an EIS fulfills its purpose of ensuring that "relevant information regarding proposed projects is available to members of the public so that they may play a role in the decisionmaking process"—an agency must consider all relevant costs and not overestimate benefits.  *See Hughes River*, 81 F.3d at 446.  "Inaccurate economic information may defeat the purpose of an EIS by 'impairing the agency's consideration of the adverse environmental effects' and by 'skewing the public's evaluation of a proposed agency action.'"  *Natural Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 811-812 (9th Cir. 2005) (citation omitted) (invalidating EIS because its economic analysis for timber demand was misleading, incomplete, and "subverted NEPA's purpose of providing decision makers and the public with an accurate assessment of the information relevant to evaluate" the action).

Despite having at least nine years to do so, the Corps did not prepare a full assessment of the costs and benefits of either its "immediate need" dredging action or its long-term sediment

management under the PSMP.  The Corps defends its refusal to complete the kind of analysis required by NEPA with the remarkable assertion that it need not do so because the PSMP and its "immediate need" dredging action are not classified as a "Dredged Material Management Plan" under its internal guidance.  Ex. 23 at Response to FEIS Comment 20422; Ex. 13 at G-67 to G-68 (FEIS App'x G—Response to Comment 8360).  The Court should not be distracted by this semantic claim that cannot modify the requirements of NEPA in any event.[18]  The title of a document does not control whether or to what extent the Corps is required to address economic effects in its NEPA analysis.  *See Conservation Law Found., v. Pritzker*, No. CV 13-821 (JEB), 2014 WL 1338596, at *7 (D.D.C. Apr. 4, 2014) (rejecting agency's attempt to escape legal requirements by inventing new terminology for its action: "[a]ccording to the Service, the statutory limits on its authority apply only when it says the magic words," rendering the "[e]xpress limits set by Congress … mere verbiage, easily circumvented through clever use of a marine thesaurus.").

B.  The Corps' Discussion of Economics is Incomplete and Misleading.

While the Corps asserted it had no obligation to provide an economic analysis, it also seeks to defend the short and flawed arithmetic it does present.  In the FEIS, the Corps offers a single, oversimplified calculation to rationalize its continued channel maintenance.  This calculation starts with extrapolating a 2002 estimate to conclude that shipping by barge results in a cost savings of $8.45/ton over truck or rail transportation and then multiplies that figure by the "about 3 million tons" shipped annually on the entire lower Snake River to conclude that the current economic benefit of maintaining the channel is approximately $25 million dollars/year.  Ex. 9 at 3-55 (FEIS). The Corps estimates that channel maintenance will cost an average of between $1-5 million dollars each year.  *Id*.  Based solely on this simple calculation and comparison, the Corps concludes that "ongoing channel maintenance is warranted."  *Id*.  *See also* Ex. 22 at 7 (Dredging ROD); Ex. 21 at 8

---

[18] Moreover, the agency's refusal to perform this analysis also departs from its previous approach to maintaining this same navigation channel.  *See* Ex. 4 (2002 DMMP EIS App'x. C) (containing 71-page economic analysis).

1    (PSMP ROD).

2          The Corps' truncated consideration fails to capture and address available and relevant

3    information about the costs and benefits of continued channel maintenance that fatally undermines

4    its conclusion that continued operation of the channel is economically justified.  As highlighted in

5    comments on both the draft and final EIS, use of the lower Snake River navigation channel has

6    declined significantly over the last decade.  Indeed, the available information demonstrates that the

7    costs of channel maintenance already exceed any benefits provided by reduced costs to shippers

8    who use the current navigation channel, largely due to the ongoing declines in shipping volumes.

9    Ex. 16 Attach. 1 at 2 (NRE FEIS Report).  That available evidence demonstrates that the current

10   decline in shipping volume—and consequently any benefits expected from channel maintenance—

11   is likely to continue in both the short and long-term.  *See id.* at 19 ("Further reductions in shipments

12   through the Lower Granite locks seem especially likely.").  The Corps ignored this evidence in its

13   single-page economic discussion.  *See* Ex. 9 at 3-55 (FEIS).

