1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The Honorable James L. Robart

United States District Court
for the Western District of Washington
at Seattle

|  |  |
|---|---|
| **Idaho Rivers United**, et al., | ) |
| Plaintiffs, | ) |
| v. | ) Case No. 14-cv-1800-JLR |
| **U.S. Army Corps of Engineers**, | ) **Federal Defendant's Opposition to** |
| Defendant, | ) **Motion for Preliminary Injunction** |
| and | ) Noted for December 19, 2014 |
| **Inland Port and Navigation Group**, et al., | ) Hearing: January 2, 2015, 9am |
| Defendant-Intervenors. | ) |

United States Department of Justice
P.O. Box 7611
Washington, D.C.  20044
(202) 305-0248

## **Table of Contents**

Introduction ......................................................................................................................... 1

Factual Background .............................................................................................................. 1

    I.    The Corps' Programmatic Sediment Management Plan ............................ 2

    II.    Sediment Currently Impairing Navigation ................................................ 4

Statutory Background ........................................................................................................... 6

Standard of Review .............................................................................................................. 7

Argument .............................................................................................................................. 7

    I.    Plaintiffs Have Failed to Demonstrate a Likely Irreparable
        Harm that Would Justify the Extraordinary Remedy of a
        Preliminary Injunction ............................................................................. 7

    II.    The Corps' Range of Alternatives for the Current Immediate
        Need Action Was Reasonable and Therefore Complied with
        NEPA .................................................................................................... 10

    III.    The Corps Took the Requisite Hard Look at Potential Impacts to
        Pacific Lamprey ..................................................................................... 14

    IV.    The Corps' Discussion of Impacts from Climate Change Properly
        Identified the Uncertainty of Potential Future Effects ........................... 16

    V.    Plaintiffs Economics-Based Claim Will Fail Because NEPA Does
        Not Require Cost-Benefit Analyses ....................................................... 18

    VI.    The Corps Fully Complied with Applicable Clean Water Act
        Regulations In Authorizing Discharges Associated with the
        Maintenance Dredging Challenged by Plaintiffs ................................... 21

    VII.    Potential Harms to the Corps and Navigational Safety Outweigh
        Plaintiffs' Speculative Assertion of Harm to Pacific Lamprey ............. 24

Conclusion ......................................................................................................................... 26

Fed. Defs.' Opp'n to Prelim. Inj. - i
No. 2:14-cv-01800-JLR

United States Department of Justice
P.O. Box 7611
Washington, D.C.  20044
(202) 305-0248

1

## <u>Table of Authorities</u>

2

### Cases

3

4
*Alliance for the Wild Rockies v. Cottrell,*
632 F.3d 1127 (9th Cir. 2011) ........................................................... 7, 8, 25

5
*Auer v. Robbins,*
6
519 U.S. 452 (1997) ........................................................................... 23

7
*Chevron U.S.A. Inc. v. Natural Res. Defense Council, Inc.,*
467 U.S. 837 (1984) ...................................................................... 11, 23
8

9
*Churchill Cnty. v. Norton,*
276 F.3d 1060 (9th Cir. 2001) ....................................................... 14, 15
10

11
*Citizens Against Burlington v. Busey,*
938 F.2d 190 (D.C. Cir. 1991) ............................................................ 10
12

13
*City of Carmel-by-the-Sea v. U.S. Dep't of Transp.,*
123 F.3d 1142 (9th Cir. 1997) ............................................................ 10

14
*City of Sausalito v. O'Neill,*
15
386 F.3d 1186 (9th Cir. 2004) ............................................................ 19

16
*Decker v. Nw. Envtl. Def. Ctr.,*
17
133 S. Ct. 1326 (2013) ....................................................................... 23

18
*Defenders of Wildlife v. Salazar,*
19
812 F. Supp. 2d 1205 (D. Mont. 2009) ................................................ 8

20
*Dep't of Transp. v. Pub. Citizen,*
541 U.S. 752 (2004) ............................................................................. 6
21

22
*Earth Island Inst. v. U.S. Forest Serv.,*
697 F.3d 1010 (9th Cir. 2012) ............................................................ 13
23

24
*Entergy Corp. v. Riverkeeper, Inc.,*
556 U.S. 208 (2009) ...................................................................... 11, 23

25
*Friends of Se. Alaska's Future v. Morrison,*
26
153 F.3d 1059 (9th Cir. 1998) ............................................................ 10

27

28

Fed. Defs.' Opp'n to Prelim. Inj. - ii
No. 2:14-cv-01800-JLR

United States Department of Justice
P.O. Box 7611
Washington, D.C.  20044
(202) 305-0248

*Honolulu Traffic.com v. Fed. Transit Admin.,*
    742 F.3d 1222 (9th Cir. 2014) .................................................................. 11

*Humane Soc'y v. Gutierrez,*
    523 F.3d 990 (9th Cir. 2008) .......................................................... 8, 15

*Idaho Watersheds Project v. Hahn,*
    307 F.3d 815 (9th Cir. 2002) .................................................................. 26

*In re Excel Innovations, Inc.,*
    502 F.3d 1086 (9th Cir. 2007) ................................................................. 8

*Lands Council v. McNair,*
    537 F.3d 981 (9th Cir. 2008) ................................................................. 24

*League of Wilderness Defenders-Blue Mts. Biodiversity Project v. Allen,*
    615 F.3d 1122 (9th Cir. 2010) ................................................................. 6

*League of Wilderness Defenders v. Connaughton,*
    752 F.3d 755 (9th Cir. 2014) ................................................................. 20

*Leiva-Perez v. Holder,*
    640 F.3d 962 (9th Cir. 2011) ................................................................. 7

*Mazurek v. Armstrong,*
    520 U.S. 968 (1997) ................................................................. 7

*Monsanto Co. v. Geertson Seed Farms,*
    561 U.S. 139 (2010) ................................................................. 8

*Munaf v. Geren,*
    553 U.S. 674 (2008) ................................................................. 7

*N. Alaskan Envtl. Ctr. v. Kempthorne,*
    457 F.3d 969 (9th Cir. 2006) ................................................................. 12

*N. Cal. River Watch v. Wilcox,*
    633 F.3d 766 (9th Cir. 2011) ................................................................. 23

*NWF v. NMFS,*
    422 F.3d 782 (9th Cir. 2005) ................................................................. 8

*Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.,*
    545 U.S. 967 (2005) ................................................................. 23

Fed. Defs.' Opp'n to Prelim. Inj. - iii
No. 2:14-cv-01800-JLR

United States Department of Justice
P.O. Box 7611
Washington, D.C.  20044
(202) 305-0248

*Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv.*,
    235 F. Supp. 2d 1143 (W.D. Wash. 2002) .................................................2, 8, 14, 20

*Native Ecosys. Council v. U.S. Forest Serv.*,
    428 F.3d 1233 (9th Cir. 2005) ....................................................................14

*Native Ecosys. Council v. Weldon*,
    697 F.3d 1043 (9th Cir. 2012)..........................................................6, 16, 20

*Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Eng'rs*,
    817 F. Supp. 2d 1290 (D. Or. 2011) ............................................................8, 9

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) .....................................................................................6

*Trout Unlimited v. Morton*,
    509 F.2d 1276 (9th Cir. 1974).............................................................18, 19

*United States v. Oakland Cannabis Buyers' Coop.*,
    532 U.S. 483 (2001) ...................................................................................25

*Vt. Yankee Nuclear Power Corp. v. NRDC*,
    435 U.S. 519 (1978) .....................................................................................6

*Westlands Water Dist. v. U.S. Dep't of the Interior*,
    376 F.3d 853 (9th Cir. 2004) ....................................................................11

*WildEarth Guardians v. Bureau of Land Mgmt.*,
    8 F. Supp. 3d 17 (D.D.C. 2014) ................................................................18

*Winter v. Nat'l Res. Def. Council*,
    555 U.S. 7 (2008) ......................................................................7, 8, 10, 24

**Statutes**

33 U.S.C. § 1344(a), (d), (e) ........................................................................6, 21

Flood Control Act of 1945, Pub. L. 97-14, 59 Stat. 10 (Mar. 2, 1945)....................1, 24, 25

Flood Control Act of 1950, Pub. L. 81-516, 64 Stat. 163 (May 17, 1950) ........................11

Flood Control Act of 1962, Pub. L. 87-874, 76 Stat. 1173  (Oct. 23,
    1962).........................................................................2, 11, 24, 25

Water Resources Development Act of 1992, Pub. L. 102-580, § 109(a), 106 Stat.
        4797 (Oct. 31, 1992).................................................................................................. 12

## Regulations

33 C.F.R. Pts. 323, 325 .................................................................................... 7, 21, 22

33 C.F.R. § 320.1(b) ................................................................................................ 21

33 C.F.R. § 320.4 ..................................................................................................... 21

33 C.F.R. § 320.4(a) .......................................................................................... 21, 24

33 C.F.R. § 335.1 ..................................................................................................... 22

33 C.F.R. § 335.3 ..................................................................................................... 21

