James L. Buchal (WSB #31369)
MURPHY & BUCHAL LLP
3425 SE Yamhill Street, Suite 100
Portland, OR  97214
Tel:  503-227-1011
Fax:  503-573-1939
jbuchal@mbllp.com
*Attorney for Intervenor-Defendant*
*Columbia Snake River Irrigators Association*


IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| IDAHO RIVERS UNITED; WASHINGTON WILDLIFE FEDERATION; PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS; INSTITUTE FOR FISHERIES RESOURCES; SIERRA CLUB; RIENDS OF THE CLEARWATER; and NEZ PERCE TRIBE, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES ARMY CORPS OF ENGINEERS, <br><br> Defendant, <br><br> and <br><br> COLUMBIA SNAKE RIVER IRRIGATORS ASSOCIATION; and INLAND PORT AND NAVIGATION GROUP, <br><br> Intervenor-Defendants. | 2:14-CV-1800-JLR <br><br><br> CSRIA'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION <br><br><br> CALENDARED BY MINUTE ORDER FOR: <br><br> January 2, 2014 at 9:00 a.m. |

1

**TABLE OF CONTENTS**

2   TABLE OF AUTHORITIES ...................................................................................... i

3   Summary of Argument ............................................................................................ i

4   Argument. ................................................................................................................3

5   I.    THE APPLICABLE LEGAL STANDARDS SET AN INSURMOUNTABLE
6         BARRIER FOR PLAINTIFFS. .....................................................................3

7         A.   Recent Supreme Court Authority Confirms that the Injunction
               Remains An Extraordinary Remedy in NEPA Cases. ..................................3

8         B.   The Standard of Review Is Highly Deferential...........................................4

9         C.   NEPA Was Never Even Intended to Apply in this Context. ......................6

10  II.   PLAINTIFFS FAIL TO DEMONSTRATE A LIKELIHOOD OF SUCCESS,
11        OR EVEN A SERIOUS QUESTION, AS TO THE MERITS
          OF THEIR CLAIMS.......................................................................................7

12        A.   The Scope of the Immediate Action Is Infinitesimal for Environmental
13             Purposes ....................................................................................................7

14        B.   The Corps Adequately Considered Alternatives.........................................9

15        C.   The Corps Adequately Considered Lamprey Impacts ...............................12

16        D.   The Corps' Economic Analysis Was Adequate for NEPA.......................16

17        E.   There Is No Question about CWA Compliance .........................................19

18        F.   The Corps Treatment of Asserted "Climate Change" Was Adequate .......20

19  III.  THERE IS NO IRREPARABLE INJURY AND NO BALANCE OF
20        HARDSHIP FAVORING PLAINTIFFS.......................................................21

21  IV.   THE PUBLIC INTEREST MILITATES AGAINST ENTRY OF AN
          INJUNCTION................................................................................................21
22

23  Conclusion .............................................................................................................22

24

i

James L. Buchal, WSB No. 31369
Murphy & Buchal LLP
3425 SE Yamhill Street, Suite 100
Portland, Oregon  97214
Phone:  503-227-1011
Fax:  503-573-1939

1

# TABLE OF AUTHORITIES

2

**Cases**

3

*Alliance for the Wild Rockies v. Cottrell*,

4
    632 F.3d 1127 (9th Cir. 2011) ...............................................................................1

5

*American Iron & Steel Institute v. EPA*,
    115 F.3d 979 (D.C. Cir. 1997)...............................................................................14

6

*Angoon v. Hodel*,

7
    803 F.2d 1016 (9th Cir. 1986) ...............................................................................10

8

*Barnes v. U.S. Department of Transportation*,
    655 F.3d 1124 (9th Cir. 2011) ...............................................................................20

9

*City of Sausalito v. O'Neill*,

10
    386 F.3d 1186 (9th Cir. 2004) ...............................................................................10

11

*Crosby v. Young*,
    512 F. Supp. 1363 (E.D. Mich. 1981).....................................................................4

12

*Earth Island Institute v. U.S. Forest Service*,

13
    442 F.3d 1147 (2006).................................................................................................5

14

*Fund for Animals, Inc. v. Lujan*,

15
    962 F.2d 1391 (9th Cir. 1992) .................................................................................1

16

*Hughes River Watershed Conservancy v. Glickman*,
    81 F.3d 437 (4th Cir. 1996) ...................................................................................17

17

*Izaak Walton League v. Marsh*,

18
    655 F.3d 346 (D.C. Cir. 1981).................................................................................9

19

*Kootenai Tribe of Idaho v. Veneman*,
    313 F.3d 1094 (9th Cir. 2002) ...............................................................................11

20

*Lands Council v. McNair*,

21
    537 F.3d 981 (2008) (*en banc*) ......................................................................4, 16

22

*Marsh v. Oregon Natural Resources Council*,
    490 U.S. 360 (1989)..................................................................................................5

23

24

CSRIA'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
Case No. 2:14-CV-1800-JLR

James L. Buchal, WSB No. 31369
Murphy & Buchal LLP
3425 SE Yamhill Street, Suite 100
Portland, Oregon  97214
Phone:  503-227-1011
Fax:  503-573-1939

*Muckleshoot Indian Tribe v. U.S. Forest Service*,
    177 F.3d 800 (9th Cir. 1999) ...........................................................................11

*National Wildlife Federation v. Burlington N. R.R.*,
    23 F.3d 1508 (9th Cir. 1994) .............................................................................1

*National Wildlife Federation v. NMFS*,
    235 F. Supp.2d 1143 (W.D. Wash. 2002)................................1, 5, 9, 10, 18, 20, 21

*National Wildlife Federation v. NMFS*,
    No. 2:02-cv-2259-RSL (W.D. Wash. Nov. 1, 2014) ......................1, 6, 7, 9, 20, 21

*NRDC v. U.S. Forest Service*,
    421 F.3d 797 (9th Cir. 2005) ...........................................................................18

*Oklahoma ex rel. Phillips v. Guy F. Atkinson Co.*,
    313 U.S. 508 (1941)........................................................................................17

*Shell Offshore, Inc. v. Greenpeace, Inc.*,
    709 F.3d 1281 (9th Cir. 2013) ...........................................................................4

*Sierra Club v. Sigler*,
    695 F.2d 957 (5th Cir. 1983) ...........................................................................17

*SLEC, Inc. v. Sand*,
    629 F.2d 1005 (5th Cir. 1980) .........................................................................17

*Upper Snake River v. Hodel*,
    921 F.2d 232 (9th Cir. 1990) .............................................................................6

*Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*,
    435 U.S. 519 (1978)...................................................................................9, 17

*Washington Environmental Council v. Bellon*,
    732 F.3d 1131 (9th Cir. 2013) .........................................................................21

*Winter v. NRDC, Inc.*,
    555 U.S. 7 (2008)...................................................................................1, 3, 4, 5

**Federal Statutes**

16 U.S.C. § 1536(a)(2)...................................................................................14

iii

CSRIA'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
Case No. 2:14-CV-1800-JLR