14          The Corps' assumption of existing and continued economic benefits suffers from at least

15   two fatal flaws.  First, the Corps' calculation of alleged shipping benefits of $8.45 per ton is

16   extrapolated from its 2002 Lower Snake River Juvenile Salmon Migration Feasibility Report.  Ex. 9

17   at 3-55 (FEIS).[19]  The Corps knew that the methodology it used was flawed and of extremely

18   limited utility even when it was first produced, acknowledging that some costs were overstated and

19   warning that further analysis and corrections would be needed before relying on this analysis in the

20   future.  *See, e.g.*, Ex. 16 Attach. 1 at 15 (NRE FEIS Report) (highlighting areas where Corps

21   expressly recognized limits of its analysis, overstatements of benefits, and warnings about future

22   reliance; Ex. 5 at I3-86 (2002 EIS App'x I).  Similarly, the Corps' 2002 analysis ignored and

23

24   _____
     [19] In its RODs, the Corps mentions an entirely new figure.  Ex. 21 at 8 (NMFS PSMP ROD); Ex. 22 at 7
25   (Dredging ROD) (noting that the "Planning Center of Expertise for Inland Navigation" found navigation
     costs savings of $10.90 versus shipping by rail).  The Corps provides no citation for this figure, which did
26   not appear in the EIS, and it does not apply or discuss it further.  Because it played no role in the EIS, the
     Court should ignore it.

27

28   PLAINTIFFS' MOTION FOR PRELIMINARY          *Earthjustice*
     INJUNCTION (No. 2:14-cv-01800-JLR)   -17-    *705 Second Ave., Suite 203*
                                                   *Seattle, WA  98104-1711*
                                                   *(206) 343-7340 | Phone*

1   underestimated the number of grain-loading facilities for loading grain onto rail.  Ex. 16 Attach. 1 at

2   15 (NRE FEIS Report).  These and other errors caused the Corps to overestimate the costs of

3   shipping by rail and truck, thereby producing an inflated perceived benefit from barging relative to

4   other shipping modes.  *Id.* at 15-16.   The Corps failed to address any of these acknowledged

5   shortfalls in its 2002 analysis before carrying them forward in the FEIS.[20]

6          The Corps' only defense of its exclusive reliance on this 12-year-old, flawed analysis is to

7   emphasize that it represented the "best available" analysis at the time it was prepared.  *See* Ex. 21 at

8   8-9 & n.5 (PSMP ROD); Ex. 22 at 7 & n.6 (Dredging ROD).  While that characterization is

9   questionable on its face, it is utterly irrelevant to the Corps' decision to rely on it now.  NEPA

10  requires the Corps to use accurate, up-to-date, and high quality information and to react when

11  significant new information or events change its previous assumptions.  *Lands Council v. Powell*,

12  395 F.3d 1019, 1031 (9th Cir. 2004).  The Corps cannot tier to or rely on a stale analysis.  *N. Plains*

13  *Res. Council, Inc. v. Surface Transp. Bd.,* 668 F.3d at 1086-87 (concluding that the Surface

14  Transportation Board did not take a "hard look" at environmental impacts when it relied on ten-

15  year-old aerial survey); *see also W. Watersheds Project v. Abbey,* 719 F.3d at 1052.  The Corps

16  cannot pretend that it is still 2002 when making a decision in 2014.[21]

17         Second, the Corps applies its outdated projection of transportation savings to the total

18  tonnage shipped on the <u>entire</u> lower Snake River corridor, rather than to the limited, uppermost

19  portion of Lower Granite Reservoir near the Snake and Clearwater confluence area where it

20  proposes to do almost all of the sediment management actions in both the short- and the long-term.

21
22  [20] There are numerous other flaws in the 2002 report, in addition to those discussed above.  *See* Ex. 16 Attach. 1 at 4-5, 13-17 (NRE FEIS Report).