33 C.F.R. § 336.1(a) .................................................................................... 7, 21, 22, 23

33 C.F.R. § 336.1(b)(7) ..................................................................................... 5, 7, 22

33 U.S.C. § 1251(a) ................................................................................................... 6

40 C.F.R. § 230.1 ..................................................................................................... 22

40 C.F.R. §§ 1500-1508 ............................................................................................. 6

40 C.F.R. § 1501.1(d) .............................................................................................. 16

40 C.F.R. § 1502.14(a) ...................................................................................... 10, 14

40 C.F.R. § 1502.23 .................................................................................................. 19

40 C.F.R. § 1508.8 .................................................................................................... 18

40 C.F.R. § 1508.14 .................................................................................................. 18

50 C.F.R. § 402.01(b) ............................................................................................... 25

Final Rule for Operation and Maintenance of Army Corps of Engineers Civil
        Works Projects Involving the Discharge of Dredged Material Into Waters
        of the U.S. or Ocean Waters, 53 Fed. Reg. 14,902, 14,903 (Apr. 26, 1988)........... 22

United States Department of Justice
P.O. Box 7611
Washington, D.C.  20044
(202) 305-0248

## Introduction

This case involves the U.S. Army Corps of Engineers' implementation of Congress's directive to maintain commercial navigation on the Lower Snake River. In developing a long-term management plan for addressing sediment accumulation, the Corps identified a current and immediate need to reestablish the federal navigation channel to its Congressionally-specified dimensions at two discrete locations on the 140-mile channel. The first is on the downstream side of the Ice Harbor Dam's navigation lock. The second is at the confluence of the Snake and Clearwater rivers near Clarkston, Washington. Water depth at those locations is as low as nine and seven feet, respectively, and is interfering with safe navigation. Plaintiffs' motion to enjoin the Corps action should be denied. Plaintiffs present only a speculative harm to Pacific lamprey and fail to raise even a serious question going to the merits of their claims. Granting the motion, by contrast, would leave the channel at dimensions other than those specified by Congress and continue to present a harm to navigational safety.

## Factual Background

The Lower Snake River federal navigation channel is located between the Snake River's confluence with the Columbia River near Pasco, Washington, and its confluence with the Clearwater River near the Washington-Idaho border. EIS at 1-6.[1] Congress first authorized the Corps to maintain the Lower Snake for navigation in 1945. *See* Flood Control Act of 1945, Pub. L. 97-14, 59 Stat. 10, 21 (Mar. 2, 1945). Eighteen years later, in 1962, Congress legislated that "the depth and width of the authorized channel in the Columbia-Snake River barge navigation project <u>shall</u> be established as fourteen feet and two hundred and fifty feet, respectively, at minimum regulated flow." Flood Control Act of 1962, Pub. L. 87-874, 76 Stat. 1173, 1193 (Oct. 23, 1962) (emphasis

---

[1] "EIS" citations refer to the Lower Snake River Programmatic Sediment Management Plan Final Environmental Impact Statement. The portions to which we cite are attached as Exhibit 1 to the Declaration of Kristofor R. Swanson ("Swanson Decl.").

United States Department of Justice
P.O. Box 7611
Washington, D.C.  20044
(202) 305-0248

1    added). The Lower Snake is home to four multipurpose Corps civil works lock and dam

2    projects. From west to east, they are Ice Harbor Dam, Lower Monumental Dam, Little

3    Goose Dam, and Lower Granite Dam. EIS at 1-6, 1-7. In addition to navigation, the

4    projects serve purposes of power generation, recreation, fish and wildlife conservation,

5    and incidental water supply for irrigation. EIS at 1-4, 1-7. The Corps collectively refers

6    to these as "the Lower Snake River Projects." Decl. of Lt. Col. Timothy R. Vail ¶ 2.

7    **I.    The Corps' Programmatic Sediment Management Plan**

8         Like any river, the Lower Snake is subject to constant erosion, currents, and

9    sedimentation that combine to impact river depth and dimension. Historically, when

10   those forces have altered the navigation channel from Congress's authorized

11   dimensions, the Corps has dredged the encroaching areas. EIS at 1-4. In 2002, to

12   evaluate alternatives for managing disposal of any future sediment it may dredge from

13   the Lower Snake River, the Corps prepared a Dredged Material Management Plan. *See*

14   EIS at 1-3. A group of organizations—including many of the Plaintiffs here—challenged

15   the dredging plan and this Court enjoined the dredging. *Nat'l Wildlife Fed. v. Nat'l*

16   *Marine Fisheries Serv.*, 235 F. Supp. 2d 1143, 1162–63 (W.D. Wash. 2002) (Lasnik, J.).

17   After a second injunction, the parties settled the litigation, with the Corps agreeing to

18   conduct review under the National Environmental Policy Act for a long-term approach

19   to sediment management. Compl. Ex. 2 (ECF No. 1). The parties referred to that new

20   management approach as a "Programmatic Sediment Management Plan." *Id.* at 3.

21        The new Plan was intended to create a decision-making framework through

22   which sediment accumulation interfering with existing project purposes (including, but

23   not limited to, navigation) could be managed and, to the extent possible, prevented. EIS

24   at 1-4. To that end, the Corps undertook extensive studies to identify sediment

25   accumulation problem areas (EIS at 1-10 to 1-12), as well as analyze sediment sources

26   and how sediment moves through the river system and is deposited in the Lower Snake

27   River reservoirs (EIS at 1-18 to 1-28). *See* EIS App. M at M-9 to M-36, M-95 to 108.

28

Fed. Defs.' Opp'n to Prelim. Inj. - 2
No. 2:14-cv-01800-JLR

United States Department of Justice
P.O. Box 7611
Washington, D.C.  20044
(202) 305-0248

1    Through workshops with technical experts, the Corps developed a broad range of

2    management measures that could address sediment accumulation problems. EIS at 2-4.

3    As a result of its efforts, the Corps identified twenty-four potential sediment

4    management measures across four different categories. EIS at 2-4 to 2-9. The Corps

5    created six management frameworks (and a "no action" alternative), each constituting a

6    different "toolbox," and analyzed those frameworks in an Environmental Impact

7    Statement. *See* EIS at 2-27 to 2-41. The Corps selected "Alternative 7" as its

8    Programmatic Sediment Management Plan. Pls.' Ex. 21 (ECF No. 14-5). The Plan

9    provides "a broad range of dredging, system management, and structural management

10   measures" (*id.* at 1), and includes a suite of fourteen potential management measures

11   to address sediment accumulation, only one of which is dredging. *See* EIS at 2-29 to 2-

12   30 (chart), 2-36 to 2-37. The result is "a proactive adaptive management plan" for

13   addressing both immediate, near-term sediment problems that may arise and

14   "anticipated future problems before they are critical." *See* EIS App. A at A-1.

15   The Plan identifies certain conditions under each of the Corps' management

16   purposes that, when met, will trigger either an "immediate" or "future forecast" action

17   from the available management measures. *Id.* at A-19 to A-30. With respect to

18   navigational purposes, Corps action is triggered when, as a result of sediment

19   accumulation, a portion of the navigation channel is less than fourteen feet at

20   Minimum Operating Pool[2] and impairs safe commercial navigation or access to

21   navigation locks ("immediate need"), or when that scenario is forecasted to occur more

22   than once in a five year period ("future forecast need"). *Id.* at A-22. The Plan identifies

23   the specific management measures the Corps should consider to remedy an immediate

24   or forecasted sediment problem. *See, e.g., id.* at A-21 to A-22.

25   

_____

26   [2] Specific elevation operating ranges (from sea level) are authorized for the reservoirs
behind each dams on the Lower Snake River. Vail Decl. ¶ 2. The operating range for the

27   Lower Granite Reservoir, for example, is 733 to 738 feet above sea level. Vail Decl. ¶ 2. The
lower end of the elevation range is known as the "Minimum Operating Pool" or "MOP."

28   

Fed. Defs.' Opp'n to Prelim. Inj. - 3                United States Department of Justice
No. 2:14-cv-01800-JLR                                 P.O. Box 7611
                                                      Washington, D.C.  20044
                                                      (202) 305-0248

## II.        Sediment Currently Impairing Navigation

In developing the Programmatic Sediment Management Plan, the Corps identified two locations where sediment accumulation in the navigation channel has lowered water depth to as low as seven and nine feet and is currently impairing navigation. Pls.' Ex. 22 at 1(ECF No. 14-6). This triggered an immediate need for action under the Plan, which the Corps has referred to as "the *Current* Immediate Need Action" (to contrast from immediate needs that may arise in the future). *See id.* at 2. Thus, Plaintiffs' motion is not about the entire 140-mile channel, but a very narrow action designed to alleviate the current impairments. Those areas total only 141.5 of the 33,890 surface acres in the Lower Snake River system. Decl. of Sandra Shelin ¶ 13

The first impairment is at the downstream lock approach at Ice Harbor Dam near River Mile 9.5.[3] EIS at 2-3; EIS App. L at L-4, L-5 (maps). River turbulence has moved large, coarse river cobbles into the navigation channel. EIS at 3-94 to 3-95. This has reduced water depth to nine feet at Minimum Operating Pool—five feet less than Congress's specified depth. EIS App. I at I-8. Lock access is critical for navigation, as all barges entering or leaving the Snake River system must pass through Ice Harbor Dam. EIS at 3-56. Shoaling has narrowed the room for barges to maneuver and created safety issues, including recent bottom scrapings. Vail Decl. ¶ 7.