James L. Buchal, WSB No. 31369
Murphy & Buchal LLP
3425 SE Yamhill Street, Suite 100
Portland, Oregon  97214
Phone:  503-227-1011
Fax:  503-573-1939

42 U.S.C. § 4321 .................................................................................................1

42 U.S.C. § 4332(C) .........................................................................................17

**Federal Regulations**

33 C.F.R. § 320.1(a) ........................................................................................19

33 C.F.R. § 320.4(a)(1) ...................................................................................19

40 C.F.R. § 1508.27(a) .....................................................................................20

**Other Authority**

Pub. L. No. 87-874, § 203, 76 Stat. 1173, 1193 (1962) (Flood Control Act of 1962) ......17

64 Fed. Reg. 71,813, 71,814 (Dec. 22, 1999) ..................................................12

Council on Environmental Quality, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations*, 46 C.F.R. 18026 (Mar. 23, 1981) ................................. 9

iv

James L. Buchal, WSB No. 31369
Murphy & Buchal LLP
3425 SE Yamhill Street, Suite 100
Portland, Oregon  97214
Phone:  503-227-1011
Fax:  503-573-1939

**Summary of Argument**

Both the facts and the law have changed since this Court's prior decisions preliminarily enjoining the United States Corps of Engineers from dredging:  *National Wildlife Federation (NWF) v. NMFS*, 235 F. Supp.2d 1143 (W.D. Wash. 2002); *NWF v. NMFS*, No. 2:02-cv-2259-RSL (Nov. 1, 2014).  The Supreme Court and the Ninth Circuit have significantly restricted the availability of injunctions issued pursuant to the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, and the Corps has completed a thorough environmental analysis of Snake River dredging.

As to the law, no longer can plaintiffs rely on the mere "possibility of irreparable injury," *NWF*, 235 F. Supp.2d at 1151 (quoting *Fund for Animals, Inc. v. Lujan*, 962 F.2d 1391, 1400 (9th Cir. 1992)).  In the wake of *Winter v. NRDC, Inc.,* 555 U.S. 7 (2008), they must demonstrate that irreparable harm is *likely*.  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).  Last time around, plaintiffs raised the specter of injury to salmon and steelhead species listed for protection under the Endangered Species Act, which invoked then-special rules for injunctions.  *See National Wildlife Federation v. Burlington N. R.R.,* 23 F.3d 1508, 1511 (9th Cir. 1994) (former law that ESA claims "removed from the courts their traditional equitable discretion").  This time around, we now know that Plaintiffs' fears of jeopardy to salmon were groundless.  Thus plaintiffs now invoke the lamprey, but a careful review of the evidence confirms that there is no likelihood of any appreciable effect whatsoever on plaintiffs' enjoyment of this sea-going parasite.

This time around, the Corps gave exhaustive consideration to all the reasonable alternatives raised by plaintiffs in its environmental impact statement.  It did so even though the law has evolved away from requiring agencies to consider alternatives they cannot lawfully

CSRIA'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION
Case No. 2:14-CV-1800-JLR

James L. Buchal, WSB No. 31369
Murphy & Buchal LLP
3425 SE Yamhill Street, Suite 100
Portland, Oregon  97214
Phone:  503-227-1011
Fax:  503-573-1939

1    implement.  What is before the Court for immediate injunctive relief is the Corps' distinct

2    decision to proceed with the immediately-needed dredging between now and March 1, 2015.

3    There is no reasonable alternative to the dredging itself, and the Corps is proceeding with that

4    dredging after conducting a careful environmental analysis and adopting all reasonable measures

5    to prevent environmental harm in the short term, including harm to lamprey.  The Corps'

6    treatment of alternatives in this context cannot reasonably be said to be arbitrary and capricious.

7          The particular environmental harm highlighted by plaintiffs, risk to lamprey populations,

8    is of vanishingly small magnitude.  One study in the record finds no lamprey whatsoever near the

9    dredging areas, and one notes that single specimens are often captured when trawling with nets

10   to sample salmon smolts.  The Corps' conclusion that while lamprey impacts were not

11   demonstrated, they were possible, coupled with the adoption of in-water work times and

12   equipment choices to minimize impact, make the Corps' action not arbitrary and capricious.  The

13   dredged areas are tiny by comparison to the river as a whole, and even tinier in comparison to the

14   larger set of more important tributary habitat where lamprey actually spawn.  The lack of any

15   appreciable injury to lamprey means that plaintiffs fail entirely to demonstrate a balance of

16   hardships tipping in their favor.

17         As to issues concerning economic analyses, plaintiffs mistake this case for a forum on

18   whether or not to construct the navigation channel.  Plaintiffs' claims about cost-effectiveness

19   are fundamentally an attempt to induce this Court to second-guess that judgment by Congress, a

20   result not permissible under the Constitution's separation of powers.  Ample authority confirms a

21   highly limited role for economic analysis, with this Court not to disturb the Corps' judgment

22   without clear and convincing evidence that the economic errors have seriously prejudiced

23   decisionmaking concerning environmental impacts.

24

2

CSRIA'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
Case No. 2:14-CV-1800-JLR

James L. Buchal, WSB No. 31369
Murphy & Buchal LLP
3425 SE Yamhill Street, Suite 100
Portland, Oregon  97214
Phone:  503-227-1011
Fax:  503-573-1939

1    Plaintiffs' claims for a separate "public interest review" under the Corps Clean Water Act

2  regulations are similarly meritless; the public interest choice was made by Congress when it

3  established a fourteen-foot deep navigation channel in 1962.  The Corps' voluminous and careful

4  decision documents here amply consider the public interest.  Plaintiffs' claims concerning global

5  warming are similarly meritless, and not really relevant for purposes of evaluating the immediate

6  action.

7    What is manifestly not in the public interest would be entry of the requested preliminary

8  injunction.  Defendant-intervenors the Columbia Snake River Irrigators Association (CSRIA)

9  files herewith the Declaration of Dr. Darryll Olsen showing the injuries that would result to its

10  members; CSRIA relies upon the material submitted by defendant-intervenors the Inland Ports

11  and Navigation Group (IPNG) for further evidence.

12                                    **Argument**

13  **I.    THE APPLICABLE LEGAL STANDARDS SET AN INSURMOUNTABLE**
        **BARRIER FOR PLAINTIFFS.**

14
        **A.    Recent Supreme Court Authority Confirms that the Injunction Remains An**
15           **Extraordinary Remedy in NEPA Cases.**

16    The recent U.S. Supreme Court decision in the *Winter* case reversed the Ninth Circuit's

17  upholding of a NEPA injunction, and updated the governing law:

18       "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on
         the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief,
19       that the balance of equities tips in his favor, and that an injunction is in the public
         interest."
20

21  *Winter v. NRDC, Inc.,* 555 U.S. 7, 20 (2008).  As set forth below, none of these factors supports

22  granting an injunction in these circumstances.  Plaintiffs argue that notwithstanding *Winter*, the

23  Ninth Circuit would allow them to demonstrate only "serious questions" going to the merits,"

24
                                         3

James L. Buchal, WSB No. 31369
Murphy & Buchal LLP
3425 SE Yamhill Street, Suite 100
Portland, Oregon  97214
Phone:  503-227-1011
Fax:  503-573-1939

1   plus that "the balance of hardships tips sharply" in their favor.  (Pltf. Mem. at 2 (citing *Shell*

2   *Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013)).  Plaintiffs must still,

3   however, demonstrate that irreparable harm is *likely* and that granting an injunction is in the

4   public interest—which they cannot do.  Nor can they demonstrate serious questions as to the

5   merits, coupled with a balance of hardships tipping sharply in their favor.