23  [21] For example, the Corps ignored that shipping volumes have declined steeply in the past, and the
24  available information indicates that they will continue to decline in the future.  Ex. 16 Attach. 1 at 16-17, 19 (NRE FEIS Report).  Likewise, shipments through Lower Granite dam from all ports in the Lower
25  Granite pool have declined from 2.3 million tons in 1994 to 1.5 million tons in 2012.  *Id.* at 19 (citing FEIS at Table 3-14).  Most of these declines occurred before the recession and have continued since.
26  *Id.* at 19.  *See also id.* at 20, 25 (discussing Corps' failure to consider impacts of recent unit train grain-loading facilities on barge shipping).

27
28  PLAINTIFFS' MOTION FOR PRELIMINARY
    INJUNCTION (No. 2:14-cv-01800-JLR)   -18-

*Earthjustice*
705 Second Ave., Suite 203
Seattle, WA  98104-1711
(206) 343-7340 / Phone

That is, nearly all of the costs of dredging are for maintaining the part of the river farthest inland, reached by the fewest vessels, resulting in a marked overstatement of benefits from this dredging. Ex. 15 at L-3 (FEIS App'x L) (96% or 458,472 of the 479,616 cy to be dredged occurs here).  The only freight transportation facilities that benefit from dredging in this area are the Port of Lewiston and the adjacent Lewis and Clark Terminal.  These facilities combined have recently shipped on average about 600,000-800,000 tons/year. Ex. 16 Attach. 1 at 12 (NRE FEIS Report).  Thus, even using the Corps' inflated estimate of $8.45/ton benefit from barging, maintaining the 14-foot channel for these facilities results in only $5-6.7 million in annual benefits.  *Id.*  The Corps itself estimates that it will cost from $1-5 million/year to maintain the channel (a figure that is itself low because it ignores other integral costs of maintaining the navigation system—*see infra* at § I.C.).[22] The Corps' simplistic comparison of the savings based on the total amount of cargo on the entire Snake River to the costs of dredging omits these vital distinctions and ends up producing an inflated and distorted picture of the purported benefits of its proposals.  *See Johnston v. Davis*, 698 F.2d 1088, 1094 (10th Cir. 1983) (EIS invalid for overstating benefits); *Hughes River Watershed Council*, 81 F.3d at 447.

Finally, in addition to overstating the benefits of maintaining a navigation channel, the Corps has ignored or dismissed information showing that the costs of continued channel maintenance over the indefinite lifespan of the PSMP are far greater, resulting in an unaccountably optimistic and one-sided estimate of benefits from continued maintenance of the waterway.  For example, the Corps has not included and analyzed in this EIS the costs associated with actions

---

[22] Furthermore, the Corps' calculation of benefits is based on the false premise that navigation is an all-or-nothing proposition, i.e., that all navigation throughout the river will cease if the channel is not maintained at 14 feet.  But the record demonstrates that substantial navigation—e.g., through light-loaded barges or seasonal use—would continue even in the absence of a 14-foot deep channel.  Indeed, while the Corps states that sediment conditions in this part of the channel are virtually unchanged since 2012, Ex. 15 at L-12 (FEIS App'x L), navigation to Lewiston continues under those conditions.  The record is devoid of any evidence that the tonnage moved on the river below that point is in any way dependent on the status of the uppermost port.  Any such assertion defies common sense: drivers will not stop using an entire 500-mile interstate just because the last exit may be under construction or unusable at some times of the year.

PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION (No. 2:14-cv-01800-JLR)   -19-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340 | Phone*

(primarily dredging) it has proposed to address flow conveyance through Lower Granite

Reservoir.[23]  Dredging to maintain flow conveyance "involves removal of substantially greater

quantities of sediments" than dredging for navigation.  Ex. 14 at K-159 (FEIS App'x K).  The Corps

predicts in the PSMP that it will need to remove over 750,000-1,000,000 cy annually to keep up

with future sediment deposition.  *Id.* at K-160; Ex. 19 at 7-8 (NMFS PSMP BiOp).  Although the

Corps includes flow conveyance dredging as a purpose covered by the PSMP and outlines triggers

for action, *see* Ex. 10 at A-22, A-27 to A-28 (FEIS App'x A), the Corps does not disclose the cost

of future conveyance dredging in its abridged economic analysis for the PSMP.  These and other

system maintenance costs over the life of the PSMP are inseparable; without them, there can be no

navigation system.  Dredging for flow conveyance and other costs dwarf those associated with

navigation channel maintenance.  Ex. 16 Attach. 1 at 17 (NRE FEIS Report) (annual flow

conveyance costs alone adds $9 million a year).