The second impairment is 130 river miles upstream of Ice Harbor Dam, where sediment falls out of the water column at the confluence of the Snake and Clearwater rivers. EIS at 2-3; EIS at 3-94; EIS App. L at L-6, L-7 (maps). Water depths in the navigation channel are as shallow as seven feet at Minimum Operating Pool at certain locations—only half of Congress's specified depth. *Id.* at L-5; EIS App. I at I-8. The federal navigation channel at the confluence is adjacent, and necessary for safe access to the Ports of Clarkston, Washington, and Lewiston, Idaho. EIS at 3-56. The area of

---

[3] River mile counts run upstream, which is generally west to east in the Lower Snake River. River Mile zero for the Snake River is at its confluence with the Columbia River.

Fed. Defs.' Opp'n to Prelim. Inj. - 4
No. 2:14-cv-01800-JLR

United States Department of Justice
P.O. Box 7611
Washington, D.C.  20044
(202) 305-0248

the channel at the confluence that is less that fourteen feet at Minimum Operating Pool has increased to 54 acres since previous maintenance actions in 2005/2006. Vail Decl. ¶ 4. Navigation has become extremely difficult, and commercial vessels are beginning to ground on the bottom of the channel. *See* Vail Decl. ¶ 4.

Given the immediate need to reestablish the navigation channel, the Corps analyzed alternatives and potential impacts associated with Current Immediate Need Action in the Environmental Impact Statement for the Programmatic Sediment Management Plan. *See* Pls.' Ex. 22 at 1. On November 14, 2014, the Corps decided to take action this winter to address the navigational impairments at the Ice Harbor Dam and Clearwater-Snake confluence.[4] *Id.* To reduce any fish entrainment and turbidity, the Corps will use a clamshell dredge to remove the impairments and return the navigation channel to Congress's specified dimensions. Shelin Decl. ¶ 8. The sediment will be loaded onto a barge, transported, and used to create thirteen acres of shallow-water habitat for juvenile salmonids at Knoxway Canyon, which is 23 river miles downstream from the confluence of the Snake and Clearwater rivers. *See* Pls.' Ex. 22 at 2, 5–6; EIS App. L at L-16; Shelin Decl. ¶¶ 10–12. On December 12, 2014, the Corps issued a notice to proceed to its dredging contractor. Vail Decl. ¶ 10. The contractor will need approximately thirty days to mobilize for the project, and dredging is anticipated to begin on about January 12, 2014. Vail Decl. ¶ 10. The timing for the dredging is driven by an in-water work window of December 15 to March 1, when salmonids are less likely to be present. Pls.' Ex. 22 at 5–7; EIS App. L at L-2; Shelin Decl. ¶ 7.

---

[4] The sediment accumulation problem also extends into the ports at Lewiston and Clarkston. Each port submitted a permit application to the Corps under the Clean Water Act and the Rivers and Harbors Act for maintenance dredging in the non-federal port berthing areas. EIS at xi–xii; EIS App. L at L-2. Water depths in the berthing areas are currently as shallow as 7.3 feet at Minimum Operating Pool. EIS App. I at I-8; EIS App. L at L-9, L-10 (maps). The Corps' Seattle and Walla Walla District offices granted the permits on November 14, 2014. Vail Decl. ¶ 9 & Attach. B. Though funded by the Ports, dredging will be done by the same contractor and during the same work window as the Corps' work in the federal navigation channel, in accordance with 33 C.F.R. § 336.1(b)(7). Vail Decl. ¶ 9.

Fed. Defs.' Opp'n to Prelim. Inj. - 5
No. 2:14-cv-01800-JLR

United States Department of Justice
P.O. Box 7611
Washington, D.C.  20044
(202) 305-0248

1

## **Statutory Background**

2        Congress enacted the National Environmental Policy Act to establish a process

3   for federal agencies to consider the environmental impacts of their actions. *Vt. Yankee*

4   *Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978). NEPA serves to inform agency

5   decision-makers when reaching a decision, and to inform the public regarding

6   environmental effects. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349

7   (1989). "NEPA itself does not mandate particular results, but simply prescribes the

8   necessary process." *Id.* at 350; *see Native Ecosys. Council v. Weldon*, 697 F.3d 1043,

9   1051 (9th Cir. 2012). Agency compliance with NEPA is bounded by a "rule of reason."

10  *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004); *see League of Wilderness*

11  *Defenders-Blue Mts. Biodiversity Project v. Allen*, 615 F.3d 1122, 1130 (9th Cir. 2010).

12  Council on Environmental Quality regulations govern implementation of the statute.

13  *See* 40 C.F.R. §§ 1500–1508.

14        The Clean Water Act (CWA) establishes a comprehensive program to "restore

15  and maintain the chemical, physical, and biological integrity of the Nation's waters."

16  33 U.S.C. § 1251(a). To achieve that objective, the CWA prohibits the "discharge of any

17  pollutant"—defined as the addition of any pollutant to the waters of the United States

18  from any point source—except "as in compliance with" specified provisions of the Act.

19  *Id.* § 1311(a). In most cases, regulated entities achieve compliance by obeying the terms

20  of a permit issued under one of the CWA's two complementary permitting programs,

21  one of which is for discharge of dredged or fill material and is administered primarily

22  by the Corps pursuant to CWA section 404, *id.* § 1344. Section 404 authorizes the Corps

23  to issue individual or general permits for discharges into navigable waters. 33 U.S.C.

24  § 1344(a), (d), (e). Individual permits are issued case-by-case, after a process that

25  involves site-specific documentation and review, opportunity for public hearing, public

26  interest review, and a formal determination. *See* 33 C.F.R. Pts. 323, 325. When

27  authorized by Congress, the Corps also undertakes the construction, operation and

28

United States Department of Justice
P.O. Box 7611
Washington, D.C.  20044
(202) 305-0248

1   maintenance of Federal civil works projects (e.g., maintenance dredging of navigation

2   channels) that may involve the discharge of dredge or fill material into waters of the

3   United States. In such circumstances, "the Corps does not process and issue permits for

4   its own activities." 33 C.F.R. § 336.1(a). Rather, the Corps' regulations provide that it

5   will "authorize[ ] its own discharges of dredged or fill material by applying all

6   applicable substantive legal requirements, including public notice, opportunity for

7   public hearing, and application of the section 404(b)(1) guidelines." *Id.*; *see generally* 33

8   C.F.R. Pts. 335–338.

9                              **Standard of Review**

10          Issuance of preliminary relief before the merits of a case have been decided is an

11   "extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 690 (2008).

12   Plaintiffs correctly state the four-factor test for preliminary injunctive relief and the

13   standard that will apply to the Court's evaluation of the underlying claims. *See* Pls.'

14   Mot. for Prelim. Inj. ("Mot.") 1–2 & n.3 (ECF No. 8). An injunction can only issue,

15   however, where a plaintiff makes a "clear showing" and presents "substantial proof"

16   that an injunction is warranted. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per

17   curiam). This includes a requirement "to demonstrate that irreparable injury is *likely* in

18   the absence of an injunction." *Winter v. Nat'l Res. Def. Council*, 555 U.S. 7, 22 (2008).

19   The Ninth Circuit's "serious questions" standard still requires a plaintiff to

20   demonstrate a "substantial case for relief on the merits," *Leiva-Perez v. Holder*, 640

21   F.3d 962, 967 (9th Cir. 2011), and that the other factors tip *sharply* in the plaintiffs'

22   favor. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

23                                  **Argument**

24   **I.    Plaintiffs Have Failed to Demonstrate a Likely Irreparable Harm that**
          **Would Justify the Extraordinary Remedy of a Preliminary Injunction**

25

26          Plaintiffs' motion should be denied because they have not made the requisite

27   showing of harm. Plaintiffs must demonstrate an immediate and irreparable harm that

28

Fed. Defs.' Opp'n to Prelim. Inj. - 7
No. 2:14-cv-01800-JLR

United States Department of Justice
P.O. Box 7611
Washington, D.C.  20044
(202) 305-0248

1    is "*likely*, not just possible." *Cottrell*, 632 F.3d at 1131 (citing *Winter*, 555 U.S. at 22).

2    "Speculative injury cannot be the basis for a finding of irreparable harm." *In re Excel*

3    *Innovations, Inc.*, 502 F.3d 1086, 1098 (9th Cir. 2007). Notably, this Court's previous

4    injunctions related to Corps navigational maintenance on the Lower Snake River

5    occurred prior to the Supreme Court's 2008 *Winter* decision, which overruled the

6    standard upon which those injunctions were issued. *See Nat'l Wildlife Fed'n*, 235 F.