6        As *Winter* reaffirmed, "[a] preliminary injunction is an extraordinary remedy never

7   awarded as of right;" rather, this Court must carefully "balance the competing claims of injury

8   and consider the effect of granting or withholding the requested relief, paying particular regard to

9   the public consequences."  *Winter*, 555 U.S. at 9.  Another factor militating against entry of an

10  injunction is that this Court does not yet have before it the full administrative record supporting

11  the Record of Decision, and "[w]ithout the entire record before it, a court cannot determine if an

12  environmental assessment is reasonable".  *Crosby v. Young*, 512 F. Supp. 1363, 1371 (E.D.

13  Mich. 1981).  The extraordinarily short amount of time during this holiday season to brief

14  plaintiffs' request for extraordinary relief also counsels caution in entering it.

15        **B.      The Standard of Review Is Highly Deferential.**

16        In yet another decision tightening the standards for issuance of injunctive relief in this

17  context, the Ninth Circuit has warned that a court evaluating likelihood of success (or serious

18  questions) "must remember that the APA provides the authority for our review of decisions

19  under NEPA" (or the CWA).  *Lands Council v. McNair*, 537 F.3d 981, 987 (2008) (*en banc*).

20  And under the resulting "arbitrary and capricious" standard, the Corps has only erred

21          "if the agency relied on factors Congress did not intend it to consider, 'entirely failed to
            consider an important aspect of the problem,' or offered an explanation 'that runs counter
22          to the evidence before the agency or is so implausible that it could not be ascribed to a
            difference in view or the product of agency expertise.'"

23

24                                          4

James L. Buchal, WSB No. 31369
Murphy & Buchal LLP
3425 SE Yamhill Street, Suite 100
Portland, Oregon  97214
Phone:  503-227-1011
Fax:  503-573-1939

*Id.* (quoting *Earth Island Institute v. U.S. Forest Service*, 442 F.3d 1147, 1156 (2006)).  Because resolution of plaintiff's claims involves primarily issues of fact, and "analysis of the relevant documents requires a high level of technical expertise," *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 377 (1989) (quotations and citations omitted), "defer[ence] to the informed discretion of the responsible federal agencies" is required.  *Id.*

*Winter* re-emphasized that NEPA "does not mandate various results" but merely requires that the agency take a "hard look at environmental consequences," finding in that case that the agency had done so based on a "detailed, 293-page EA".  *Winter* 555 U.S. at 23 (quoting various cases).  Here plaintiffs have presented the Court with excerpts from the Corps' 414-page Lower Snake River Programmatic Sediment Management Plan (PSMP) Final Environmental Impact Statement (FEIS) and 910-page Record of Decision (ROD) package.  And it is not the first extraordinarily-detailed study of the environmental impacts associated with maintaining navigation through the Snake River.

This Court's prior decision in *National Wildlife Federation v. NMFS*, 235 F. Supp.2d 1143 (W.D. Wash. 2002), considered the Dredged Material Management Plan and Environmental Impact Statement (DMMP/EIS).  There followed the "SEA 03/04" documents considered in 2004.  *NWF*, slip op. 13 (NEPA violation because SEA 03/04 is "not an EIS, an EA, or a FONSI").  Backing up the Corps' information based were still further NEPA studies such as the Final Lower Snake River Juvenile Salmon Migration Feasibility Report/Environmental Impact Statement (hereafter "2002 EIS").  This even more massive study, with 21 lengthy appendices, considered, among other things, the impacts of removing Lower Snake River Dams and the resulting environmental impacts of terminating barge traffic on the

5

CSRIA'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
Case No. 2:14-CV-1800-JLR

James L. Buchal, WSB No. 31369
Murphy & Buchal LLP
3425 SE Yamhill Street, Suite 100
Portland, Oregon  97214
Phone:  503-227-1011
Fax:  503-573-1939

1   Snake River, ultimately rejecting the dam breaching alternative.[1]

2       For all these reasons, even the preliminary record before this Court does not raise a

3   serious question as to arbitrary and capricious conduct by the Corps.  This case does not involve

4   a failure to conduct environmental analyses; it involves nitpicking the policy choices that have

5   probably been the subject of more comprehensive and detailed environmental analysis than any

6   other issue on earth.

7       **C.   NEPA Was Never Even Intended to Apply in this Context.**

8       From CSRIA's perspective, a mere continuation of routine dredging operations should

9   not invoke NEPA at all under the authority of *Upper Snake River v. Hodel*, 921 F.2d 232 (9th

10  Cir. 1990).  There the Ninth Circuit, noting that NEPA does not apply retroactively, found that

11  an EIS was only required where there were significant changes to ongoing project operations.

12  *Id.* at 234.  There, as here, the dam operators were "doing nothing new, nor more extensive, nor

13  other than that contemplated when the project was first operational."  *Id.* at 235; *cf.* Buchal Decl.

14  Ex. 1 at 8; FEIS at 2-34 (noting alternative for "continuation of the Corps' historical practices of

15  using dredging").

16      The Corps' decision to look more broadly to alternatives to continued dredging was thus

17  arguably never even required by NEPA.  This Court did previously reject application of *Upper*

18  *Snake River Irrigators* case, but recognized that the Corps in invoking the case was arbitrarily

19  and capriciously rejecting its own voluntary determination that NEPA applied.  *NWF v. NMFS*,

20  No. 2:02-cv-02259-RSL, slip op. at 11-12 (W.D. Wash. Nov. 1, 2014).  As a matter of policy,

21  ────────────────────

22  [1] This massive Corps EIS is available at

23  http://www.nww.usace.army.mil/Library/2002LSRStudy.aspx (accessed 12/9/14).  This is but
    one of many gigantic NEPA studies concerning the federal projects along the Columbia and

24  Snake Rivers that cannot be adequately briefed or reviewed in this preliminary context.

CSRIA'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
Case No. 2:14-CV-1800-JLR

James L. Buchal, WSB No. 31369
Murphy & Buchal LLP
3425 SE Yamhill Street, Suite 100
Portland, Oregon  97214
Phone:  503-227-1011
Fax:  503-573-1939

1   agencies should not have to fear that going above and beyond to consider environmental

2   consequences will frustrate operations that, had they ignored environmental consequences

3   entirely, might have proceeded as a matter of course.  An injunction under these circumstances

4   would be akin to adopting a policy of "no good deed goes unpunished" and operate contrary to

5   the overarching policies of NEPA.