     Moreover, the FEIS calculates the annualized costs of channel maintenance ($1-5 million)

based on the assumption that sediment deposition will not increase in the future.  As discussed

*supra* at Argument Section I.C, however, the Corps' own scientists determined that more frequent

forest fires and changes in precipitation timing and quality (i.e., more falling as rain rather than

snow) from climate change is reasonably certain to result in far more sediment reaching Lower

Granite reservoir over the life of the PSMP, increasing the costs of addressing the accumulated

sediment.  Ex. 11 at D-10 (FEIS App'x D); Ex. 12 Pt. 3 at 175 (FEIS App'x F).

     Regardless of the substantive outcome of the Corps' analyses, NEPA requires the Corps to

at least disclose these economic factors and accurately analyze their significance for decision

makers and the public.  *See Hughes River*, 81 F.3d at 447.  The Court should reject the Corps'

attempt to evade its responsibility to take a hard look at economic factors before it proceeds with

site-specific dredging and an indefinite longer-term plan demanding significant economic resources

---

[23] "Flow conveyance" refers to the capacity necessary for Lower Granite reservoir to pass high flows and is associated with reducing the risk of flooding from high water events.

PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION (No. 2:14-cv-01800-JLR)   -20-

*Earthjustice*
705 Second Ave., Suite 203
Seattle, WA  98104-1711
(206) 343-7340 | Phone

1   and carrying significant environmental impacts.

2   III.     PLAINTIFFS ARE LIKELY TO PREVAIL ON THEIR CLAIM THAT THE
          DREDGING ACTION VIOLATES THE CLEAN WATER ACT.

3

4          The Corps has violated the CWA by failing to complete the necessary public interest

5   analysis before deciding to proceed with its "immediate need" dredging this winter.  The CWA

6   regulates or prohibits discharge of dredged or fill material into navigable waters of the United States

7   without a permit from the Corps.  33 U.S.C. § 1344.  Even though it does not issue permits to itself,

8   the Corps must "apply[] all applicable substantive legal requirements, including public notice,

9   opportunity for public hearing, and application of the 404(b)(1) guidelines" when it conducts an

10  otherwise regulated activity.  33 C.F.R. § 336.1(a).

11         These substantive requirements include a "public interest review" that requires "the

12  consideration of the full public interest by balancing the favorable impacts against the detrimental

13  impacts," of the proposal, 33 C.F.R. § 320.1(a)(1), and includes "an evaluation of the probable

14  impacts, including cumulative impacts, of the proposed activity and its intended use on the public

15  interest," 33 C.F.R. § 320.4(a)(1).  The Corps must consider "conservation, economics, aesthetics,

16  general environmental concerns, wetlands . . . fish and wildlife values . . . [and] water quality . . . ."

17  33 C.F.R. § 320.4(a)(1).  The Corps must also weigh "[t]he relative extent of the public and private

18  need for the proposed structure or work."  33 C.F.R. § 320.4(a)(2)(i).

19         Here, although it had earlier promised to do so,[24] the Corps has simply declined to undertake

20  a public interest review, because it believes that "[t]he public interest associated with a federal Civil

21  Works project is established when authorized by Congress and confirmed through O&M funding/

22  appropriations."  Ex. 13 at G-173 (FEIS App'x G—Response to Comment 9319).  As the lack of

23  citation for this novel position indicates, there is no such blanket exception to the CWA or its

24

25  [24] "The decision to perform the dredging and disposal as proposed will be based on an evaluation of the
    probable impact including cumulative impacts of the proposed activity on the public interest."  Ex. 6

26  (Corps Public Notice No. CENWW-PM-PD-EC 13-01).