7    Supp. 2d at 1161 (assessing "possibility of irreparable injury").

8         In their present motion, Plaintiffs posit, based upon the declaration of David

9    Statler, that the Current Immediate Need Action "will likely result in irreparable

10   harm" to lamprey.[5] Mot. at 22–23; Decl. of David Statler ("Statler Decl.") ¶¶ 26–37

11   (ECF No. 10). Mr. Statler opines that there is "a high likelihood to harm or kill

12   individual lamprey through dislodgement and downstream movement of juvenile

13   lamprey caused by removal of dredge material or placement of dredge spoils in areas

14   where juvenile lamprey are present; and through imbedding or smothering in dredge

15   material removal or placement." *Id.* ¶ 37.

16        The problem is that none of the data Mr. Statler relies upon even facially

17   support his conclusion. The planned dredging is to occur at River Mile 9.5 (Ice Harbor

18

19

20   [5] Plaintiffs argue in passing that the "take" of even one listed salmon or steelhead is an
     irreparable harm. *See* Mot. at 23–24 & n.26. They are incorrect as a matter of law. Courts
21   have consistently held that harm to an ESA-listed species is measured at the species level—
     an injunction can only be justified if there is irreparable harm to the species. *See Nw. Envtl.*
22   *Def. Ctr. v. U.S. Army Corps of Eng'rs*, 817 F. Supp. 2d 1290, 1314–16 (D. Or. 2011); *see also*
     *NWF v. NMFS*, 422 F.3d 782, 796 (9th Cir. 2005) (need to show "irreparable harm to a
23   threatened species"); *Humane Soc'y v. Gutierrez*, 523 F.3d 990, 991 (9th Cir. 2008) (finding
     death of over 2,000 listed salmon was not irreparable harm). Plaintiffs have not presented
24   any proof that a species as a whole is likely to be harmed. To the contrary, the Biological
     Opinion upon which they rely actually finds that the Current Immediate Need Action is not
25   likely to jeopardize the species. Pls.' Ex. 19 at 3 (summary page). The effort to base an
     injunction on injury to salmon or steelhead must therefore be denied. *Defenders of Wildlife*
26   *v. Salazar*, 812 F. Supp. 2d 1205 (D. Mont. 2009). Similarly, the Supreme Court has
     rejected Plaintiffs' contention (Mot. at 24) that irreparable harm arises solely from a
27   violation of NEPA. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157–158 (2010).

28

Fed. Defs.' Opp'n to Prelim. Inj. - 8                    United States Department of Justice
No. 2:14-cv-01800-JLR                                    P.O. Box 7611
                                                         Washington, D.C.  20044
                                                         (202) 305-0248

1   Dam) and upstream from River Mile 138 (the confluence). *See* EIS App. L at L-2. But

2   Mr. Statler's data include no lamprey counts downstream of River Mile 76 (*sixty-six*

3   miles from Ice Harbor Dam) or upstream of River Mile 134 (four miles from the

4   confluence). *See* Attach. to Statler Decl; Decl. of Marvin Shutters ¶ 13. The data do not

5   show any lamprey to be present where the Corps will actually be dredging. *See* Statler

6   Decl. ¶¶ 26, 27 (noting collection locations). All told, Mr. Statler's data reflect only

7   seventeen juvenile lamprey in the entirety of Lower Granite Reservoir. *See* Attach. to

8   Statler Decl; Shutters Decl. ¶¶ 12, 13. That is significant given that the planned

9   dredging and disposal areas cover just 1.5 percent of the 8,900-acre reservoir. Shutters

10   Decl. ¶ 9. Even if the data reflected a local lamprey presence, harm to any individual

11   lamprey—a species that is not listed as threatened or endangered under the

12   Endangered Species Act—would not justify a preliminary injunction. *See Nw. Envtl.*

13   *Def. Ctr.*, 817 F. Supp. 2d at 1314–16 (finding harm to individuals insufficient, even for

14   threatened and endangered species). Plaintiffs present no evidence that the species is

15   at risk; to the contrary, adult lamprey counts have been increasing. Shutters Decl. ¶ 15.

16       Mr. Statler also wrongly focuses on migratory juvenile lamprey. *See* Statler Decl.

17   ¶ 37; Shutters Decl. ¶ 13. Migratory juvenile lamprey are not found in sediment.

18   Shutters Decl. ¶ 13. Instead, they are mobile in the water column and, like adult

19   lamprey, have the ability to retreat from dredging and disposal activities. Shutters

20   Decl. ¶ 9, 13. Indeed, the sampling method for the data upon which Mr. Statler relies

21   was for the collection of salmon (not lamprey) in the water column (not sediment).

22   Shutters Decl. ¶ 13. Here, dredging and disposal will occur between now and March 1,

23   which avoids adult lamprey migration and the majority of migratory juvenile lamprey

24   migration. Shutters Decl. ¶ 9

25       Rather than migratory juveniles, the proper focus here should be larval

26   juveniles, which do live in sediment. Shutters Decl. ¶ 13. Unlike Mr. Statler, the Corps

27   undertook extensive site-specific surveys to determine whether any larval juvenile

28

Fed. Defs.' Opp'n to Prelim. Inj. - 9
No. 2:14-cv-01800-JLR

United States Department of Justice
P.O. Box 7611
Washington, D.C.  20044
(202) 305-0248

1   lamprey could be entrained in the dredged material or buried at the disposal site.

2   Shutters Decl. ¶¶ 5–6. Not a single larval juvenile lamprey was found at any of the

3   samples points. Shutters Decl. ¶¶ 6, 8. The facts here do not support a conclusion that

4   Pacific lamprey are likely to be harmed. At most, there is a possibility of harm, and that

5   possibility exists only *if* lamprey are present in the work areas—a conclusion not

6   supported by facts. Shutters Decl. ¶ 16. A mere possibility of harm—which, in this case,

7   is speculative at best—cannot serve as the basis for preliminary injunctive relief.

8   *Winter*, 555 U.S. at 22.

9   ## II.   The Corps' Range of Alternatives for the Current Immediate Need Action Was Reasonable and Therefore Complied with NEPA

10

11          NEPA requires federal agencies to explore and evaluate alternatives to their

12  proposed actions. 40 C.F.R. § 1502.14(a) (emphasis added). But an EIS "need not

13  consider an infinite range of alternatives, only reasonable and feasible ones." *City of

14  Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997). An

15  alternative's reasonableness is governed by a given project's purpose and need. *Id.* at

16  1155. The Ninth Circuit affords agencies "considerable discretion to define the purpose

17  and need." *Friends of Se. Alaska's Future v. Morrison*, 153 F.3d 1059, 1066 (9th Cir.

18  1998). A reasonable purpose and need statement must be upheld. *See Citizens Against

19  Burlington v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991).

20          The Corps' purpose and need for the Current Immediate Need Action meets that

21  reasonableness standard. Sediment accumulation is currently impairing navigation at

22  the downstream approach to Ice Harbor Dam's lock and the confluence of the Snake

23  and Clearwater Rivers. EIS at 1-5. The Corps therefore identified a purpose and need

24  "to re-establish the federal navigation channel to the congressionally authorized

25  dimensions . . . ." EIS at 1-4. The Corps based that objective on Congress's

26  authorization for the navigation channel: "the Columbia-Snake River barge navigation

27  project <u>shall</u> be established as fourteen feet and two hundred and fifty feet,

28

Fed. Defs.' Opp'n to Prelim. Inj. - 10
No. 2:14-cv-01800-JLR

respectively, at minimum regulated flow." 76 Stat. at 1193 (emphasis added); *see* EIS at 1-8 to 1-9, App. G at G-84. The Corps properly used the statutory directive to guide its purpose and need. *See Honolulu Traffic.com v. Fed. Transit Admin.*, 742 F.3d 1222, 1230 (9th Cir. 2014); *Westlands Water Dist. v. U.S. Dep't of the Interior*, 376 F.3d 853, 866 (9th Cir. 2004).

Plaintiffs indirectly attack the purpose and need by arguing that Congress, despite its use of the word "shall," did not intend for the Corps to maintain the navigation channel at 14 feet. *See* Mot. at 6–8. But the argument fails because the question is one of statutory interpretation. Even if Congress had been less clear, the Corps' reasonable interpretation would be entitled to deference under the *Chevron* standard.[6] *See Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 & n.4 (2009). For Plaintiffs to prevail on their argument that the Corps' purpose and need was unreasonable, Congress would have had to explicitly *prohibit* the channel from being maintained at 14 feet by 250 feet. Even Plaintiffs do not make that argument. Indeed, Congress has continued to authorize Corps action to maintain the navigation channel at the authorized dimensions. *See, e.g.,* Water Resources Development Act of 1992, Pub. L. 102-580, § 109(a), 106 Stat. 4797, 4816–17 (Oct. 31, 1992).