6   **II.   PLAINTIFFS FAIL TO DEMONSTRATE A LIKELIHOOD OF SUCCESS, OR**
    **EVEN A SERIOUS QUESTION, AS TO THE MERITS OF THEIR CLAIMS.**

7

        **A.   The Scope of the Immediate Action Is Infinitesimal for Environmental**
8       **Purposes.**

9          As the Corps explained,

10      "This PSMP programmatic EIS includes alternatives that define broad programs for
        managing sediments through implementation of future actions as they relate to
11      maintaining the authorized project purposes of the [Lower Snake River Projects].
        Actions taken to address the current immediate need action (consistent with the PSMP) to
12      reestablish the navigation channel, including regulatory review by the Corps of related
        port actions, are covered in this EIS at a site-specific level."  (Buchal Decl. Ex. 1 at 3;
13      FEIS at xii.)

14   The Council on Environmental Quality (CEQ), the agency charged with interpreting NEPA,

15   agrees that a single EIS may support both programmatic and project-specific proposals.  (*See*

16   Buchal Decl. Ex. 2 at 2 n.2; Immediate Need ROD at 2 n.2.)  For purposes of this preliminary

17   injunction motion, it is incumbent upon plaintiffs to show a probability of success concerning the

18   Corps' environmental analysis of the "immediate need action", and thus this brief focuses upon

19   that analysis.  *Cf. NWF*, slip op. at 9, 22 (analyzing single 2004-05 dredging proposal).  Those

20   immediate needs involve dredging in areas where the federal navigation channel is less than

21   authorized dimensions.  (Buchal Decl. Ex. 1 at 4; FEIS at xv.)

22          The environmental analysis of the immediate need action challenged by plaintiffs'

23   motion was extraordinarily detailed.  There is an entire separate, detailed ROD for the immediate

24

7

James L. Buchal, WSB No. 31369
Murphy & Buchal LLP
3425 SE Yamhill Street, Suite 100
Portland, Oregon  97214
Phone:  503-227-1011
Fax:  503-573-1939

1    need decision.  (Buchal Decl. Ex. 2; Immediate Need ROD.)  The Corp also obtained two highly-

2    detailed biological opinions from NOAA Fisheries (NOAA BiOp) and the U.S. Department of

3    Fish and Wildlife (USFW BiOp) covering eight different fish species.  While the opinions

4    formally concerned salmon and bull trout, lamprey were addressed as well.  (Buchal Decl. Ex. 4

5    at 14; USFWS BiOp at 59.)

6           The opinions focused on the immediate action, specifically,

7           ". . . dredging of the following sites: (1) Downstream navigation lock of Ice Harbor Dam
           (Snake river mile (RM) 9.5); (2) the Federal navigation channel in the Snake and
8           Clearwater Rivers confluence area (Snake RM 138 to Clearwater RM 2.0); (3) the
           berthing area for the Port of Clarkston, Washington (Snake RM 137.9 and 139); (4) the
9           berthing area for the Port of Lewiston, Idaho (Clearwater River, RM 1 to 1.5). The
           proposed action also entails using dredged material as fill to construct a shallow water
10          bench for juvenile habitat at Knoxway Bench (RM 116) immediately upstream of
           Knoxway Canyon."

11

12   (Buchal Decl. Ex. 3 at 2; NOAA BiOp at 3.)  The record reflects detailed maps of the sites,

13   which confirms that they are utterly tiny in relation to the overall watershed.  (Buchal Decl. Ex. 4

14   at 7-11; USFW BiOp at 7-11.)

15          The authorized channel is 250 feet wide, but only very tiny portions of the channel will

16   be dredged, and the average width of these reservoirs is far larger than the channel.  The

17   maximum quantity that might be removed is 500,000 cubic yards, over 139 miles of Snake River

18   and 2 miles of Clearwater River.  (Buchal Decl. Ex. 4 at 2; USFW BiOp at 26.)  By way of

19   comparison, if the dredging were two yards deep, the 500,000 cubic yards number would

20   correspond to dredging 1.7 miles of the River, or 1% of the river length involved.  And the

21   channel itself is a tiny fraction of the overall reservoir beds, and that whole area pales in

22   biological significance compared to the tributary habitat area were the lamprey spawn.  *See also*

23   *infra* Point II(C).

24

CSRIA'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
Case No. 2:14-CV-1800-JLR

James L. Buchal, WSB No. 31369
Murphy & Buchal LLP
3425 SE Yamhill Street, Suite 100
Portland, Oregon  97214
Phone:  503-227-1011
Fax:  503-573-1939

1          **B.        The Corps Adequately Considered Alternatives.**

2          It is well-settled that under NEPA the range of alternatives that must be discussed is a

3   matter within an agency's discretion.  *See Vermont Yankee Nuclear Power Corp. v. National*

4   *Resources Defense Council,* 435 U.S. 519, 551-52 (1978).  Also inherent in NEPA is the

5   requirement that alternatives to proposed action be "reasonable".  40 C.F.R. § 1502.14.

6   "Reasonable alternatives include those that are practical or feasible from the technical and

7   economic standpoint and using common sense . . .".  Council on Environmental Quality, *Forty*

8   *Most Asked Questions Concerning CEQ's NEPA Regulations*, 46 C.F.R. 18026 (Mar. 23, 1981).

9          Where, as here, "Congress has enacted legislation approving a specific project, the

10  implementing agency's obligation to discuss alternatives in its environmental impact statement is

11  relatively narrow."  *Izaak Walton League v. Marsh*, 655 F.3d 346, 372 (D.C. Cir. 1981).

12  Common sense confirms the Corps' detailed conclusion in its ROD (Buchal Decl. Ex. 2 at 4;

13  Immediate Need ROD at 2) that none of the long-term alternatives highlighted by plaintiffs can

14  get the dredging channel cleared before March 1, 2015.

15         It is worth noting that plaintiffs' "alternatives" arguments now are generally the same

16  arguments made before this Court in 2002:

17             ". . . the Corps failed to consider strategies to reduce the heavy inflow of sediment into
               the Lower Granite Reservoir by encouraging better upstream practices, strategies to use
18             partial, temporary reservoir drawdowns and increased flows to "flush" sediment
               downstream, and strategies that would require the use of lighter loaded barges to reduce
19             the need for dredging."

20  *NWF*, 235 F. Supp.2d at 1151.  By 2004, the Corps' analysis of these alternatives in its "SEA

21  03/04" document was already sufficient to deny any predicate for an injunction based on

22  insufficient consideration of alternatives.  *NWF*, slip op. at 18.

23         This time around, the Corps has "establish[ed] continued implementation of current or

24

9

James L. Buchal, WSB No. 31369
Murphy & Buchal LLP
3425 SE Yamhill Street, Suite 100
Portland, Oregon  97214
Phone:  503-227-1011
Fax:  503-573-1939

1   increased (as funding/technology allow) upland sediment reduction measures (USRM) as a

2   baseline component of all alternatives evaluated in the ESI, including the 'no action'

3   alternative. . ." (Buchal Decl. Ex. 1 at 5; FEIS at 1-30), considering this alternative in depth.  The

4   Corps has carefully considered drawdowns, including them in several alternatives (*e.g.,* Buchal

5   Decl. Ex. 1 at 7; FEIS at 2-29)—while noting that performing them "would require sufficient

6   lead time to plan, design and implement modifications to infrastructure" (Buchal Decl. Ex. 1 at

7   6; FEIS at 2-20).