27

28  PLAINTIFFS' MOTION FOR PRELIMINARY            *Earthjustice*
    INJUNCTION (No. 2:14-cv-01800-JLR)   -21-    *705 Second Ave., Suite 203*
                                                 *Seattle, WA  98104-1711*
                                                 *(206) 343-7340 | Phone*

1    implementing regulations.[25]

2    IV.   THE BALANCE OF HARM AND THE PUBLIC INTEREST REQUIRE AN
3          INJUNCTION PREVENTING DREDGING AND IN-RIVER DISPOSAL PENDING
          COMPLIANCE WITH NEPA AND THE CWA.

4          A.    Plaintiffs Will Suffer Irreparable Harm in the Absence of an Injunction.

5          With respect to the second factor of the injunction test, a showing of irreparable harm, it is

6    well-established that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by

7    money damages and is often permanent or at least of long duration, i.e., irreparable." *Amoco Prod.*

8    *Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987).  The 2014-2015 dredging project will likely result

9    in irreparable harm to Pacific lamprey.  Pacific lamprey, or *Heesu* in the Nez Perce language, are a

10   culturally significant, treaty-reserved resource that have been integral to the spiritual, physical, and

11   economic health of the Tribe since time immemorial.  Declaration of Josiah Pinkham ("Pinkham

12   Decl.") ¶ 7.  The Nez Perce Tribe's relationship with Pacific lamprey is thousands of generations

13   old and enriches Tribal members' lives in many ways by aiding mental health, physical health and

14   enhancing social interaction. Id. at ¶ 5.  Pacific lamprey figure prominently in Nez Perce oral

15   histories, and are an important source of protein in the Nez Perce diet.  *Id.*  Lamprey skin was also

16   used for moccasins and the oil was a medicine for hair as well as the skin and body.  *Id.*  Pacific

17   lamprey in the Snake River have severely declined in the last three decades.  Statler Decl. at ¶ 13.

18   Counts of Pacific lamprey at Lower Granite Dam exemplify the dire status of the species in the

19   Snake Basin, declining from more than 1,000 adults in the late 1990s to 12 in 2009.  *Id.* ¶ 14.

20         The Corps has failed to acknowledge and disclose the present critically imperiled status of

21   Pacific Lamprey within the Snake River Basin in its analysis.  *See supra*, § I.B.  Moreover, the

22   Corps did not consider or disclose baseline status conditions for Pacific lamprey necessary to assess

23   _____

24   [25] Nor can the EIS stand in for the public interest review, particularly given the Corps failure to consider
     multiple factors relevant to the public interest review.  *See supra* Argument Section I.A (failure to take a
25   hard look at the environmental impacts of the action); *supra* Argument Section I.B (failure to analyze
     economic effects), *supra* Argument Section II.  *But see* 33 C.F.R. § 320.4(a)(1) (requiring consideration
26   of each of these factors).  A faulty NEPA economic analysis, as here, infects the public interest analysis
     and renders it inadequate.  *See Van Abbema v. Fornell*, 807 F.2d 633, 643 (7th Cir. 1986).