---

[6] Plaintiffs' strained interpretation of the legislative history here is the same one they made in their comments on the Draft EIS. The Corps explained why that interpretation is incorrect. *See* EIS App. G at G-83 to G-84; *see also* Swanson Decl. Ex. 3 at 16, 18 (recommending dimension). Plaintiffs' contention that Congress did not intend the channel to be navigable year-round (Mot. at 6, 7 n.12) incorrectly derives from early (1938) plans involving a 5-foot channel that would be blocked by ice two months of the year. EIS App. G at G-83; Pls.' Ex. 1 at 9. The House report upon which they rely pre-dates the 1962 Flood Control Act by twenty-four years. *See id.* Plaintiffs' argument also makes little sense: suspending navigation for part of the year does not change the sediment depth; whenever navigation resumed, the channel would still need to be navigable, which, in this case, Congress has defined as 14 feet at Minimum Operating Pool. EIS App. G at G-83, G-85. Ironically, the Dalles Dam project Plaintiffs use as an analogy actually undercuts their argument. The authorizing statute does not contain a directive as to channel dimensions. *See* Flood Control Act of 1950, Pub. L. 81-516, § 204, 64 Stat. 163, 179–80 (May 17, 1950).

United States Department of Justice
P.O. Box 7611
Washington, D.C.  20044
(202) 305-0248

1    With its purpose and need established, the Corps turned to its Programmatic

2  Sediment Management Plan to identify reasonable alternatives for the Current

3  Immediate Need Action. The Plan identifies two management options when an

4  immediate need action is triggered for navigation. The first is changes in reservoir

5  operations.[7] EIS App. A at A-23. But those measures are only temporary—sediment

6  continues to accumulate and the Corps can only raise the reservoir so high given design

7  and structural limitations. *See* EIS at 2-20; Pls.' Ex. 22 at 4. Thus, the second option for

8  a navigational immediate need action is to remove the impairing sediment. EIS App. A

9  at A-23. Plaintiffs argue that the range of alternatives is unreasonable because it

10  includes only those two possibilities. Mot. at 4–6, 8–10. Plaintiffs are wrong.[8]

11    First, Plaintiffs ignore that agencies "need not . . . discuss alternatives . . . which

12  are infeasible, ineffective, or inconsistent with the basic policy objectives . . . ." *N.*

13  *Alaskan Envtl. Center v. Kempthorne*, 457 F.3d 969, 978 (9th Cir. 2006). In assessing

14  potential management measures as part of the Programmatic Sediment Management

15  Plan, the Corps concluded that non-dredging management measures would not

16  effectively reestablish the channel at Congress's statutorily-prescribed dimensions once

17  sediment is already impairing navigation. EIS at 2-41. Other management measures

18  would therefore not meet the purpose and need for the Current Immediate Need Action.

19  *See Id.* Courts have consistently upheld alternatives analyses where only one

20  alternative would meet the purpose and need for the action. *See, e.g., Earth Island Inst.*

21  *v. U.S. Forest Serv.*, 697 F.3d 1010, 1021–23 (9th Cir. 2012).

---

23  [7] To provide for safe navigation, the Corps has been increasing water releases at Ice Harbor
24  Dam to provide adequate depth when barges enter or exit, and increasing water depth in
   Lower Granite Reservoir to an elevation above the Minimum Operating Pool. EIS at 1-14 to
25  1-15. Thus, as NEPA requires, the Corps analyzed changes in reservoir operations as the
   "no action" alternative to the proposed Current Immediate Need Action. *See* EIS at 2-41.

27  [8] It is inaccurate to say the Corps considered only two alternatives for the Current
   Immediate Need Action. The Corps also considered several dredging design alternatives
28  (i.e., where and how to dispose of the dredge spoils) *See* EIS App. L at L-13 to L-47.

Fed. Defs.' Opp'n to Prelim. Inj. - 12                   United States Department of Justice
No. 2:14-cv-01800-JLR                                    P.O. Box 7611
                                                         Washington, D.C.  20044
                                                         (202) 305-0248

Second, contrary to Plaintiffs' contention, the Corps did analyze why the other management measures would not effectively meet the purpose and need. *See* Mot. at 5. The Corps analyzed the effectiveness of various management measures on sediment. *See* EIS App. F at Pt. 1, F-19 to F-21 (summarizing findings of 600 page report). The alternatives assessment for the Programmatic Sediment Management Plan discussed whether each would be feasible and effective in scenarios where an immediate need for action had arisen.[9] For example, the EIS notes that, to be effective at scouring impeding sediment, a drawdown of reservoir levels would, among presenting other issues, need to occur between late-April and mid-June (to take advantage of spring flows); last up to six weeks; and lower the reservoir depth up to fifteen feet below Minimum Operating Pool. EIS at 2-20. Any drawdown would also need to rely on adequate high-flow prediction and modeling, requiring sufficient lead time to plan, design, and implement. *Id.* Drawdowns are also not targeted; they affect the entire reservoir and mobilize sediments over a vast area, rather than only the location where sediment is actually impairing Corps project purposes. *See id.*

The Corps also provided explanations for agitating sediment (EIS at 2-19); reconfiguring or relocating facilities (EIS at 2-21); upland sediment reduction (EIS at 2-39); and in-river structures like bendway weirs (EIS at 2-17 to 2-18). When Plaintiffs suggested the light-loading of barges was a potential alternative, the Corps explained why that solution was not reasonable or an "alternative." EIS App. G at G-85. The

---

[9] The Corps' discussion on alternatives for the Current Immediate Need Action thus only focused on those of the alternatives that would be effective for the action in question. *See* EIS at 2-41 to 2-42. Plaintiffs' argument that the Corps cannot rely on its Plan-level explanations because they occurred primarily in the discussion of the Plan is incorrect. *See* Mot. at 9. Plaintiffs themselves acknowledge that "alternatives for a site-specific action must be considered *somewhere*." *Id.* Here, they are in the very EIS that Plaintiffs challenge. Plaintiffs' assertion that the alternatives analysis is faulty because the EIS was not released five years earlier is even farther afield. *See id.* at 6. The fact that the Corps took longer than expected to thoroughly study the sediment problem—a study Plaintiffs themselves requested—does not support a conclusion that the Corps' study was insufficient.

United States Department of Justice
P.O. Box 7611
Washington, D.C.  20044
(202) 305-0248

1    Corps reiterated these explanations in its decision to apply the Plan and undertake the

2    Current Immediate Need Action. Pls.' Ex. 22 at 4–5. Though some non-dredging

3    measures in the Plan may, after analysis, present longer-term solutions to address or

4    prevent navigation-impairing sediment accumulation, only dredging can effectively

5    address accumulation once navigation is actually impaired, as it is here. *See* EIS App. A

6    at A-23 to A-24.

7         Plaintiffs' analogy to the Court's 2002 conclusion on the Corps' Dredge Material

8    Management Plan also fails. *See* Mot. at 4 (citing *Nat'l Wildlife Fed'n*, 235 F. Supp. 2d

9    at 1154–58). The 2002 Plan was a twenty-year plan to address dredged material

10   disposal for future dredging. *Nat'l Wildlife Fed'n*, 235 F. Supp. 2d at 1152–53. The

11   current action, by contrast, is focused on currently-existing impairments. *See* Pls.' Ex.

12   22. Like Plaintiffs' present motion, the plaintiffs' second motion for a preliminary

13   injunction in the prior litigation similarly involved a single Corps action. *See* Compl.

14   Ex. 1 at 5. In that context, Judge Lasnik rejected the same alternatives arguments that

15   Plaintiffs bring here. *See id.* at 15–18. "So long as 'all reasonable alternatives' have

16   been considered and an appropriate explanation is provided as to why an alternative

17   was eliminated, the regulatory requirement is satisfied." *Native Ecosys. Council*, 428

18   F.3d at 1246; *see* 40 C.F.R. § 1502.14(a). The EIS includes thirty-one pages of discussion

19   on the practicality and effectiveness of various management measures. EIS at 2-12 to 2-

20   43. Plaintiffs have not presented a serious question going to their alternatives claim.

21   **III.   The Corps Took the Requisite Hard Look at Potential Impacts to Pacific
22        Lamprey**

23        When reviewing an agency's impact analysis under NEPA, a court's "role is to

24   ensure that the agency has taken a 'hard look'" at potential effects. *Churchill Cnty. v.

25   Norton*, 276 F.3d 1060, 1072 (9th Cir. 2001) (citation omitted). This involves "a

26   pragmatic judgment whether the EIS's form, content and preparation foster both

27   informed decision-making and informed public participation." *Id.* at 1071 (internal

28

Fed. Defs.' Opp'n to Prelim. Inj. - 14
No. 2:14-cv-01800-JLR

United States Department of Justice
P.O. Box 7611
Washington, D.C.  20044
(202) 305-0248

quotation marks and citations omitted). Here, the Corps took the requisite hard look at potential impacts to Pacific lamprey.

The Corps reviewed available literature on lamprey behavior and location. EIS at 3-15 to 3-16. There is "no evidence that [adult] Pacific lamprey have used or currently use the mainstream Snake River for spawning or rearing." EIS at 3-16. The Corps recognized, however, that use of the Lower Snake River's mainstem by larval juvenile lamprey is largely unknown. *See id.* The agency therefore took 646 samples at 24 survey sites in July and September of 2011, including numerous samples from the confluence of the Snake and Clearwater rivers and the planned disposal area. *Id.*; Shutters Decl. ¶¶ 4–6 & Attach. A & B. No lamprey were found. EIS at 3-16. The Corps acknowledged that the survey, given its scope and nature, did not completely foreclose that some larval juveniles could be present during dredging and disposal. *Id.* The Corps therefore concluded that larval lamprey may be present during dredging and disposal and, if so, "may be impacted during the proposed near-term action."[10] EIS at 4-12, 4-15, 4-22; EIS App. G at G-139 to G-140; *see id.* at G-168. But the Corps noted that the limited amount of rearing habitat makes it unlikely that larval juveniles exist "in moderate or high numbers." EIS at 3-16. This was not an unsupported, generalized statement of the possible. *See* Mot. at 10, 12–13. It was the Corps' conservative conclusion based upon its independent study and survey.