8          It is doubtful that consideration of these alternatives was even required by law.  Although

9   this Court emphasized last time around that the Corps should not exclude alternatives that

10  required additional legislative authorizations, *NWF*, 235 F. Supp.2d at 1154, since then, Ninth

11  Circuit authority has made it clear that alternatives which would require Congressional action to

12  implement "will qualify for inclusion in an EIS only in very rare circumstances".  *City of*

13  *Sausalito v. O'Neill*, 386 F.3d 1186, 1208 (9th Cir. 2004) (quoting *Angoon v. Hodel*, 803 F.2d

14  1016, 1021 n.2 (9th Cir. 1986)).  As in *Angoon*, the Corps is simply not "well-placed" to

15  consider offsite sediment mitigation programs far from its facilities.  *Angoon*, 803 F.2d at 1021

16  n.2.  But the Corps did so anyway, and cannot remotely be characterized as arbitrary and

17  capricious.

18         The Corps has continued to reject the alternative of simply letting the channel fill up, and

19  telling barges to run with less than full loads.  In 2002, while the Court noted that even though

20  "light loading may be less compatible with" maintaining the navigation channel, the Corps

21  "should consider" it.  *NWF*, 235 F. Supp.2d at 1156-57.  By 2004, however, the Court had

22  changed its position on light loading, noting that "[b]ecause doing nothing would not meet the

23  Corps' stated purpose of maintaining a navigable channel, the agency did not act arbitrarily or

24

10

James L. Buchal, WSB No. 31369
Murphy & Buchal LLP
3425 SE Yamhill Street, Suite 100
Portland, Oregon  97214
Phone:  503-227-1011
Fax:  503-573-1939

1    capriciously in rejecting this alternative." *NWF*, slip op. at 18.

2          The Ninth Circuit has repeatedly held that agencies need not consider alternatives that are

3    inconsistent with basic policy objectives. *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094,

4    1121 (9th Cir. 2002); *see also Muckleshoot Indian Tribe v. U.S. Forest Service*, 177 F.3d 800,

5    813 (9th Cir. 1999).  In *Kootenai Tribe*, the Court of Appeals upheld NEPA analysis of a

6    "roadless rule" banning road construction in certain national forest areas, reversing a district

7    court injunction.  Every alternative considered by the Forest Service included "a total ban on

8    road construction within roadless areas".  *Kootenai Tribe*, 313 F.3d at 1120.  Nevertheless, the

9    Court upheld this range of alternatives because additional alternatives that allowed road

10   construction, even with mitigation, "would be inconsistent with the Forest Service's policy

11   objective".  *Id.* at 1121.  So too are alternatives that do not involve maintaining channel depth

12   inconsistent with the Congressional directive.

13         As the Corps explained in the EIS:

14         "The purpose of the proposed action is to maintain the existing projects (the LSRP) by
           managing sediment that interferes with the existing authorized project purposes by

15         adopting and implementing a PSMP, which includes actions for long-term and immediate
           needs. The purpose also includes re-establishing the federal navigation channel to the

16         congressionally-authorized dimensions of 14 feet deep by 250 feet wide to address
           sediment accumulation that is currently interfering with commercial navigation."

17

18   (Buchal Decl. Ex. 1 at 2; FEIS at x.)  It is not as if the Corps is blind to light-loading; the Corps

19   did note in the FEIS that absent action, "[b]arge operators could modify their operations to adjust

20   to the reduced depth . . .".  (Buchal Decl. Ex. 1 at 16; FEIS at 4-84.)  But the Corps is not

21   required to treat this option as a formal alternative.

22         Evaluation of the range of alternatives does involve attention to the overall environmental

23   impacts of the action chosen.  Where a policy "has a primary and central purpose to conserve and

24

11

CSRIA'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
Case No. 2:14-CV-1800-JLR

James L. Buchal, WSB No. 31369
Murphy & Buchal LLP
3425 SE Yamhill Street, Suite 100
Portland, Oregon  97214
Phone:  503-227-1011
Fax:  503-573-1939

protect the natural environment," it is especially inappropriate for courts to impose additional alternatives.  *See Kootenai*, 313 F.3d at 1120.  As recognized in the EIS, the primary impact of failing to dredge the navigation channel is that "when commercial navigation is impeded, commodities would likely shift to other modes (truck, train), resulting in increased demand for freight rail service and heavy truck traffic on regional roadways."  (Buchal Decl. Ex. 1 at 14; FEIS at 4-37.)  And it was and is obvious that the policy choice here moves traffic from inefficient, high-fuel consumption modes to more efficient modes with lesser impacts on the human environment.  (*See generally* Olsen Decl. ¶ 13; *see also* Declaration of David Doeringsfeld ¶ 10.)

While it may be true that other modes of transportation have fewer impacts on the aquatic parasites highlighted by plaintiffs, none of the alternatives advanced by plaintiffs can fairly be characterized as avoiding or minimizing adverse environmental effects.  The net effect of dredging, in avoiding significant expansions of increased truck and rail traffic,[2] is to "conserve and protect the natural environment," which itself militates against entry of an injunction.

## C.    The Corps Adequately Considered Lamprey Impacts.

Notwithstanding plaintiffs' repeated suggestion that the Pacific lamprey is a "critically imperiled species" (Pltfs. Motion at 22), the lamprey are not listed under the Endangered Species Act, and federal efforts on the East Coast involve controlling "sea lamprey infestations".  *E.g.*, 64 Fed. Reg. 71,813, 71,814 (Dec. 22, 1999).  Plaintiff Nez Perce Tribe, however, is involved in a "translocation initiative" to spread the lamprey. (Statler Decl. ¶¶ 21-22.)

---

[2] Plaintiffs' claim of excess capacity in a single rail-based grain transport hub overlooks the massive capacity constraints currently operating with respect to truck and rail traffic.  (*See* Olsen Decl. ¶ 8.)