27

28   PLAINTIFFS' MOTION FOR PRELIMINARY
     INJUNCTION (No. 2:14-cv-01800-JLR)   -22-

the impacts of its proposed actions.  *Id.*  As detailed in Mr. Statler's declaration, the Clearwater-Snake confluence area that the Corps seeks to dredge immediately this winter has a likelihood of containing moderate to high localized densities of Pacific Lamprey.  Statler Decl. at ¶ 35.  *See also id.* at ¶ 26-27 (summarizing U.S. Geological Survey data collected from 2009-2013 demonstrating presence of Pacific Lamprey at multiple sites in the mainstem Snake River within Lower Granite and Little Goose Reservoirs from River Mile 76.0 to River Mile 134.3, close to the dredging project); *id.* at ¶ 28 (summarizing 2012 study finding Columbia River reservoirs and depositional areas may be used at higher relative rates by larval lamprey, and explaining that Snake River reservoirs have similar habitat conditions that would support Pacific lamprey); *id.* at ¶ 29 (describing the Tribe's translocation project releasing lamprey in areas upstream of the dredging project).  As Mr. Statler explains, given the wide distribution of juvenile lamprey incidentally captured in Lower Granite and Little Goose reservoirs, the propensity for juvenile lamprey to inhabit depositional zones near the mouths of streams, and proposed activities located within the rearing and migration corridor of lamprey produced upstream, the occurrence of Pacific lamprey at moderate to high relative densities within the footprint of the proposed channel maintenance project is likely.  *Id.* at ¶ 35.  Mr. Statler concludes that the dredging project has a high likelihood to harm or kill individual lamprey through dislodgement and downstream movement of juvenile lamprey caused by removal of dredge material or placement of dredge spoils in areas where juvenile lamprey are present; and through imbedding or smothering in dredge material through removal or placement.  *Id.* at ¶ 37.  Mr. Statler also concludes that the Corps has substantially understated the likelihood and magnitude of potential harm to this critically imperiled species as a result of project activities.  *Id. See also id.* at ¶ 30 (concluding that Corps' assumption that lamprey will avoid dredge by swimming away is unsupported and "highly speculative").

The National Marine Fisheries Service has similarly concluded that the Corps' dredging action will cause harm and "take" of ESA-listed salmon and steelhead species through impacts to

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340 | Phone*

1    water quality and exposure to high levels of turbidity and potential toxic contaminants in some of

2    the sediments.  *See, e.g.,* Ex. 19 at 41-47, 71 (NMFS Dredging BiOp).  While the Service provided

3    an incidental take statement that limits this harm under Section 9 of the ESA, 16 U.S.C. § 1538; *see*

4    Ex. 19 at 70-73 (NMFS Dredging BiOp), take of these species is nonetheless irreparable.[26]  Harm to

5    either of these imperiled species and their habitats is, by definition, "irreparable."  *See League of*

6    *Wilderness Defenders v. Connaughton,* 752 F.3d 755, 764 (9th Cir. 2014) ("The logging of mature

7    trees, if indeed incorrect in law, cannot be remedied easily if at all.  Neither the planting of new

8    seedlings nor the paying of money damages can normally remedy such damage.  The harm here, as

9    with many instances of this kind of harm, is irreparable for the purposes of the preliminary

10   injunction analysis.").

11           Further, "[i]n the NEPA context, irreparable injury flows from the failure to evaluate the

12   environmental impact of a major federal action."  *Sierra Club v. Bosworth*, 510 F.3d 1016, 1034

13   (9th Cir. 2007) (quoting *High Sierra Hikers Ass'n*, 390 F.3d at 642); *see also Winter*, 555 U.S. at 23

14   ("Part of the harm NEPA attempts to prevent in requiring an EIS is that, without one, there may be

15   little if any information about prospective environmental harms and potential mitigating

16   measures.").  As detailed above in discussing the merits, the Corps has arbitrarily dismissed the

17   extent and severity of these impacts in its EIS, and failed to evaluate alternatives that would

18   minimize or avoid those impacts.  In these circumstances, the entry of an injunction is necessary to

19   preserve the status quo and prevent irreparable harm to the Plaintiffs and the environment until the

20   case is resolved on its merits and the Corps complies with the law.

---

[26] The fact that NMFS has permitted the take does not equate to a lack of irreparable harm.  "The question of irreparable injury does not focus on the significance of the injury, but rather whether the injury, irrespective of its gravity, is *irreparable*" i.e., whether it can be remedied by damages.  *Sierra Club v. Martin*, 71 F. Supp. 2d 1268, 1327 (N.D. Ga. 1999).  *See also Seattle Audubon Soc'y v. Sutherland*, No. 06-1608 MJP, 2007 WL 2220256, at *16 (W.D. Wash. Aug. 1, 2007) (holding, in an Endangered Species Act challenge "the loss of a single listed species is an irreparable harm.").

PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION (No. 2:14-cv-01800-JLR)   -24-

B.   <u>The Balancing of the Equities and the Public Interest Weigh in Favor of an Injunction to Preserve the Status Quo.</u>

The balance tips sharply in favor of Plaintiffs because there is minimal harm from a further delay and because the Corps itself has driven the many-years-long delay and the last-minute attempt to rush through inadequate NEPA and CWA analyses.  In assessing the balance of hardship, the Court must weigh "the competing claims of injury . . . and the effect on each party of the granting or withholding of the requested relief."  *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995) (internal quotation marks omitted).  In assessing the public interest, the courts have recognized that ensuring protection of the environment serves an important public purpose.  *See The Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008) (en banc) ("[P]reserving environmental resources is certainly in the public's interest."); *Earth Island Inst. v. U.S. Forest Serv*., 442 F.3d 1147, 1177 (9th Cir. 2006) *overruled in part on other grounds,* ("The preservation of our environment, as required by NEPA . . . is clearly in the public interest.").  The courts also have recognized a public interest of the "highest order" in ensuring that government agencies comply with the law.  *Seattle Audubon Soc'y v. Evans*, 771 F. Supp. 1081, 1096 (W.D. Wash. 1991).  Where a defendant has failed to comply with environmental laws, including NEPA and the CWA, the plaintiff rarely has any other adequate remedy except an injunction.  These important public interests in protecting the environment, imperiled species, and in compliance with the law outweigh any limited navigation concerns that the Corps may present.

In contrast to the harm to imperiled species, any harm suffered by the Corps or navigation interests will be minimal to non-existent.  Dredging in the lower Granite pool has not occurred since 2005-2006.  Navigation to Lewiston has proceeded during that time, and it is unlikely that a further delay while the Court resolves this case on its merits will have any meaningful impact on navigation.  Indeed, the number of acres with problem sediment accumulation have actually slightly decreased since 2012.  Ex. 15 at L-12 (FEIS App'x L).  Moreover, even if the worst conditions the Corps describes in App'x L come to pass and portions of the navigation channel near Lewiston

PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION (No. 2:14-cv-01800-JLR)   -25-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340 | Phone*

remain too shallow to accommodate full-draft barges for several months a year,[27] shippers may need to adjust, or light-load barges during those times of the year, but this would not halt  navigation, nor would such a temporary adjustment cause an economic collapse for the shippers or for the regional economy.  *See League of Wilderness Defenders*, 752 F.3d at 765 (concluding that the balance of equities tips toward "plaintiffs, because the harms they face are permanent, while the intervenors face temporary delay").  The record is devoid of any suggestion that dredging this winter is otherwise necessary to address any urgent condition.  To the contrary, any urgency for the Corps' action results from the agency's own, self-inflicted years-long delay and failure to properly complete the NEPA process and comply with the CWA.

CONCLUSION

For the foregoing reasons, Plaintiffs have demonstrated a high likelihood of success on the merits of their claims that the Corps has violated NEPA and the CWA, that irreparable harm is likely to result in the absence of an injunction, and the balance of harms and the public interest tip sharply in their favor.  Plaintiffs respectfully request that the Court grant this motion for a preliminary injunction and enjoin the Corps from proceeding with its proposed 2014-2015 dredging project pending resolution of the merits.  A proposed order is submitted herewith.

---

[27] As the Corps admits, it may raise reservoir levels during at least eight months of the year (September-early April), as it is only during the salmon migration season that the reservoir levels are constrained to protect fish.  Any minimal economic impact from seasonal light-loading during the salmon migration season is inadequate to outweigh Plaintiffs' substantial interests in protecting imperiled lamprey and salmonids and ensuring the integrity of the legal process.

PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION (No. 2:14-cv-01800-JLR)   -26-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340 | Phone*

1    Respectfully submitted this 26th day of November, 2014.

2

3                                    s/  Stephen D. Mashuda
4                                    STEPHEN D. MASHUDA (WSB #36968)
                                     MATTHEW R. BACA (WSB #45676)
5                                    Earthjustice
                                     705 Second Avenue, Suite 203
6                                    Seattle, WA  98104-1711
                                     (206) 343-7340 | Phone
7                                    (206) 343-1526 | Fax
                                     smashuda@earthjustice.org
8                                    mbaca@earthjustice.org

9                                    *Attorneys for Plaintiffs Idaho Rivers United;*
10                                   *Washington Wildlife Federation; Pacific Coast*
                                     *Federation of Fishermen's Associations; Institute*
11                                   *for Fisheries Resources; Sierra Club; and*
                                     *Friends of the Clearwater*
12

13                                   s/  Stephen D. Mashuda, for Michael Lopez
14                                   DAVID J. CUMMINGS (WSB #33551)
                                     MICHAEL A. LOPEZ
15                                   (*Signature with permission via e-mail)
                                     Nez Perce Tribe
16                                   Office of Legal Counsel
                                     P.O. Box 305
17                                   Lapwai, ID  83540-0305
                                     (208) 843-7355 | Phone
18                                   (208) 843-7377 | Fax
                                     djc@nezperce.org
19                                   mikel@nezperce.org

20                                   *Attorneys for Plaintiff Nez Perce Tribe*

21

22

23

24

25

26

27

28    PLAINTIFFS' MOTION FOR PRELIMINARY                    *Earthjustice*
      INJUNCTION (No. 2:14-cv-01800-JLR)   -27-             *705 Second Ave., Suite 203*
                                                            *Seattle, WA  98104-1711*
                                                            *(206) 343-7340 | Phone*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>s/  Stephen D. Mashuda, for Rob Roy Smith</u>
ROB ROY SMITH (WSB #33798)
(*Signature with permission via e-mail)
Kilpatrick Townsend
1420 Fifth Avenue, Suite 4400
Seattle, WA  98101
(206) 467-9600 | Phone
(206) 623-6793 | Fax
rrsmith@kilpatricktownsend.com

*Local Counsel for the Nez Perce Tribe*

PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION (No. 2:14-cv-01800-JLR)   -28-

CERTIFICATE OF SERVICE

I am a citizen of the United States and a resident of the State of Washington.  I am over 18 years of age and not a party to this action.  My business address is 705 Second Avenue, Suite 203, Seattle, Washington 98104.

I HEREBY CERTIFY that on November 26, 2014, I filed the following documents electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

1.      Plaintiffs' Motion for Preliminary Injunction;
2.      Declaration of Josiah Pinkham;
3.      Declaration of David Statler;
4.      Declaration of Stephen D. Mashuda in Support of Plaintiffs' Motion for Preliminary Injunction, including Exhibits 1-23; and
5.      [Proposed] Order Granting Plaintiffs' Motion for Preliminary Injunction.

Kent E. Hanson
U.S. Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
P.O. Box 7611
Washington, D.C.  20044-7611
(206) 220-4198 | Phone
(202) 514-8865 | Fax
kent.hanson@usdoj.gov
*Attorney for Federal Defendant*

☐ via facsimile
☐ via overnight mail
☐ via first-class U.S. mail
☐ via hand delivery
☐ via Court's CM/ECF system
☒ via email

Kristofor R. Swanson
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, D.C.  20044-7611
(202) 305-0248 | Phone
(202) 305-0506 | Fax
kristofor.swanson@usdoj.gov
*Attorney for Federal Defendant*

☐ via facsimile
☐ via overnight mail
☐ via first-class U.S. mail
☐ via hand delivery
☐ via Court's CM/ECF system
☒ via email

AND I FURTHER CERTIFY that the above attorneys for Federal Defendant have

CERTIFICATE OF SERVICE
(Case No. 2:14-cv-01800-JLR)   -1-

consented to service by electronic means pursuant to Fed. R. Civ. P. Rule 5(b)(2)(E).

I, Catherine Hamborg, declare under penalty of perjury that the foregoing is true and correct. Executed this 26th day of November, 2014, at Seattle, Washington.

CATHERINE HAMBORG

CERTIFICATE OF SERVICE
(Case No. 2:14-cv-01800-JLR)    -2-