Plaintiffs contend that the Corps "failed to identify, evaluate or disclose [the lamprey's] current status in the project area . . . ." *See* Mot. at 11. This, of course, ignores the Corps' extensive survey to identify any lamprey present in the sediment at the dredging and disposal sites. *See* EIS at 3-16; Shutters Decl. Attach. C. Given the action at issue, the Corps focused its survey efforts on larval juvenile lamprey, which

---

[10] The conservative conclusion that there *may* be impacts to lamprey should not be confused with Plaintiffs' burden to demonstrate a *likely* irreparable harm. The Ninth Circuit has been clear that mere impacts, even those that are adverse, do not amount to a finding of irreparable harm. *See Humane Soc'y*, 523 F.3d at 991.

United States Department of Justice
P.O. Box 7611
Washington, D.C.  20044
(202) 305-0248

1   live in sediment. Shutters Decl. ¶¶ 3–4. That focus was consistent with NEPA's purpose

2   to concentrate study on the most significant aspects of environmental issues. 40 C.F.R.

3   § 1501.1(d). The Corps' survey work did not find any lamprey. EIS at 3-16; Shutters

4   Decl. ¶¶ 6, 8. Given the Corps' survey, Plaintiffs' argument is really a disagreement

5   with the methodology the Corps relied upon for its field work. *See* EIS App. G at G-139

6   to G-140 (responding to comment that a different technique would have been

7   preferable). That argument does not have a likelihood of success: courts are "'at [their]

8   most deferential' when reviewing scientific judgments and technical analyses within

9   the agency's expertise under NEPA." *Native Ecosys.*, 697 F.3d at 1051 (citation

10  omitted). In fact, the methodology the Corps chose was intended to limit effects on the

11  lamprey by avoiding actually handling any individuals. Shutters Decl. ¶ 7.

12          Further, it is unclear what an additional study would have added to the NEPA

13  process here. EIS App. G at G-139 to G-140. Based on existing information, including

14  its own survey, the Corps conservatively disclosed that the Current Immediate Need

15  Action may impact larval juvenile lamprey if, contrary to the Corps' survey, they

16  happen to be present. Plaintiff Nez Perce Tribe actually *agreed* with the Corps' lamprey

17  conclusions. Pls.' Ex. 17 at 4 (ECF No. 14-1). The Corps' assessment of Pacific lamprey

18  informed the public and agency decision-makers regarding possible impacts.

19  **IV.    The Corps' Discussion of Impacts from Climate Change Properly
20          Identified the Uncertainty of Potential Future Effects**

21          Plaintiffs' argument that the Corps failed to take a hard look at climate change's

22  potential effect on sediment contribution also largely ignores the EIS. *See* Mot. at 13–

23  14. The Corps considered studies on sediment yield, loading, accumulation, and erosion,

24  including in relation to climate change. *See* EIS at 1-24 (table listing studies); EIS App.

25  F at Pt. 3, F-173 to F-175; EIS App. D. The EIS summarized the findings from those

26  studies (EIS at 1-21 to 1-28), and includes an entire subsection on potential climate-

27

28

Fed. Defs.' Opp'n to Prelim. Inj. - 16
No. 2:14-cv-01800-JLR

United States Department of Justice
P.O. Box 7611
Washington, D.C.  20044
(202) 305-0248

1  based changes to sediment loading and transport. EIS at 4-94 to 4-99. Plaintiffs do not

2  include that subsection among their many EIS extracts. *See* Pls.' Ex. 9 (ECF No. 12-3).

3       Contrary to Plaintiffs' argument, the Corps did acknowledge that its

4  "management of sediment . . . may be affected by climate change." EIS at 4-94 to 4-95;

5  EIS App. G at G-78 to G-79; Swanson Decl. Ex. 2 at 45 (Comment 20320). The EIS

6  notes that wildfire in the watershed has been increasing and that fire-affected areas are

7  a primary sediment contributor, which may signal an increase in sediment *loading*

8  from forested watersheds. EIS at 1-22, 1-25, 1-28. But "whether or not these conditions

9  would affect sediment *transport and accumulation* when considered in combination

10  with changes in precipitation and tributary flows cannot be reasonably predicted at this

11  time." EIS at 4-96 (emphasis added).

12       Plaintiffs also take issue with a Corps statement that "present basin climactic

13  conditions might already provide the maximum long-term sediment yield conditions,"

14  arguing that it is inaccurate because "discharge is based on many factors, including

15  rainfall and resisting vegetation force." Mot. at 13. But the Corps acknowledged the

16  very complexity that Plaintiffs claim it ignored. *See* EIS at 4-96, 4-97. Indeed, because

17  of that complexity the Corps concluded that an accurate assessment of effects on

18  sediment yield and transport from changing climate conditions would require long-term

19  monitoring and adaptive management. EIS at 4-98; EIS App. G at G-78 to G-79.

20       Plaintiffs argue that the Corps should have nonetheless incorporated "likely

21  future conditions" into its impacts analyses. Mot. at 13–14. Plaintiffs ignore the

22  uncertainty surrounding localized impacts from climate change. "[A]ccurately

23  predicting how those future conditions affect sediment accumulation in the [Lower

24  Snake River] is not currently realistic or feasible." EIS App. G at G-79. "Because

25  current science does not allow for the specificity demanded by the [Plaintiffs]," NEPA

26  did not require the Corps to identify specific climate effects. *WildEarth Guardians v.*

27  *Bureau of Land Mgmt.*, 8 F. Supp. 3d 17, 36 (D.D.C. 2014) (internal citation and

28

Fed. Defs.' Opp'n to Prelim. Inj. - 17
No. 2:14-cv-01800-JLR

United States Department of Justice
P.O. Box 7611
Washington, D.C.  20044
(202) 305-0248

1   quotations omitted).[11] The Corps was disclosing existing science, not ignoring it.

2   Plaintiffs have not presented serious questions as to their climate change claim.

3   **V.   Plaintiffs Economics-Based Claim Will Fail Because NEPA Does Not
       Require Cost-Benefit Analyses**

4

5       Plaintiffs have not presented a serious question going to the merits of their

6   economic analysis claim. *See* Mot. at 14–21. Plaintiffs are correct that the "human

7   environment" under NEPA can include economic considerations. *See* 40 C.F.R. §

8   1508.14. Here, the Corps considered what socioeconomic effects the Current Immediate

9   Need Action may have. The EIS discussed how the navigation channel is used to

10  transport goods (EIS at 3-48 to 3-57), and qualitatively assessed how the Current

11  Immediate Need Action could affect that transportation sector. *See* EIS at 4-37 to 4-41.

12  Plaintiffs take issue with the scope of the Corps' assessment. They argue that NEPA

13  required the Corps to analyze the full costs and benefits of the Current Immediate Need

14  Action, and that the Corps' information is misleading. *See* Mot. at 14–21. Neither

15  argument presents serious questions going to the merits.

16      First, Plaintiffs are wrong as a matter of law that NEPA requires a cost-benefit

17  analysis.[12] The Ninth Circuit made that clear forty years ago. *Trout Unlimited v.*

18  *Morton*, 509 F.2d 1276, 1286 (9th Cir. 1974) (noting that only question is whether EIS

19  is sufficient to aid decision-making and inform the public). NEPA's implementing

20  regulations echo that conclusion: "the weighing of the merits and drawbacks of the

21

22  [11] Unlike many NEPA climate change claims, Plaintiffs are not arguing that the Corps
    failed to consider the *effects of its action* on climate change, but that the Corps failed to
23  consider the *effects of climate chang*e on its action. The uncertainty, however, remains.

24  [12] As Plaintiffs' brief and economic study make clear, they are not seriously taking issue
    with the economic *effects* from the action, despite their attempt to use that label. *See* 40
25  C.F.R. § 1508.8 (defining "effects" as those caused by the action). Instead, they are claiming
    that NEPA required the Corp to provide an economic *justification* for continuing to
26  maintain the navigation channel. *See, e.g.,* Mot. at 14 (arguing Corps failed to examine
    whether "channel is economically worth maintaining"). NEPA includes no such
27  requirement. Thus, to a large extent, Plaintiffs have failed to state a NEPA claim.
28

Fed. Defs.' Opp'n to Prelim. Inj. - 18                    United States Department of Justice
No. 2:14-cv-01800-JLR                                      P.O. Box 7611
                                                           Washington, D.C.  20044
                                                           (202) 305-0248

1   various alternatives need not be displayed in a monetary cost-benefit analysis and

2   should not be when there are important qualitative considerations." 40 C.F.R.