12

James L. Buchal, WSB No. 31369
Murphy & Buchal LLP
3425 SE Yamhill Street, Suite 100
Portland, Oregon  97214
Phone:  503-227-1011
Fax:  503-573-1939

1    The basic theory of the Nez Perce Tribe is that larvae produced from their translocation

2    program might "gradually and persistently move downstream" into dredging areas.  (Statler

3    Decl. ¶ 29.)  The Corps expressly considered and address this possibility in the EIS in detail.

4    (Buchal Decl. Ex. 1 at 11-12; FEIS 4-12 to 4-13.)  While such movement is a possibility given

5    the large numbers of larvae produced, again, the dredge areas are utterly insignificant in the

6    context of the total acreage of the tributary and river bottoms and scope of lamprey habitat.  *See*

7    *supra* Point II(A).  And two federal fisheries agencies considered the impacts on eight different

8    *listed* species that also spawn in the Snake River and found that the proposed action was not

9    likely to jeopardize any of these species or adversely modify their critical habitat (including the

10   River).  (*E.g.*, Buchal Decl. Ex. 4 at 6; USFWS BiOp.)

11   Plaintiffs also object that the Corps failed to adopt a detailed and extensive plan to survey

12   lamprey densities in dredged materials (Statler Decl. ¶¶ 25-26), and only "considered," rather

13   than adopted, each and every lamprey conservation recommendation (*id.* ¶ 32).  Such

14   "consideration", of course, is precisely what NEPA requires, and Mr. Statler does not mention

15   that the most important recommendation, avoiding work from March 1st through August 1st to

16   avoid possible nests (Buchal Decl. Ex. 5 at 17; ROD Comments at 17), is precisely what the

17   Corps proposes to do.  This is not a case where the Corps has overlooked a reasonable option to

18   route around some special area of lamprey concern.  The Snake River channel is where it is, and

19   there is no proof that the project of maintaining the channel can, before March 1, 2015, be

20   modified further to minimize lamprey impacts.

21   Mr. Statler seizes upon a statement that the Corps found "no evidence" that the lamprey

22   use the mainstem Snake River for spawning or rearing (Statler Decl. ¶ 26), yet acknowledged

23   just paragraphs later (*id.* ¶ 30) that the Corps certainly recognized the possibility that lamprey

24

13

CSRIA'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
Case No. 2:14-CV-1800-JLR

James L. Buchal, WSB No. 31369
Murphy & Buchal LLP
3425 SE Yamhill Street, Suite 100
Portland, Oregon  97214
Phone:  503-227-1011
Fax:  503-573-1939

"may be present" and "may be impacted".  The factual predicate of his testimony is his single

Exhibit 1, which reports that researchers dragging nets through the water occasionally encounter

a single juvenile lamprey.  However, there was also a specific survey at the principal dredging

location at the Snake/Clearwater confluence *which found no lamprey at all* (a study Mr. Statler

does not mention).  (Buchal Decl. Ex. 1 at 9, 13; FEIS at 3-16, 4-20.)

NEPA does not require the Corps to fund to undertake additional scientific research; even

the Endangered Species Act requires use of only the "best scientific and commercial data

available".  16 U.S.C. § 1536(a)(2).  The Corps' decision to proceed on the basis of available

information rather than "invest the resources to conduct the perfect study" is the type of decision

that receives the highest level of deference, and can only be set aside if there is "simply no

rational relationship" between the decision and the available data.  *See American Iron & Steel*

*Institute v. EPA*, 115 F.3d 979, 1004 (D.C. Cir. 1997).

That is not the case here.  The Corps' conclusion that the habitat use is "largely

unknown" (*id.*) is consistent with the available evidence, and certainly not arbitrary or

capricious.  Nor does occasional net capture show that lamprey might be captured, immobilized

and killed by dredges working the river bottom.  The Corps specifically noted that its use of a

"mechanical method of dredging, such as clamshell, dragline, or a shovel/scoop dredge" will

"avoid or reduce lamprey entrainment".  (Buchal Decl. Ex. 2 at 6; Immediate Need ROD at 6.)

Ultimately, occasional encounters with juvenile lamprey do not demonstrate general use

of the habitat for spawning or rearing, particularly when lamprey usually spawn "at the upstream

end of riffle habitat" in "streams" (Buchal Decl. Ex. 5 at 5; ROD Comments at 5), which is not

anything resembling a description of Snake River Reservoir bottoms.  While the larvae may drift

downstream, seeking "depositional areas with soft substrate near stream margins" (*id.*), there is

14

CSRIA'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
Case No. 2:14-CV-1800-JLR

James L. Buchal, WSB No. 31369
Murphy & Buchal LLP
3425 SE Yamhill Street, Suite 100
Portland, Oregon  97214
Phone:  503-227-1011
Fax:  503-573-1939

1    no evidence that most larvae make it all the way from the streams to the reservoirs.  Pictures of

2    "typical habitat" (Buchal Decl. Ex. 5 at 8; ROD Comments at 8) in the record bear no

3    resemblance to the Reservoirs.  And even if the larvae did get in the Reservoirs, "sand is the

4    dominant material in the navigation channel" (Buchal Decl. Ex. 4 at 3; USFW BiOp at 33) where

5    the dredging is occurring, which is not the "soft substrate" that the larvae prefer.

6         The Corps' conclusions are manifestly not arbitrary and capricious, particularly when Mr.

7    Statler's testimony riddled with "weasel words" such as "would be expected," "may," or "can"—

8    not "will" or "do".  His testimony that there is a "high likelihood for moderate to high localized

9    densities across the dredging project area" (*e.g.*, Buchal Decl. Ex. 2 at 5; Immediate Need ROD

10   at 5) is belied by his admission that only roughly a dozen lamprey were detected at Lower

11   Granite Dam in 2009 and 2010, and his Exhibit 1 concerning detection of single larvae.  The

12   Corp was entitled to adopt the position shared by the federal fishery agency, which opined no

13   more than "it is possible that they [lamprey] could occur within the proposed dredging and

14   disposal footprint".  (Buchal Decl. Ex. 4 at 14; USFWS BiOp at 59.)

15        Plaintiffs also complain that the Corps did not "identify, evaluate and disclose the present

16   critically-imperiled status" of the lamprey (Statler ¶ 36), but the very premise of the Corps'

17   extensive discussions and consideration of possible lamprey impacts is their status as a species of

18   concern to the Nez Perce and others.  It is utterly disingenuous for Mr. Statler to complain that

19   the Corps has "substantially understated the likelihood and magnitude of potential harm" in a

20   context where *neither he nor any other lamprey advocate has provided quantitative information*

21   *on the magnitude of any relevant variable concerning lamprey presence and abundance*—other

22   than the fact that net seining or trawling (not dredges) typically dredges up a single juvenile

23

24
                                            15

James L. Buchal, WSB No. 31369
Murphy & Buchal LLP
3425 SE Yamhill Street, Suite 100
Portland, Oregon  97214
Phone:  503-227-1011
Fax:  503-573-1939

1 lamprey.[3]

2       The Ninth Circuit took the *Lands Council* case *en banc* to reverse a panel grant of a

3 preliminary injunction under NEPA and other statutes, and "clarify" prior "environmental

4 jurisprudence" had "shifted away from the appropriate standard of review". *Lands Council*, 537

5 F.3d at 984, 988.  The Court warned that the federal courts are not to "act as a panel of scientists

6 that instructs the [agency] how to validate its hypotheses regarding wildlife viability, chooses

7 among scientific studies in determining whether the [agency] has complied with the underlying

8 [authority], and orders the agency to explain every possible scientific uncertainty." *Id*. at 988.

9 That is precisely what plaintiffs are asking this Court to do with respect to the Corps' judgments

10 about lamprey.