3   § 1502.23. Instead, the regulations require disclosure of a cost-best analysis *if* one is

4   undertaken. *See City of Sausalito v. O'Neill*, 386 F.3d 1186, 1214–16 (9th Cir. 2004)

5   (citing § 1502.23). The Corps did not undertake a detailed cost-benefit analysis for the

6   Current Immediate Need Action. EIS App. G at G-67; Decl. of James K. Fredericks ¶ 4.

7   Nor was such a study necessary. Congress has already made that assessment in its

8   explicit and repeated direction to maintain navigation on the Lower Snake River. *See*

9   *Trout Unlimited*, 509 F.2d at 1287 & n.5; EIS App. G at G-67.

10        Rather than a cost-benefit analysis, the Corps used economic indicators to

11   determine whether the existing navigational civil works projects remained in use and

12   therefore warrant continued maintenance. *Id.* This assessment was not because it was

13   necessary to compare alternatives under NEPA, but to follow internal Corps guidance

14   (which Plaintiffs do not challenge).[13] *See* EIS App. G at G-67; 40 C.F.R. § 1502.23;

15   Fredericks Decl. ¶ 5. The Corps considered that over three million tons of cargo

16   transited the Lower Snake River navigation system in 2012, an increase of 500,000 tons

17   from 2011. Swanson Decl. Ex 2 at 25–26 (Comment 20422). That continued use, and the

18   transportation savings realized when materials are shipped by barge, warrant

19   continued maintenance. EIS at 3-55; Fredericks Decl. ¶ 6. Even if this had been a cost-

20   benefits analysis (which it was not), the Corps would have complied with NEPA by

21   disclosing the information. *See* 40 C.F.R. § 1502.23.

22        Second, the Corps' disclosure of its chosen economic indicators cannot be deemed

23   "misleading." The Corps noted its sources; disclosed the conclusions it was drawing

24

25   [13] The fact that the Corps may have undertaken a cost-benefit analysis in the 2002 Dredged

26   Material Management Plan is irrelevant here. *See* Mot. at 16 n.18 (citing Pls.' Ex. 4). NEPA
     does not require cost-benefit analyses. In any event, other evidence before the Corps

27   contradicts Plaintiffs' contention (Mot. at 17) that shipping volumes and the benefits of

28   maintaining the channel will decline. *See* Letter from Dr. Eric Fruits (Swanson Decl. Ex. 2).

Fed. Defs.' Opp'n to Prelim. Inj. - 19            United States Department of Justice
No. 2:14-cv-01800-JLR                             P.O. Box 7611
                                                  Washington, D.C.  20044
                                                  (202) 305-0248

from the information; and provided those citations and numbers in response to public requests. *See* EIS App. G at G-67 to G-68; EIS at 3-55; Swanson Decl. Ex. 2 at 26, 28 (Comments 20422, 20430). Plaintiffs argue that the Corps' shipping estimate relied upon stale information from a 2002 feasibility report. Mot. at 17–18. Age alone, however, does not invalidate information considered in the NEPA process. *See League of Wilderness Defenders v. Connaughton*, 752 F.3d 755, 763 (9th Cir. 2014). And Plaintiffs do not point to any newer or better report the Corps should have considered. In any event, the Corps acknowledged the report's date and compared its numbers to 2012 tonnage levels. Swanson Decl. Ex. 2 at 26. The 2012 numbers still showed significant use of the navigation system that warranted continued maintenance.[14] Swanson Decl. Ex. 2 at 26, 28; Fredericks Decl. ¶ 6.

Plaintiffs also argue that the Corps erred in looking at transportation savings and total tonnage for the entire Lower Snake River, rather than just at the confluence of the Snake and Clearwater rivers. Mot. at 18–19. This presents nothing more than a methodological disagreement; the Corps' chosen methodology is entitled to deference. *See Weldon*, 697 F.3d at 1051, 1052, 1055–56; *Nat'l Wildlife Fed'n*, 235 F. Supp. 2d at 1158–59. The concern also makes little sense. Congress has directed the Corps to maintain navigation on the entire River, not just select portions of it. Plaintiffs have not shown serious questions going to their economic analysis claim.

---

[14] Plaintiffs argue the EIS is faulty because it did not foretell navigation use indicators for specific future actions. *See* Mot. at 19–20. Plaintiffs' economic report focuses on the selection of the Corps' Programmatic Sediment Management Plan, not the Current Immediate Need Action. *See* Pls.' Ex. 16 Attach. at 6–8. Though the Corps did generally look to economic indicators in developing the Plan, the Plan itself does not authorize any action, dredging or otherwise. Pls.' Ex. 21 at 5. Any claim related to economic indicators for potential future Corps actions is not ripe. Such a claim would also not present a basis to enjoin the Current Immediate Need Action, which is the subject of Plaintiffs' motion.

United States Department of Justice
P.O. Box 7611
Washington, D.C.  20044
(202) 305-0248

**VI.     The Corps Fully Complied with Applicable Clean Water Act Regulations In Authorizing Discharges Associated with the Maintenance Dredging Challenged by Plaintiffs**

Plaintiffs contend that the Corps' authorization of the Current Immediate Need Action is defective because the Corps did not perform a "public interest review" pursuant to 33 C.F.R. § 320.4(a). Mot. at 21–22. Plaintiffs cannot prevail on this claim because § 320.4(a) applies only to processing of CWA section 404 permit applications, and does not apply to Army civil works maintenance activities involving  projects that have been authorized by Congress.

Acting pursuant to its authority to regulate discharges of dredged and fill material into navigable waters, 33 U.S.C. § 1344(a), (d), (e), the Corps issued two separate sets of regulations: (1) requirements that apply to permit applications, 33 C.F.R. parts 321 through 330; and (2) requirements that apply to Corps authorization of its own discharges, 33 C.F.R. parts 335 through 338.

The regulations found at 33 C.F.R. parts 320 through 330 "prescribe[ ] the statutory authorities, and general and special policies and procedures applicable to the review of applications for Department of the Army (DA) permits for controlling certain activities in waters of the United States or the oceans." 33 C.F.R. § 320.1(b). Those regulations include the public review provision, 33 C.F.R. § 320.4(a), that Plaintiffs argue applies to the current immediate need maintenance dredging and disposal challenged in this case. However, § 320.4 expressly states that its requirements, "shall be applicable to the review of all applications for DA permits." Section 320.4 does not, by its own terms, apply to Corps discharges of dredged material. Moreover, "the "Corps does not process and issue permits for its own activities." 33 C.F.R. § 336.1(a).

The regulations applicable in this case are codified at 33 C.F.R. parts 335 through 338, and are "applicable to the Corps of Engineers when undertaking operation and maintenance activities at Army Civil Works projects." 33 C.F.R. § 335.3. Those regulations "prescribe[ ] the practices and procedures to be followed by the Corps of

United States Department of Justice
P.O. Box 7611
Washington, D.C.  20044
(202) 305-0248

1   Engineers to ensure compliance with the specific statutes governing Army Civil Works

2   operations and maintenance projects involving the discharge of dredged or fill material

3   into waters of the U.S. . . . ." 33 C.F.R. § 335.1. Although the Corps does not issue

4   permits for its own activities, "the Corps authorizes its own discharges of dredged or fill

5   material by applying all applicable substantive legal requirements, including public

6   notice, opportunity for public hearing, and application of the section 404(b)(1)

7   guidelines."[15] 33 C.F.R. § 336.1(a). Plaintiffs contend that § 336.1(a) makes the public

8   interest review requirements contained in § 320.4(a) applicable to Corps maintenance

9   dredging that has been authorized by Congress. Mot. at 27. However, the Corps

10  expressly addressed this proposition when it promulgated 33 C.F.R. parts 335 through

11  338 in 1988, and explained that such regulations that apply to the general public (such

12  as the public interest review) do not apply to the Corps' operation and maintenance

13  activities because Congress—not the Corps—determines that such activities are in the

14  public interest:

> The Corps is subject to the same Federal environmental laws and
> regulations as the general public even though the Corps does not issue a
> permit document to authorize its activities. This rule reflects the
> requirement to meet the same standards (see § 336.1(a)). There is, however,
> a somewhat different perspective between projects undertaken by the
> general public and Corps operations and maintenance activities.  When a
> private entity proposes to perform work requiring a Corps permit, the
> Corps must decide whether tha[t] work would be contrary to the public
> interest.  In contrast, this rule [33 C.F.R. parts 335 through 338] applies to
> operation and maintenance of Federal projects which have already been
> determined by the Congress to be in the public interest.

22  Final Rule for Operation and Maintenance of Army Corps of Engineers Civil Works

23  Projects Involving the Discharge of Dredged Material Into Waters of the U.S. or Ocean

24  Waters, 53 Fed. Reg. 14,902, 14,903 (Apr. 26, 1988). The Corps thus does not interpret

---

[15] Plaintiffs do not allege that the Corps has failed to satisfy the requirements of the
404(b)(1) guidelines, which aim to fulfill the goal of the CWA though "control of discharges
of dredged or fill material." 40 C.F.R. § 230.1.