11     **D.**    **The Corps' Economic Analysis Was Adequate for NEPA.**

12       Plaintiffs' abstract concerns about the economic benefits of maintaining the navigation

13 channel are not legally relevant, because plaintiffs do not show how reliance upon the existing

14 analyses could lead the Corp into error with adverse environmental impacts.  The Corps is under

15 a directive to maintain the navigation channel because Congress already considered its cost and

16 benefit, and complaints about the balance struck—and whether it should continue to be struck—

17 must be addressed to Congress.

18       Congress has declared by statute that "the depth and width of the authorized channel in

19 the Columbia-Snake River barge navigation project *shall be established* as fourteen feet and two

20

21 [3] The dredged materials will be utilized to build a shallow water fish habitat site of

22 approximately 13 acres that although intended for juvenile fall Chinook salmon (Buchal Decl.
Ex. 2 at 5; Immediate Need ROD at 5), is presumably suitable for lamprey as well (Buchal Decl.

23 Ex. 4 at 11-13; USFWS BiOp at 11-13).  Mr. Statler does not discuss offsetting benefits of this

24 habitat.

16

CSRIA'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
Case No. 2:14-CV-1800-JLR

James L. Buchal, WSB No. 31369
Murphy & Buchal LLP
3425 SE Yamhill Street, Suite 100
Portland, Oregon  97214
Phone:  503-227-1011
Fax:  503-573-1939

1    hundred and fifty feet, respectively, at minimum regulated flow".  Pub. L. No. 87-874, § 203, 76

2    Stat. 1173, 1193 (1962) (Flood Control Act of 1962). (emphasis added).  "It is for Congress

3    alone to decide whether a particular project, by itself or as part of a more comprehensive scheme,

4    will have such a beneficial effect on the arteries of interstate commerce as to warrant it."

5    *Oklahoma ex rel. Phillips v. Guy F. Atkinson Co.,* 313 U.S. 508, 526 (1941).  "[F]undamental

6    policy questions appropriately resolved in Congress and in the state legislatures are *not* subject to

7    reexamination in the federal courts under the guise of judicial review of agency action."

8    *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S.

9    519, 558 (1978) (emphasis in original).

10          Where, as here, Congress has already authorized and funded the project, use of economic

11   data is "left to agency discretion subject to 'extremely limited' judicial review since it is

12   'extremely tangential to the concerns expressed in NEPA.'"  *Sierra Club v. Sigler*, 695 F.2d 957,

13   980 (5th Cir. 1983) (quoting *SLEC, Inc. v. Sand*, 629 F.2d 1005, 1014 (5th Cir. 1980)).[4]  As

14   *Sigler* explains, "[o]mnipresent separation of powers considerations . . . prohibit[] th[is] court

15   from reviewing the project's economic justification unless that justification is "so flawed" as to

16   grossly distort[] the environmental considerations".  *Id.*  Plaintiffs do not begin to make this

17   showing.

18          *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437 (4th Cir. 1996), by

19   contrast, involved an *agency* decision whether or not to construct a new dam, *id.* at 440, and the

20   Court noted that "use of inflated economic benefits . . . may result in approval of a project that

21   _____

22   [4] The NEPA statute does not reference any cost-benefit assessment of projects, but merely states

23   that an EIS is required to contain a "detailed statement" of the "environmental impacts of the
     proposed action".  42 U.S.C. § 4332(C).

24                                                   17

CSRIA'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
Case No. 2:14-CV-1800-JLR

James L. Buchal, WSB No. 31369
Murphy & Buchal LLP
3425 SE Yamhill Street, Suite 100
Portland, Oregon  97214
Phone:  503-227-1011
Fax:  503-573-1939

1  otherwise would not have been approved because of its adverse environmental impacts". *NRDC*

2  *v. U.S. Forest Service,* 421 F.3d 797, 799 (9th Cir. 2005), involved an *agency* decision to

3  proceed with a timber sale.  Here Congress has established the channel and directed the Corps to

4  maintain it.

5       There is certainly no reason to believe that information in the NEPA documents

6  prejudiced the Corps to the detriment of plaintiffs with respect to the immediate dredging, and

7  last time around, this Court properly rejected arguments that plaintiffs had shown even "serious

8  questions" as to legal error in the economics analysis.  *NWF*, 235 F. Supp.2d at 1158.  The Corps

9  correctly concluded in its ROD that the "economic justification requirements in the Corps

10  planning guidance for a new navigation project are significantly more rigorous but are not

11  applicable in this maintenance situation".  (Buchal Decl. Ex. 2 at 7; Immediate Need ROD at 7.)

12       All this being said, CSRIA believes that the economic analysis by the Corps if anything

13  tends to understate the economic benefits of the dredging, because present market conditions

14  make the impact of barge service interruptions even worse.  And presently, railroad and even

15  trucking facilities are so full to capacity that agricultural producers have serious problems even

16  obtaining shipping services.  (Olsen Decl. ¶ 8.)  Absent the barge alternative, and immediately-

17  available substitutes for shipping services, agricultural interests will suffer sharply higher costs

18  or even a total inability to ship their products.  (*Id.* ¶ 14; *see also* Declaration of Robert Rich ¶ 4

19  (noting "competitiveness of barging".)  Plaintiffs' suggestion that the capacity might simply be

20  shifted to trucks and trains with a wave of the hand are not well-founded.  (*Id.* ¶ 10.)

21       Plaintiffs' economic arguments are best understood as part and parcel of a longstanding

22  campaign of deception concerning the economics of the barging industry which cannot

23  adequately be deconstructed in preliminary briefing.  By their own admission, what plaintiffs

24

18

CSRIA'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
Case No. 2:14-CV-1800-JLR

James L. Buchal, WSB No. 31369
Murphy & Buchal LLP
3425 SE Yamhill Street, Suite 100
Portland, Oregon  97214
Phone:  503-227-1011
Fax:  503-573-1939

1   really want is to use dredging as a "legal pinch point" in their broader campaign to "assess the

2   sustainability of the entire lower Snake River Project".  R. Barker, "Snake River dredging . . .",

3   *Idaho Statesman*, Nov. 25, 2014 (quoting, in part, plaintiff Idaho Rivers United).[5]   The

4   "sustainability" of the Snake River Projects was a question resolved adversely to plaintiffs in the

5   2002 Lower Snake River Juvenile Salmon Mitigation Feasibility Study mentioned above.

6   Plaintiffs are shooting at the wrong EIS.

7         **E.    There Is No Question about CWA Compliance.**

8         The Corps submitted a Clean Water Act permit application to the State of Washington,

9   and the Washington State Department of Ecology formally certified the project as compliant

10   with the Clean Water Act pursuant to § 401 of the CWA (Buchal Decl. Ex. 6; CWA Cert.).

11   Plaintiffs did not appeal that order to the Washington State Pollution Control Hearings Board.

12         Instead, plaintiffs cite a descriptive regulation entitled the "Regulatory Approach of the

13   Corps of Engineers" (33 C.F.R. § 320.1(a)) as if it established substantive and distinct procedural

14   obligations on the Corps.  Plaintiffs admit that the Corps does not issue permits to itself, and then

15   cites a "policy" concerning permits which states no more than that the Corps will consider the

16   public interest.  33 C.F.R. § 320.4(a)(1).  Plaintiffs cite no case, and CSRIA is aware of none, in

17   which the Corps has been held to prepare some distinct document beyond the ROD, EIS and

18   record here that amply support its decision.  Again, it was Congress that made the ultimate

19   determination that dredging a navigation channel was in the public interest, and Congress

20   manifestly did not intend the CWA to supplant that decision.