§ 336.1(a) to make the public interest review provisions of §320.4(a) to maintenance dredging. An agency's interpretation of its own regulations is controlling unless it is "plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (citation omitted). This is particularly true where, as here, "there is no indication that its current view is a change from prior practice or a *post hoc* justification adopted in response to litigation." *Decker v. Nw. Envtl. Def. Ctr.*, 133 S. Ct. 1326, 1337 (2013).

The Corps' 1988 rulemaking decision not to include a public interest review process in its regulations pertaining to its maintenance projects is also entitled to deference. Where, as here, an agency with delegated rulemaking authority promulgates a regulation interpreting a provision of the statute it administers, this Court reviews that interpretation pursuant to the deferential standard set out in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). At step one of the *Chevron* inquiry, the Court evaluates whether congressional intent regarding the meaning of the text in question is clear from the statute's plain language. *See Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 986 (2005). If it is, the Court must give effect to that meaning. *Id.* If the statute is ambiguous, the Court then proceeds to step two. Under step two, the Court must determine if the agency's interpretation of the statute is "a reasonable policy choice for the agency to make." *Brand X*, 545 U.S. at 986 (quoting *Chevron*, 467 U.S. at 845); *see N. Cal. River Watch v. Wilcox*, 633 F.3d 766, 772–73 (9th Cir. 2011). The agency's interpretation is controlling "if it is a reasonable interpretation of the statute—not necessarily the only possible interpretation, nor even the interpretation deemed *most* reasonable by the courts." *Entergy*, 556 U.S. at 218 (2009) (citation omitted). The CWA contains no provision requiring public interest reviews of proposed discharges of dredged material; *Chevron* step two therefore applies. Plaintiffs cannot show that the Corps' rulemaking regarding public interest reviews reflects an unreasonable interpretation of the CWA.

United States Department of Justice
P.O. Box 7611
Washington, D.C.  20044
(202) 305-0248

1       Congress has concluded that the operation and maintenance dredging that is the

2   subject of the current immediate need action ROD is in the public interest. Congress

3   authorized construction of the Lower Snake River Projects in Section 2 of the Flood

4   Control Act of 1945. *See* 59 Stat. at 21. Congress also required that the navigation

5   channel be established at 14 feet deep by 250 feet wide at Minimum Operating Pool,

6   and provided the Corps with authority to maintain the channel at those dimensions. 76

7   Stat. at 1193. The Corps has performed navigation dredging in the Lower Snake River

8   on at least 17 occasions since 1961, when the navigation channel was constructed for

9   Ice Harbor Dam, the first of the four lower Snake River dams. *See* EIS at 1-12 to 1-13.

10  Congress appropriated funds for all prior lower Snake River dredging actions, as well

11  as for the planned Current Immediate Need Action. Pursuant to the applicable CWA

12  regulations, the public interest review provision contained in 33 C.F.R. § 320.4(a) does

13  not apply to the current maintenance dredging project.[16] Accordingly, Plaintiffs cannot

14  prevail on the Fifth Claim for Relief alleged in their Complaint.

15  **VII.    Potential Harms to the Corps and Navigational Safety Outweigh
         Plaintiffs' Speculative Assertion of Harm to Pacific Lamprey**
16

17      Even if Plaintiffs had shown a likelihood of irreparable harm and likelihood of

18  success or substantial questions going to the merits, an injunction would still be

19  inappropriate given the balance afforded to the public and other interests. *See Winter*,

20  555 U.S. at 22. "[T]he Supreme Court has not established that, as a rule, any potential

21  environmental injury merits an injunction . . . . [Ninth Circuit] law does not . . . allow

22  [courts] to abandon a balance of harms analysis just because a potential environmental

23  injury is at issue." *Lands Council v. McNair*, 537 F.3d 981, 1004–05 (9th Cir. 2008).

24

25

26  [16] The Corps did complete a public interest review for the permits issued to the Ports of
    Lewiston, Idaho and Clarkston, Washington for related/ancillary port berthing area
27  maintenance dredging that will be conducted at the same time as the Corps' federal
    navigation channel maintenance dredging. Vail Decl. ¶ 9.
28

Fed. Defs.' Opp'n to Prelim. Inj. - 24                  United States Department of Justice
No. 2:14-cv-01800-JLR                                   P.O. Box 7611
                                                        Washington, D.C.  20044
                                                        (202) 305-0248

The Corps understands that the Inland Port and Navigation Group will be submitting factual information showing the threat to navigational safety that would remain with any preliminary injunction. Ensuring navigational safety, when compared to the speculative harm that Plaintiffs assert, favors denying the injunction. *See Cottrell*, 632 F.3d at 1135 (requiring that the balance of harm tip *sharply* in favor of an injunction under substantial questions standard). Because of in-water work windows for the benefit of aquatic species, an injunction would effectively delay sediment removal for at least one additional year. *See* Shelin Decl. ¶ 7. During that time, shoaling and navigational impairment will only continue.

At least two other public interest considerations further tip the scale against preliminary injunctive relief. First, Congress has already determined that the Lower Snake River should be maintained for navigation. *See* 59 Stat. at 21. Congress has also explicitly directed that the navigation channel should be maintained at 14 feet by 250 feet. 76 Stat. at 1193. Those determinations are not subject to review in this suit and Plaintiffs should not be allowed to subvert Congress's legislative directive with unsubstantiated and speculative allegations of harm to Pacific lamprey. *Accord United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001) (in crafting injunctive remedies, "a court sitting in equity cannot 'ignore the judgment of Congress, deliberately expressed in legislation'" (citation omitted)).

Second, a preliminary injunction would run counter to full implementation of measures deemed necessary to ensure the ongoing protection of salmon and steelhead listed as threatened or endangered under the Endangered Species Act. Congress has charged the National Marine Fisheries Service (NMFS) to evaluate effects on listed salmonids. 50 C.F.R. § 402.01(b). NMFS has issued a biological opinion for the Federal Columbia River Power System that addresses the Corps' operation of the Lower Snake River projects, including Lower Granite Dam. Vail Decl. ¶ 6 & Attach. A. The biological opinion directs the Corps to operate the Lower Snake River Projects within one foot of

1   the Minimum Operating Pool from April through approximately September 1 of each

2   year, unless an adjustment is necessary to meet authorized project purposes (such as

3   navigation). *Id*. These measures are intended to reduce the cross-section of the

4   reservoir, which minimizes water travel time and aids in downstream juvenile

5   salmonid migration through the reservoir. *Id*. While NMFS recognized that limited

6   adjustments to these operations can be made, it also clearly specified those operations

7   that are most beneficial to listed salmonids. *Id*. Given the current navigational

8   impairments, the Corps has been forced to raise the pool level at Lower Granite Dam in

9   order to implement Congress's navigational directive and ensure safe navigation. Vail

10  Decl. ¶ 6. An injunction would force the Corps to continue this operation. NMFS's

11  expertise and judgment on measures necessary to ensure compliance with the

12  Endangered Species Act should be afforded deference. *Cf. Idaho Watersheds Project v.*

13  *Hahn*, 307 F.3d 815, 830 31 (9th Cir. 2002) (deferring "to the considerable agency

14  expertise" in fashioning equitable relief). An injunction that hinders—rather than

15  facilitates—full implementation of NMFS's biological opinions is not in the public

16  interest. In addition, the Current Immediate Need Action will further benefit listed

17  salmonids through the creation of shallow water habitat. Shelin Decl. ¶¶ 11–12.

18                              <u>**Conclusion**</u>

19       Plaintiffs base their motion on a speculative harm to Pacific lamprey. The

20  motion should be denied on that basis alone. Plaintiffs have also failed to demonstrate

21  even a serious question going to the merits of their claims, and the balance of the harm

22  favors allowing the Corps to remove the current navigation-impairing sediment.

23  Plaintiffs' motion should be denied.

24

25  Dated: December 15, 2014

26                                         SAM HIRSCH
                                           Acting Assistant Attorney General

27
                                            *s/ Kristofor R. Swanson*
28

Fed. Defs.' Opp'n to Prelim. Inj. - 26          United States Department of Justice
No. 2:14-cv-01800-JLR                            P.O. Box 7611
                                                 Washington, D.C.  20044
                                                 (202) 305-0248

KENT E. HANSON
Environmental Defense Section
KRISTOFOR R. SWANSON
Natural Resources Section
Environment & Natural Resources Div.
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
Tel: (206) 220-4198
Tel: (202) 305-0248
Fax: (202) 305-0506
kent.hanson@usdoj.gov
kristofor.swanson@usdoj.gov

*Attorneys for Federal Defendant*

OF COUNSEL:
ROBERT D. ESKILDSEN
Assistant District Counsel
JASON DEROSA
Assistant Division Counsel
U.S. Army Corps of Engineers

## Certificate of Service

I hereby certify that on December 15, 2014, I filed the above pleading and associated declarations with the Court's CMS/ECF system, which will send notice to each party.

 *s/Kristofor R. Swanson*
KRISTOFOR R. SWANSON

United States Department of Justice
P.O. Box 7611
Washington, D.C.  20044
(202) 305-0248