21

22   _____

23   [5] Available at http://www.idahostatesman.com/2014/11/25/3507376/snake-river-dredging-goes-back.html?sp=/99/101/ (accessed 12/9/14).

24

19

CSRIA'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
Case No. 2:14-CV-1800-JLR

James L. Buchal, WSB No. 31369
Murphy & Buchal LLP
3425 SE Yamhill Street, Suite 100
Portland, Oregon  97214
Phone:  503-227-1011
Fax:  503-573-1939

1    **F.    The Corps Treatment of Asserted "Climate Change" Was Adequate.**

2           As the Ninth Circuit has recently emphasized, where, as here, site-specific actions are

3    under review, the primary NEPA focus is "effects on the locale rather than in the world as a

4    whole".  *Barnes v. U.S. Department of Transportation*, 655 F.3d 1124, 1139 (9th Cir. 2011)

5    (quoting 40 C.F.R. § 1508.27(a)).  The premise that sediment loads might increase because of

6    warming and forest fires has nothing to do with the impacts of the immediate action, and relates

7    only to highly-speculative projections of future sediment discharge into the Snake River.

8    Moreover, any issues in the far future associated with tiny rises in temperatures even more

9    inappropriate for extraordinary preliminary injunctive relief.

10   **III.   THERE IS NO IRREPARABLE INJURY AND NO BALANCE OF HARDSHIP
            FAVORING PLAINTIFFS.**

11

12          This is not a case where any plaintiffs visit or enjoy the underwater contours of the

13   navigation channels; the Corps' actions are in substance invisible to plaintiffs and the claimed

14   injury arises only through asserted effects on fish.  Both prior injunction decisions were heavily

15   premised on irreparable injury to salmon and steelhead species federally listed as endangered.

16   *NWF,* slip op. at 25-26; *NWF*, 235 F. Supp.2d at 1162-62.  The biological opinions now before

17   the Court confirm that plaintiffs cried wolf about irreparable harm to salmon and steelhead, and

18   the Court should be leery about the new wolf at the door:  the fate of a salmon and steelhead

19   parasite, the lamprey.

20          The testimonies of a Nez Perce tribal member and of Mr. Statler fall far short of

21   identifying any impacts that are likely to have any effect whatsoever on the opportunities of Nez

22   Perce members or other plaintiffs to catch or see a lamprey.  Indeed, as demonstrated above, the

23   Corps' immediate dredging plans are so insignificant in the context of the entire Snake River

24                                                  20

James L. Buchal, WSB No. 31369
Murphy & Buchal LLP
3425 SE Yamhill Street, Suite 100
Portland, Oregon  97214
Phone:  503-227-1011
Fax:  503-573-1939

1   watershed that it is doubtful plaintiffs even have standing to raise them.  As the Ninth Circuit has

2   emphasized in cases involving alleged injuries from $CO_2$ production, "[p]laintiffs must . . .

3   establish that their specific, localized injuries are fairly traceable" to agency action.  *Washington*

4   *Environmental Council v. Bellon*, 732 F.3d 1131, 1144 (9th Cir. 2013).  The possible death of a

5   handful of lamprey larvae do not meet this standard.

6        It is sheer, unsupported speculation to suggest that the dredging would make any

7   appreciable difference whatsoever in the opportunities of the Nez Perce and other tribal interests

8   to harvest and eat lamprey.  In all likelihood, catching and killing a single adult lamprey has

9   more impact on lamprey populations than years of dredging—and in both cases an immeasurable

10   impact.

11        The Declaration of Dr. Olsen establishes significant harms to CSRIA and its members

12   that would arise by reason of an injunction.  CSRIA also relies upon IPNG's even more detailed

13   showing of harm.  As detailed in IPNG's declarations, unlike last time around, when the barges

14   were apparently not yet running aground,[6] accidents are already occurring now for want to

15   dredging that pose serious risk to human life *and* the environment—not to mention the economic

16   loss.  The environmental risks alone outweigh the extraordinarily-tenuous harm to plaintiffs'

17   interests from killing a few lamprey larvae—if that would even happen.

18   **IV.   THE PUBLIC INTEREST MILITATES AGAINST ENTRY OF AN INJUNCTION.**

19

20        Last time around, this Court relied heavily upon protection of endangered salmon and

21   steelhead as tipping the public interest balance.  *NWF*, 235 F. Supp. at 1162-63.  That interest no

22   _____

23   [6] NWF, slip op. at 28 ("the lack of vessel groundings or other accidents may be merely

24   fortuitous . . .").

CSRIA'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
Case No. 2:14-CV-1800-JLR

James L. Buchal, WSB No. 31369
Murphy & Buchal LLP
3425 SE Yamhill Street, Suite 100
Portland, Oregon  97214
Phone:  503-227-1011
Fax:  503-573-1939

1   longer factors into the balance.  Absent such an overriding factor—and the lamprey are certainly

2   not one—there is no reason to disturb Congress' judgment that there shall be a fourteen-foot

3   navigation channel up the Snake River.

4                                              **Conclusion**

5            Plaintiffs are pursuing the same white whale they have been pursuing for decades:

6   making any argument, no matter how feeble, to pick away at the important benefits provided to

7   the Pacific Northwest provided by the operation of the Snake River Dams.  Their claim that the

8   Corps failed adequately to inform itself about the environmental impacts of dredging is meritless,

9   and the motion for preliminary injunction should be denied.

10           DATED:   December 15, 2014.

11                                              *s/  James L. Buchal*
                                                James L. Buchal (WSB #31369)
12                                              MURPHY & BUCHAL LLP
                                                3425 SE Yamhill Street, Suite 100
13                                              Portland, OR  97214
                                                Tel:  503-227-1011
14                                              Fax:  503-573-1939
                                                jbuchal@mbllp.com
15                                              *Attorney for Intervenor-Defendant*
                                                *Columbia Snake River Irrigators Association*
16

17

18

19

20

21

22

23

24
                                              22

CSRIA'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
Case No. 2:14-CV-1800-JLR

James L. Buchal, WSB No. 31369
Murphy & Buchal LLP
3425 SE Yamhill Street, Suite 100
Portland, Oregon  97214
Phone:  503-227-1011
Fax:  503-573-1939

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**CERTIFICATE OF SERVICE**

I certify that on December 15, 2014, the foregoing CSRIA's Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunction will be electronically filed with the Court's electronic court filing system, which will generate automatic service upon all Parties enrolled to receive such notice.

*s/ Carole A. Caldwell*

23

CSRIA'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
Case No. 2:14-CV-1800-JLR

James L. Buchal, WSB No. 31369
Murphy & Buchal LLP
3425 SE Yamhill Street, Suite 100
Portland, Oregon  97214
Phone:  503-227-1011
Fax:  503-573-1939