UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

IDAHO RIVERS UNITED, et al.,

                Plaintiffs,

        v.

UNITED STATES ARMY CORPS
OF ENGINEERS,

                Defendant,

       and

INLAND PORT AND NAVIGATION
GROUP, et al.,

           Intervenor-Defendants.

CASE NO. C14-1800JLR

ORDER REGARDING CROSS-
MOTIONS FOR SUMMARY
JUDGMENT

## I.  INTRODUCTION

In November 2014, Plaintiffs Idaho Rivers United, Washington Wildlife

Federation, Pacific Coast Federation of Fishermen's Associations, Institute for Fisheries

Resources, Sierra Club, Friends of the Clearwater, and Nez Perce Tribe (collectively

1   "Plaintiffs") sued Defendant United States Army Corps of Engineers ("the Corps") for

2   alleged violations of the National Environmental Policy Act ("NEPA"), 42 U.S.C.

3   §§ 4321-47, and the Clean Water Act (CWA"), 33 U.S.C. §§ 1251-1387, over the Corps'

4   proposed maintenance of the Snake River navigation channel.  (*See generally* Compl.

5   (Dkt. # 1); Am. Compl. (Dkt. # 60).)  In their amended complaint, Plaintiffs challenge

6   two actions by the Corps:  "1) the Corps' 'immediate need' proposed dredging action for

7   the winter of 2014-2015; and 2) the Corps' long-term plan for addressing sediment

8   accumulation in the Snake River from Lewiston, Idaho to the confluence with the

9   Columbia River."  (Am. Compl. ¶ 6.)  In early January 2015, the court denied Plaintiffs'

10  motion for a preliminary injunction to prevent the Corps from dredging in the winter of

11  2015.  (*See generally* Min. Entry (Dkt. # 56); PI Order (Dkt. # 57).)  In doing so,

12  however, the court declined to rule on the likelihood of Plaintiffs' success on the merits

13  and directed the parties to present these issues to the court as soon as practicable on

14  summary judgment.  (*Id.* at 29 n.16, 30.)

15      The court now considers three motions for summary judgment:  (1) Plaintiffs'

16  motion for summary judgment (Plf. Mot. (Dkt. # 72)); (2) the Corps' cross-motion for

17  summary judgment (Def. Mot. (Dkt. # 75)); and (3) Intervenor-Defendant Inland Port and

18  Navigation Group's ("IPNG") cross-motion for summary judgment (IPNG Mot. (Dkt.

19  # 76)).  The court has reviewed the motions, all submissions filed in support of and

20  opposition to the motions, the balance of the record, and the applicable law.  In addition,

21  the court heard the oral argument of counsel on February 2, 2016.  Although the parties

22  dispute the appropriate legal outcome, all parties agree that that this action is suitable for

disposition on summary judgment. (*See* Plf. Mot. at 3; IPNG Mot. at 10; Def. Mot. at 6.) Therefore, being fully advised, the court GRANTS the Corps' and IPNG's cross-motions for summary judgment and DENIES Plaintiffs' motion as discussed below.

## II.    BACKGROUND

The Lower Snake River federal navigation channel is located between the Snake River's confluence with the Columbia River near Pasco, Washington, and the Snake River's confluence with the Clearwater River near the Washington-Idaho border.  (AR (Dkt. ## 65, 73) 50797 at 50836.)[1]  Congress first authorized the Corps to construct and maintain the Lower Snake River for navigation in 1945.  *See* Flood Control Act of 1945, Pub. L. No. 97-14, 59 Stat. 10, 21 (1945).  In 1962, Congress legislated that "the depth and width of the authorized channel in the Columbia-Snake River barge navigation project shall be established as fourteen feet and two hundred and fifty feet, respectively, at minimum regulated flow."  Flood Control Act of 1962, Pub. L. No. 87-874, 76 Stat. 1173, 1193 (1962).

There are four multipurpose civil works locks and dam projects located on the Lower Snake River, including Ice Harbor, Lower Monumental Little Goose, and Lower Granite.  (AR 50797 at 50836-37; Swanson Decl. (Dkt. # 36) Ex. 1 at 1-1.)  The Corps collectively refers to these projects as the Lower Snake River Projects ("LSRP"). (Swanson Decl. Ex. 1 at 1-1.)   In addition to commercial navigation, these projects serve

---

[1] The court adopts the same format as the parties when citing to the Administrative Record:  (AR XXX at YYY), where XXX is the first page of the PDF document in the Corps' index, and YYY is the internal Bates-stamped page referenced.

1  purposes of power generation, recreation, fish and wildlife conservation, and incidental

2  water supply for irrigation.  (AR 50797 at 50834, 50837.)

3      Above these projects, the Snake River drains a 32,000 square-mile area of

4  forested, agricultural, and developed lands.  (*Id.* at 50838.)  Sediment from this landscape

5  has washed into and accumulated in the reservoir above Lower Granite Dam.  (*Id.*)  The

6  Corps has historically used dredging as its primary method of removing accumulated

7  sediment that interferes with commercial navigation on the Lower Snake River.

8  (Swanson Decl. Ex. 1 at 1-1.)

9      Conflict over the Corps' management of the Lower Snake River—in particular the

10  Corps' dredging activities—has a long history in this district.  In 2002, a group of

11  organizations, including Plaintiffs, challenged the Corps' planned dredging on the Lower

12  Snake River.  The Honorable Robert S. Lasnik entered a preliminary injunction halting

13  the dredging at that time.  *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 235

14  F. Supp. 2d 1143, 1162-63 (W.D. Wash. 2002).  After Judge Lasnik issued a second

15  preliminary injunction against the Corps' planned dredging on November 1, 2004, the

16  parties agreed to settle their dispute.  (*See* PI Order at 4.)  As part of the settlement, the

17  plaintiffs agreed not to bring any further challenges to the Corps' planned maintenance

18  dredging for the winter of 2005-2006, and the Corps agreed to conduct review under

19  NEPA for a long-term approach to sediment management in the Lower Snake River,

20  known as the Programmatic Sediment Management Plan ("PSMP" or "the Plan").  (*See*

21  *id.* (citing Compl. Ex. 2 (attaching the settlement agreement)).)

22

1    The Corps issued its Final Environmental Impact Statement ("FEIS") for the

2    PSMP in August 2014.  (*See* AR 50797 at 50797-1210.)  The Plan creates a decision-

3    making framework through which sediment accumulation that interferes with existing

4    project purposes (including but not limited to navigation) can be managed and, to the

5    extent possible, prevented.  (*Id.* at 50834.)  In creating the Plan, the Corps studied

6    sediment accumulation areas (*id.* at 50840-42), as well as sediment sources, movement,

7    and deposition in the reservoirs (*id.* at 50848-58).  (*See* AR 46662 at 46676-703, 46764-

8    77.)  By holding workshops with technical experts, the Corps developed a range of

9    management measures to address sediment accumulation.  (AR 50797 at 50866.)

10    After its assessment, the Corps identified 24 potential sediment management

11    measures across four different categories.  (*Id.* at 50866-71.)  The Corps created six

12    management frameworks (and a "no action" alternative), each constituting a different

13    "toolbox," and analyzed those frameworks in the FEIS.  (*Id.* at 50889-904).  The Corps

14    selected "Alternative 7" as its PSMP.  (AR 61037 at 61047.)

15    Alternative 7 includes "triggers" to identify an "immediate need" for action to

16    address accumulated sediment and "future forecast needs" to address areas where

17    sediment accumulation has been a problem in the past or is predicted to be a problem in

18    the future.  (AR 50797 at 50890; AR 42407 at 42429-40.)  For purposes of navigation,

19    Alternative 7 triggers an action when (1) sediment accumulation causes a portion of the

20    navigation channel to be less than fourteen feet deep when a reservoir is at its Minimum

21

22

1  Operating Pool[2] and this situation impairs safe commercial navigation or access to

2  navigation locks ("immediate need"), or (2) that scenario is forecasted to occur more than

3  once in a five-year period ("future forecast need").  (AR 42407 at 42432.)

4       Alternative 7 includes a suite of fourteen potential management measures, one of

5  which is dredging, that the Corps can employ to address either an immediate or

6  forecasted sediment accumulation problem.  (AR 50797 at 50891-92, 50898-99.)

7  Measures other than dredging include the construction of bendway weirs and other in-

8  water structures, reservoir drawdown to increase river velocity and flush sediment from

9  depositional areas, sediment agitation, raising the Lewiston levees, and relocating

10 facilities.  (*Id.*)  Thus, the management plan addresses both immediate and near-term

11 sediment problems that may arise and "anticipated future problems before they are

12 critical."  (AR 42407 at 424411.)  In this way, the PSMP provides for monitoring and

13 planning for sediment accumulation rather than simply reacting to accumulation after it

14 becomes a problem.  (*See* AR 57292 at 57296-99.)

15      The PSMP, however, does not authorize any specific on-the-ground action.  (*See*

16 AR 61037 at 61037-38.)  Rather, the Plan is "designed to evaluate future actions for

17 sediment management" and provide "a roadmap for future project-specific decision-

18 making."  (AR 50797 at 50810, 50812.)  Due to the programmatic nature of the PSMP,

19

20 _____

21      [2] Specific elevation operating ranges (from sea level) are authorized for the reservoirs
   behind each dam on the Lower Snake River.  The lower end of the elevation range is known as
22 the "Minimum Operating Pool" or "MOP."  (*See* AR 42407 at 42412.)

the Corps was required to structure the FEIS programmatically as well.[3]  As such, the

Corps will be required to issue project-specific NEPA analyses that will tier and build

from the programmatic FEIS before the Corps engages in any future dredging or other

sediment management action.[4]

   While developing the PSMP, the Corps identified two locations where sediment

accumulation was already interfering with navigation—at the confluence of the Snake

and Clearwater Rivers and on the downstream side of the Ice Harbor Dam's lock.  (AR

60818 at 60818.)  This triggered an immediate need for action under the PSMP, which

the Corps referred to as "the Current Immediate Need Action" to contrast it from

"immediate need actions" that may arise in the future .  (*See id.* at 60819.)  The Corps

then analyzed alternatives and potential impacts associated with the Current Immediate

Need Action in the same FEIS that the Corps had prepared for the PSMP.[5]  As a result of

_____

   [3] (*See* AR 50383 at 50389 ("This PSMP programmatic EIS includes alternatives that define broad programs for managing sediments through implementation of future actions as they relate to maintaining the authorized project purposes of the LSRP.").)

   [4] (AR 50383 at 50389 ("Future actions would require project-specific environmental reviews, including preparation of appropriate NEPA documents tiered off this programmatic EIS."); AR 57292 at 57296-97 ("[O]nce a potential sediment problem is identified through monitoring and a need for action is triggered by the PSMP framework, the proposed site-specific action would be evaluated based on effectiveness of a measure and environmental effects. Additionally, any action would be coordinated and reviewed through the NEPA process and other processes of environmental regulations, as necessary, to identify and adopt any measures as appropriate to reduce or avoid impacts.").)

   [5] (*See id.* at 60818-19 ("In the interest of efficiency and in order to facilitate meaningful public involvement on our sediment management planning in the region, the Corps analyzed the potential for site-specific immediate action alongside the plan-level descriptions in the PSMP EIS.  The use of a single FEIS to evaluate both the PSMP and the Current Immediate Need Action was determined to be in line with CEQ guidance and regulations.").)

ORDER- 7

1    that process, the Corps concluded that "dredging and disposal presented the only measure

2    capable of meeting the purpose and need to re-establish the federal channel to

3    congressionally authorized dimensions to address sediment accumulation that is currently

4    interfering with commercial navigation." (*Id.* at 60819.)  To reestablish the federal

5    navigation channel to the congressionally authorized dimensions, the Corps concluded

6    that it should dredge the navigation channel in two general places:  the downstream lock

7    approach at Ice Harbor Dam, and confluence of the Snake and Clearwater Rivers at the

8    upstream end of the Lower Granite Reservoir.  (*Id.*)

9        On November 14, 2014, the Corps adopted the PSMP and approved the Current

10   Immediate Need Action in two separate decisions.  (*See* AR 60818 at 60818-27; AR

11   61037 at 61037-47 (records of decision).)  Plaintiffs filed suit on November 24, 2014,

12   under the Administrative Procedures Act ("APA"), 5 U.S.C. § 551 *et seq.*, alleging that

13   the Corps' adoption of the PSMP and approval of the Current Immediate Need Action

14   violated NEPA and the CWA.  (*See* Compl.; Am. Compl.)  On November 26, 2014,

15   Plaintiffs filed a motion for a preliminary injunction to stop the Corps from implementing

16   the Current Immediate Need Action of dredging on the Lower Snake River.  (*See* PI Mot.

17   (Dkt. # 8).)  In early January 2015, the court denied Plaintiffs' motion.  (*See* Min. Entry;

18   PI Order.)  The Corps' contractor began work to implement the Current Immediate Need

19   Action on January 12, 2015.  (Werner Decl. (Dkt. # 75-1) ¶ 2.)  The contractor completed

20   all dredging and disposing of dredged materials on February 26, 2015.  (*Id.*)

21        On May 14, 2015, Plaintiffs moved for summary judgment "on their claims that

22   the FEIS and [the records of decision] for the 2015 dredging action and the long-term

1  PSMP violate NEPA and the [CWA]." (Plf. Mot. at 3.) The Corps and IPNG both

2  opposed Plaintiffs' motion and filed cross-motions for summary judgment seeking,

3  alternatively, the dismissal of Plaintiffs' claims on various grounds or the entry of

4  summary judgment on the merits in the Corps' favor. (*See generally* Def. Mot.; IPNG

5  Mot.) The court now considers all three of these motions.

6                          **III.    ANALYSIS**

7  **A. Justiciability Issues**

8         Before launching into the substance of Plaintiffs' claims, the court first must

9  address certain justiciability issues. Plaintiff challenge whether the Corps complied with

10  NEPA and the CWA when the Corps: (1) approved the Current Immediate Need Action

11  of dredging on the Lower Snake River during the winter of 2015, and (2) adopted the

12  PSMP. (*See* Def. Mot. at 6-12; IPNG Mot. at 11-20.) Specifically, the Corps and IPNG

13  challenge Plaintiffs' claims concerning the 2015 dredging on grounds of standing and

14  mootness (*see* Def. Mot. at 7-8; IPNG Mot. at 11-13) and Plaintiffs' claims concerning

15  the PSMP on grounds of standing and ripeness (*see* Def. Mot. at 9-12; IPNG Mot. at 13-

16  20).

17         The judicial power of the federal courts is limited to "cases" and "controversies."

18  U.S. Const., Art. III, § 2. If there is no case or controversy within the meaning of those

19  constitutional terms, then the court lacks subject matter jurisdiction to hear the claim. *See*

20  *Baker v. Carr*, 369 U.S. 186, 198 (1962). Thus, a federal court's "role is neither to issue

21  advisory opinions nor to declare rights in hypothetical cases, but to adjudicate live cases

22  or controversies consistent with the powers granted the judiciary in Article III of the

1   Constitution." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th

2   Cir. 2000) (en banc).

3          The advisory opinion prohibition stands at the core of Article III and underpins the

4   justiciability doctrines of standing, ripeness, and mootness.  *See Westlands Water Dist. v.*

5   *Nat. Res. Def, Council*, 276 F. Supp. 2d 1046, 1051 (E.D. Cal. 2003); *see also W. Oil &*

6   *Gas Assoc. v. Sonoma Cty.*, 905 F.2d 1287, 1290 (9th Cir. 1990) ("The ripeness and

7   mootness doctrines are based in part upon the Article III requirement that courts decide

8   only cases or controversies.").  However, the concept of justiciability blends both the

9   constitutional limitations of Article III and prudential considerations concerning the

10  proper role of courts in our democracy.  *See Assiniboine & Sioux Tribes of Fort Peck*

11  *Indian Reservation v. Bd. of Oil & Gas Conservation of State of Mont.*, 792 F.2d 782, 787

12  (9th Cir. 1986) (quoting *Flast v. Cohen*, 392 U.S. 83, 97 (1968) ("The doctrine [of

13  justiciability] is a blend of constitutional limitations and prudential considerations, which

14  are not easily distinguishable and 'make the justiciability doctrine one of uncertain and

15  shifting contours.'")).  Although the justiciability doctrines of standing, mootness, and

16  ripeness tend to intersect and overlap, courts generally analyze the concepts separately

17  for the sake of clarity.  *See Assiniboine*, 792 F.2d at 787.  The court, therefore, sets forth

18  the standards for each doctrine and discusses their applicability to this case separately

19  below.

20  //

21  //

22  //

### 1. Plaintiffs Lack Standing to Assert Claims Regarding the 2015 Dredging and the PSMP

The court first addresses the Corps and IPNG's challenge to Plaintiffs' claims concerning the 2015 dredging and the PSMP on grounds of standing. (*See* Def. Mot. at 8-11; IPNG Mot. at 11-13.) "[T]he standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his [or her] invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his [or her] behalf." *Warth v. Seldin*, 422 U.S. 490, 498 (1975) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). "The oft-cited *Lujan v. Defenders of Wildlife* case states the three requirements for Article III standing: (1) an injury in fact that (2) is fairly traceable to the challenged conduct and (3) has some likelihood of redressability." *Pub. Lands for the People, Inc. v. U.S. Dep't of Agric.*, 697 F.3d 1192, 1195-96 (9th Cir. 2012) (citing *Lujan*, 504 U.S. 555, 560-61 (1992)). With respect to the "injury in fact" requirement, the threat of injury must be "concrete and particularized; . . . actual and imminent, not conjectural or hypothetical." *Id.* at 1196 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).[6] The "injury in fact" element is at the center of the Corps' and IPNG's challenge based on standing to Plaintiffs' claims.

//

---

[6] Standing can encompass both the constitutional issues as well as prudential considerations. *See City of L.A. v. Cty. of Kern*, 581 F.3d 841, 846 (9th Cir. 2009) ("Several doctrines fall under the rubric of 'prudential standing.'"). However, neither the Corps nor IPNG raised any arguments challenging Plaintiffs' claims based on prudential standing. (*See generally* Corps Mot. at 9-10; IPNG Mot. at 11-19.) Accordingly, the court declines to consider prudential standing with respect to Plaintiffs' claims.

1

**a.  The 2015 Dredging**

2

Both the Corps and IPNG challenge Plaintiffs' standing to sue concerning the

3

Corps' 2015 dredging of portions of the Lower Snake River.  (IPNG Mot. at 11-13; Def.

4

Reply (Dkt. # 82) at 1-3.)  They argue that Plaintiffs have failed to demonstrate the first

5

element of standing—an injury in fact.  *See Pub. Lands for the People*, 697 F.3d at 1195-

6

96.  They assert that Plaintiffs rely upon declarations[7] that make only generalized

7

statements that dredging to maintain the Lower Snake River System harms salmon and

8

lamprey, but provide no specific, factual evidence that the 2015 dredging at issue here

9

actually harmed these fish.  (IPNG Mot. at 11-13; Def. Reply at 1-2; IPNG Reply (Dkt. #

10

83) at 2-5.)  In response, Plaintiffs assert (without citation to authority) that "[a]

11

fisherman or recreationalist is harmed, as a matter of law and common sense, by the harm

12

to fish or the environment," and that "the same holds true for members of the Tribe."

13

(Plf. Resp. (Dkt. # 79) at 26.)  Plaintiffs also cite portions of their standing declarations

14

that assert that any dredging under the PSMP—no matter where or how it is conducted or

15

even whether fish are present at the time—harms fish.[8]

16

17

[7] At the summary judgment stage, a plaintiff must set forth, by affidavit or other evidence, specific facts to establish standing.  *Lujan*, 504 U.S. at 561.

18

19

[8] (*See* Plf. Resp. at 26 (citing Allen Decl. (Dkt. # 72-1) ¶ 19 ("In addition to the systematic ways the dams and navigation channel hurt fish, the specific dredging proposed to maintain that system harms fish through turbidity plumes from dredging and disposal, and

20

potential mobilization of toxics."); Kane Decl. (Dkt. # 72-2) ¶ 11 ("The Corps' reliance on dredging to remove sediment and maintain navigation channels is one of the dam-related activities that causes significant harm to already embattled fish populations."); Spain Decl. (Dkt.

21

# 72-5) ¶ 17 ("[D]redging in the Snake River, no matter when it is done, harms juvenile and adult salmon and steelhead that *may* be in these reservoirs at the time by increasing turbidity,

22

disrupting the invertebrate food chain, mobilizing potential toxins, destroying important

1    Absent from Plaintiffs' declarations are any factual showings of actual harm to

2    salmon or lamprey as a result of the Corps' 2015 dredging activities on the Lower Snake

3    River.  Not one of Plaintiffs' declarants specifically tether the generalized harm to fish or

4    the environment they assert to the Corps' particular 2015 dredging at issue here.  Instead,

5    Plaintiffs posit sweeping, generalized assertions that dredging in general is harmful to

6    fish.  (*See supra* n.8.)  Such generalized statements of harm are insufficient to

7    demonstrate injury in fact for purposes of standing.  "Standing . . . is not 'an ingenious

8    academic exercise in the conceivable' . . . [but] requires . . . a factual showing of

9    perceptible harm."  *Summers v. Earth Island Inst.*, 555 U.S. 485, 499 (2008) (quoting

10   *Lujan*, 504 U.S. at 566) (alterations in original).  The alleged harm must be concrete and

11   particular.  *Pub. Lands for the People*, 697 F.3d at 1196.  Generalized grievances,

12   untethered to a concrete action and concrete injuries, are insufficient to withstand Article

13   III scrutiny.

14

15

16   spawning habitat, and by killing *unknown* numbers of individual fish by scooping them up in the dredging equipment.") (italics added); Lewis Decl. (Dkt. # 72-3) ¶ 14 ("[T]he Corps did not

17   comprehensively survey for or consider impacts to lamprey in the Snake-Clearwater confluence before it dredged in 2014-2015, nor does its PSMP include any plans to do so in the future before dredging . . . . The Corps did not even monitor the damage it likely caused to lamprey during this

18   winter's dredging—missing an opportunity to learn from its mistakes and ensure that lamprey and lamprey habitat are protected in the future."); MacFarlane Decl. (Dkt. # 72-4) ¶ 18 ("As long

19   as the Corps persists down this path [of maintaining the navigation channel and the dams], it will continue to harm salmon, along with other [Friends of the Clearwater] members and me, through

20   actions like dredging that destroy salmon and salmon habitat."); *see also* Allen Decl. ¶ 11 ("I believe the periodic dredging or other maintenance to support navigation that the Corps seeks to

21   do through its indefinite [PSMP] ensures that these dams will remain in place and continue to harm salmon and steelhead."); Lewis Decl. ¶ 13 ("Dredging harms salmon, steelhead, and

22   lamprey in a number of different ways."); Kane Decl. ¶ 26 ("Dredging and other maintenance of the navigation channel will continue, perpetuating harms to Pacific lamprey.").)

1    In response to Plaintiffs' generalized assertions that dredging can cause harm to

2    fish or the environment, Defendants point to specific evidence of the Corps' efforts to

3    avoid that harm in this instance.  First, the 2015 dredging was timed to occur during "fish

4    windows" when migrating salmonids and lamprey were not likely present.  (AR 50462 at

5    50492, 50613.)  Second, the Environmental Protection Agency and the Corps conducted

6    water quality monitoring and produced an adaptive management plan to minimize any

7    possible turbidity plumes, the mobilization of toxic pollutants, or the entrapment of fish.

8    (*See* AR 59760 at 59764-65 (ROD for Implementation of Current Immediate Need

9    Action).)  Third, the Corps conducted sediment analysis in the dredged areas to ensure

10   that dredging would not pose toxicity to fish.  (*Id.* 59765; *see also* AR 48885 at 48885-

11   9436 (Appendix of FEIS, providing water quality and sediment quality reports, which

12   Plaintiffs have not challenged).)  Fourth, the National Marine Fisheries Service

13   ("NMFS") of the National Oceanic and Atmospheric Administration ("NOAA")

14   completed a biological opinion on the effects of dredging on migrating salmonids and

15   concluded that dredging was not likely to adversely affect salmonids through use of

16   dredging equipment, re-suspension of sediments, turbidity, toxicity, or any of the other

17   means cited by Plaintiffs' declarants.  (*See* AR 56852 at 56908-17 (NMFS's Immediate

18   Need Action Biological Opinion).)  Except for their generalized statements concerning

19   dredging, Plaintiffs provide no evidence to the contrary concerning the 2015 dredging

20   activities of the Corps.  Plaintiffs' failure to demonstrate any injury from the 2015

21   dredging that is "concrete and particularized" as opposed to "conjectural or hypothetical"

22   is fatal to their claim concerning the 2015 dredging.  *See Summers*, 555 U.S. at 493.  The

1   court concludes that Plaintiffs lack standing to challenge the Corps' 2015 dredging of the

2   Lower Snake River.[9]

3        **b.   The PSMP**

4        The court separately analyzes Plaintiffs' standing with respect to their claims

5   involving the Corps' adoption of the PSMP and comes to the same conclusion—that

6   Plaintiffs lack standing.  The PSMP is merely a plan.  It does not mandate any specific

7   Corps action, dredging or otherwise.  (*See* AR 61037 at 61037-38, 61041-42; AR 50797

8   at 50810, 50812; AR 42407 at 42411.)  Rather, the PSMP provides a framework under

9   which the Corps can address sediment issues as they arise and "identify long-term

10  solutions for proactively addressing sediment problems."  (AR 61037 at 61037-38; *see*

11  AR 42407 at 42411.)  The PSMP contains a list of potential sediment management tools,

12  none of which will necessarily be used, and analyzes impacts that can be associated with

13  those tools, none of which will necessarily occur.  The court does not know which

14  sediment management actions the Corps will take in the future, under what

15  circumstances, or where the Corps might employ any such actions.  As a result, the court

16  cannot know what adverse impacts might occur.  Further, the court does not know what

17

18  ───────────────

19        [9] Plaintiffs suggest in a footnote that the court could order future injunctive relief that could "partially alleviate the harm already caused by the Corps' first application of the PSMP through its 2015 dredging action."  (Plf. Reply at 26, n.29.)  Even assuming that Plaintiffs

20  suffered some injury from the now-complete 2015 dredging, that injury cannot be redressed by prospective injunctive relief.  "Past injury is not sufficient to confer standing. . . . There must be

21  an 'imminent future injury that is sought to be enjoined.'"  *Wilderness Soc., Inc. v. Rey*, 622 F.3d 1251, 1256 (9th Cir. 2010) (internal citations omitted; quoting *Summers*, 555 U.S. at 495).  Even if the court could and were inclined to order the Corps to engage in some after-the-fact dredging

22  mitigation, Plaintiffs have not identified any specific harm from the dredging to mitigate.

1   new technologies or science might exist at that time that could reduce potential adverse

2   impacts of any action.

3          Standing requires a factual showing that alleged injuries are "likely" and not

4   merely "conceivable."  *See Summers*, 555 U.S. at 499.  As discussed above, Plaintiffs

5   have generalized concerns about the possibility that dredging—as a means of removing

6   accumulated sediment—could harm fish by causing turbidity plumes, mobilization of

7   toxins, interference with food sources, adverse impacts to spawning habitats, and other

8   adverse effects.  (*See* Allen Decl. ¶ 18; Kane Decl. ¶ 11; Lewis Decl. ¶ 12; MacFarlane

9   Decl. ¶ 13; Spain Decl. ¶ 17); *see also supra* n.8.  But the Corps has no current plans

10  under the PSMP to dredge or perform any other activity described in the PSMP

11  framework.  Because the PSMP is just a plan, and the Corps has no present plans to

12  implement any sediment management actions, Plaintiffs fail to demonstrate a likely

13  injury.

14         Plaintiffs argue, however, that the Ninth Circuit has repeatedly held that plaintiffs

15  have "standing to challenge programmatic management direction without also

16  challenging an implementing project that will cause discrete injury."  *Cottonwood Envtl.*

17  *Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1081 (9th Cir. 2015) (citing *Sierra Forest*

18  *Legacy v. Sherman*, 646 F.3d 1161, 1176 (9th Cir. 2011)).  The court agrees that

19  Plaintiffs may challenge the PSMP without mounting a corresponding challenge to an

20  implementing project.  They may not, however, mount a challenge to the PSMP without

21  demonstrating "any concrete application that threatens imminent harm to [their]

22  interests."  *Summers*, 555 U.S at 494.  In *Cottonwood*, although the court held that

Plaintiffs could challenge an agency's plan without challenging an implementing project

arising from the plan, such projects were underway at the time of suit.  789 F.3d at

1081-82.  The court explained that "a procedural injury is complete after [a Plan] has

been adopted, so long as . . . it is fairly traceable to some action that will affect the

plaintiff's interests."  *Id.* at 1081.  Although the plaintiffs in *Cottonwood* were not

required to challenge any particular implementing project, they had standing because

"[t]he[ir] declarations connect[ed] their procedural injury to imminent harm in specific

forests and project areas."  *Id.*

The same rationale prevailed in *Sierra Forest Legacy*, where plaintiffs challenged

the Forest Service's 2004 programmatic framework for the management of federal forest

lands in the Sierra Nevada, but they also asserted interests in areas encompassed by three

timber projects within just one of the affected forests.  646 F.3d at 1179-80.  The

plaintiffs had "standing not based on whether [they] challenged any of the projects, but

because [they] asserted interests in areas that would be affected by specific projects in a

forest that was subject to the 2004 Framework."  *See Salix v. U.S. Forest Serv.*, 944 F.

Supp. 2d 984, 989 (D. Mont. 2013), *aff'd and remanded sub nom. Cottonwood Envtl. Law

Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075 (9th Cir. 2015).  Thus, both *Cottonwood* and

*Sierra Forest Legacy* are distinguishable because the plaintiffs in those cases connected

their alleged procedural injury based on the agency's plan to imminent harm arising from

specific projects implemented under the plan.  Here, there are no such ongoing or planned

implementing projects under PSMP that can cause imminent harm to Plaintiffs' interests.

1    The court agrees with the Corps and IPNG that *Summers v. Earth Island Institute*,

2    555 U.S. 488 (2009), provides controlling guidance here.  In *Summers*, the plaintiffs

3    challenged various timber regulations and also challenged the failure of the Forest

4    Service to apply one of the regulations to a particular project, the Burnt Ridge Project.

5    *Id.* at 494.  The plaintiffs settled the dispute over the Burnt Ridge project before the

6    challenge to the regulations was decided.  *Id.*  The Supreme Court held that the plaintiffs

7    lacked standing to challenge the regulations because their dispute over the Burnt Ridge

8    project had been resolved.  *Id.*  The Court did not reach this conclusion because the

9    separate claim was no longer part of the action; rather, the Court emphasized that the

10   plaintiffs had only alleged injury associated with the Burnt Ridge project.  *Id.* at 495.

11   They had not alleged a particularized injury in any other area.  *See id.*  The Court held:

12   "We know of no precedent for the proposition that when a plaintiff has sued to challenge

13   the lawfulness of certain action or threatened action but has settled that suit, he retains

14   standing to challenge the basis for that action (here, the regulation in the abstract), apart

15   from any concrete application that threatens imminent harm to his interests."  *Id.* at 494.

16   Thus, the lack of a concrete application that threatened imminent harm to the plaintiffs'

17   interests—not the lack of an independent, project-specific claim—ultimately deprived the

18   plaintiffs of standing to challenge the regulations in *Summers.*

19       The same is true here.  The Corps' one application of the PSMP—the Current

20   Immediate Need Action to dredge in 2015—is now complete.  The Corps has no current,

21   concrete plans to apply the PSMP in a manner that threatens imminent harm to Plaintiffs.

22   Accordingly, the court concludes that Plaintiffs lack standing to challenge the PSMP.

### 2. Plaintiffs' Claims Concerning the Corps' 2015 Dredging of the Lower Snake River Are Moot

The court next addresses the Corps' and IPNG's challenge that Plaintiffs' claims concerning the 2015 dredging are moot. (*See* Def. Mot. at 7-8; IPNG Mot. at 12-13.) As discussed below, the court concludes that, even if Plaintiffs had standing initially to pursue their claims, those claims are now moot.

"The ripeness inquiry asks 'whether there is yet any need for the court to act,' while the mootness inquiry asks 'whether there is anything left for the court to do.'" *W. Oil and Gas Ass'n v. Sonoma Cty.*, 905 F.2d 1287, 1290 (9th Cir. 1990) (quoting 13A Wright, Miller & Cooper, *Federal Practice and Procedure*, § 3532.1 (2d ed. 1984)). "The basic question in determining mootness is whether there is a present controversy as to which effective relief can be granted." *Nw. Envtl. Def. Ctr. v. Gordon*, 849 F.2d 1241, 1244 (9th Cir. 1988) (citing *United States v. Geophysical Corp. of Alaska*, 732 F.2d 693, 698 (9th Cir. 1984)). "A case becomes moot whenever it los[es] its character as a present, live controversy of the kind that must exist if [courts] are to avoid advisory opinions on abstract propositions of law." *West v. Sec'y of Dep't of Transp.*, 206 F.3d 920, 924 (9th Cir. 2000) (quoting *Hall v. Beals*, 396 U.S. 45, 48 (1969)); *see also City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (stating that unless the plaintiff can obtain effective relief, any opinion as to the legality of the challenged action would be advisory, in violation of Article III of the United States Constitution). A federal court has no authority to issue opinions upon moot questions. *See Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992).

1   It is not enough to survive a mootness challenge for there to have been an actual

2   dispute at the time the complaint was filed; there must remain a "live" controversy

3   throughout all stages of the court's review.  *Burke v. Barnes*, 479 U.S. 361, 363 (1987);

4   *Preiser v. Hewkirk*, 422 U.S. 395, 401 (1975).  Essentially, any change in the facts that

5   ends the controversy renders the case moot.  *See Sosna v. Iowa*, 419 U.S. 393, 403

6   (1975).  Even if a case is not constitutionally moot, the court may in its discretion dismiss

7   a claim as prudentially moot "if circumstances have changed since the beginning of

8   litigation that forestall any occasion for meaningful relief."  *Deutsche Bank Nat. Tr. Co.*

9   *v. FDIC*, 744 F.3d 1124, 1135 (9th Cir. 2004).

10   Based on the foregoing authorities, the court concludes that Plaintiffs' claims

11   regarding the Corps' 2015 dredging are now moot.  Plaintiffs assert that their claim is not

12   moot because "an improper regulatory framework remains in effect, [and] claims against

13   that framework are not moot."  (Plf. Mem. at 21.)  Defendants are not asserting, however,

14   that Plaintiffs claims concerning the PSMP are moot.  Defendants only maintain that

15   Plaintiffs' claims concerning the now-complete 2015 dredging are moot.

16   Plaintiffs also assert that their claims concerning the 2015 dredging are not moot

17   because the court could order a variety of mitigation measures "to remedy, in part, the

18   harm already caused to salmon, steelhead, and lamprey."  (Plf. Resp. at 22.)  Plaintiffs

19   are correct that completion of a project does not necessarily moot an environmental

20   claim.  *See West v. Sec'y of Dep't of Transp.*, 206 F.3d 920, 925 (9th Cir. 2000); *Tyler v.*

21   *Cuomo*, 236 F.3d 1124, 1137 (9th Cir. 2000); *Cuddy Mountain. v. Alexander*, 303 F.3d

22   1059, 1066 (9th Cir. 2002).  Rather, a case is moot only where there is no effective relief

1   for the alleged violation. *Id.* Plaintiffs, however, have failed to demonstrate any on-

2   going injury to fish as a result of the 2015 dredging that the Corps could mitigate, so the

3   court is at a loss to understand what relief it could order to mitigate a harm that has not

4   been substantiated.

5         Finally, Plaintiffs argue that their challenge to the 2015 dredging qualifies under

6   the "capable of repetition, yet evading review" exception to the mootness doctrine. (*See*

7   *id.* at 23-25.) Plaintiffs assert that "the compressed time frame leading up to the Corps'

8   2015 dredging project" supports application of this doctrine. (*See* Plf. Mot. at 30.) The

9   court disagrees. The Corps' 2015 dredging did not evade review. Plaintiffs chose not to

10  appeal the court's denial of their motion for a preliminary injunction. The Ninth Circuit

11  has stated that "[w]here prompt application for a stay pending appeal can preserve an

12  issue for appeal, the issue is not one that will evade review." *Headwaters, Inc. v. Bureau*

13  *of Land Mgmt., Medford Dist.*, 893 F.2d 1012, 1016 (9th Cir. 1989); *see also Bunker Ltd.*

14  *P'ship v. United States*, 820 F.2d 308, 311 (9th Cir. 1987) ("[A] party may not profit

15  from the 'capable of repetition, yet evading review' exception to mootness, where

16  through his own failure to seek and obtain a stay he has prevented an appellate court from

17  reviewing the trial court's decision."). In such circumstances, the court has no power to

18  hear the action, "and the controversy must be resolved in a future action presenting a live

19  dispute." *Protectmarriage.com-Yes on 8 v. Bowen*, 752 F.3d 827, 837 (9th Cir. 2014).

20  Plaintiffs provide no response to this argument, and the court concludes that it is

21  dispositive of this issue. Accordingly, the court holds that Plaintiffs' claim concerning

22  the Corps' 2015 dredging is moot.

1        **3.  Ripeness**

2        Finally, the court addresses the Corps' challenge to Plaintiffs' claims concerning

3    the PSMP on grounds of ripeness.  (*See* Def. Mot. at 7-8.)  As discussed below, the court

4    concludes that these claims are not ripe for the court's review.

5        The ripeness doctrine has both constitutional and prudential components.  *In re*

6    *Coleman*, 560 F.3d 1000, 1004 (9th Cir. 2009).  The doctrine is "designed to prevent the

7    courts, through avoidance of premature adjudication, from entangling themselves in

8    abstract disagreements over administrative policies, and also to protect the agencies from

9    judicial interference until an administrative decision has been formalized and its effects

10   felt in a concrete way by the challenging parties."  *Nat'l Park Hospitality Assoc. v. Dept.*

11   *of the Interior*, 538 U.S. 803, 807-08 (2003) (internal quotations omitted).  "The

12   constitutional ripeness of a declaratory judgment action depends upon 'whether the facts

13   alleged, under all the circumstances, show that there is a substantial controversy, between

14   parties having adverse legal interests, of sufficient immediacy and reality to warrant the

15   issuance of a declaratory judgment.'"  *United States v. Braren*, 338 F.3d 971, 975 (9th

16   Cir. 2003) (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co*., 312 U.S. 270, 273 (1941)); *see*

17   *also Hulteen v. AT&T Corp*., 498 F.3d 1001, 1004 n.1 (9th Cir. 2007) (en banc) (finding

18   jurisdiction because "substantial controversy" requirement was met).  The issues

19   presented must be "definite and concrete, not hypothetical or abstract."  *Thomas v.*

20   *Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc)

21   (internal quotation marks omitted).  Where a dispute hangs on "future contingencies that

22   may or may not occur," *Clinton v. Acequia, Inc*., 94 F.3d 568, 572 (9th Cir. 1996), it may

1  be too "impermissibly speculative" to present a justiciable controversy.  *Portland Police*

2  *Ass'n v. City of Portland*, 658 F.2d 1272, 1273 (9th Cir. 1981).

3       In many cases constitutional ripeness coincides squarely with standing's injury in

4  fact prong.  *Thomas*, 220 F.3d at 1138-39.  "The constitutional component of ripeness is a

5  jurisdictional prerequisite."  *United States v. Antelope*, 395 F.3d 1128, 1132 (9th Cir.

6  2005).  A prudential ripeness analysis requires the court to consider: 1) whether the issues

7  are fit for judicial resolution, and 2) the potential hardship to the parties if judicial

8  resolution is postponed.  *Nat'l Audubon Soc., Inc. v. Davis*, 307 F.3d 835, 850 (9th Cir.

9  2002).  The Ninth Circuit has noted that actions are ripe for adjudication where "the

10  specific facts surrounding possible actions . . . will not aid resolution" of the challenges

11  raised and the "injury is established, and the legal arguments are as clear as they are

12  likely to become."  *Id*.

13       The fact that Plaintiffs presently have no standing to challenge the PSMP does not

14  mean that they can never challenge the PSMP under NEPA or the CWA.  As discussed

15  above, because their claim with respect to the 2015 dredging is now moot, Plaintiffs must

16  wait until the Corps applies the PSMP in some other manner that injures Plaintiffs'

17  interests.  Those future applications, however, are not presently ripe for review.

18       The Supreme Court has said that challenges to agency planning documents should

19  await an actual site-specific implementation of the plan where:  (1) there would be no

20  hardship to the plaintiff, (2) judicial review would inappropriately interfere with further

21  administrative action, and (3) the court would benefit from additional factual

22  development of the issues.  *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726,

733-36 (1998).  IPNG argues that these factors favor finding Plaintiffs' claims

concerning possible future applications of the PSMP to be not ripe for review.  (*See*

IPNG Mot. at 19-20; IPNG Reply at 9.)  Specifically, IPNG argues that a delay in

adjudication will not create a hardship for Plaintiffs because there is no pending Corps

action under the PSMP that will adversely impact fish and lamprey.  (IPNG Mot. at 19-

20.)  Indeed, there is no pending action at all.  In addition, the court will benefit from

further factual development and additional tiered NEPA analysis by the Corps before the

Corps engages in any specific sediment management action under the PSMP.  (*Id.* at 20.)

Relying on *Cottonwood*, Plaintiffs insist their challenge to the PSMP "can never

get riper" and that no further factual development would be useful.  (Plf. Resp. at 28

(quoting *Cottonwood*, 789 F.3d at 1084).)  Once again, however, the court concludes that

*Cottonwood* is distinguishable.  In *Cottonwood*, the Forest Service was "actively applying

the [Plan] at the project-specific level," and therefore "delayed review would cause

hardship to [the plaintiffs]."  789 F.3d at 1084.  Here, in contrast, no such hardship exists

because the Corps is not presently implementing any projects under the PSMP.  The

court, therefore, concludes that it is appropriate to wait until the Corps proposes further

dredging or other sediment management activities pursuant to the PSMP to avoid

entanglement in an abstract dispute about the propriety of future events that may not

materialize as anticipated.

**B. Plaintiffs' Substantive Claims**

Even if Plaintiffs' claims were not barred by the various justiciability doctrines

discussed above, the court would nevertheless grant summary judgment to the Corps and

1   IPNG on substantive grounds and deny the same to Plaintiffs based on the present record.

2   The evidence in the administrative record demonstrates that the Corps did not act in an

3   arbitrary or capricious manner, abuse its discretion, or otherwise act contrary to the law

4   when it issued the PSMP and conducted the Current Immediate Need Action of dredging

5   portions of the Lower Snake River in 2015.

6        **1.  Standards of Review**

7        Under the APA, a reviewing court may set aside "agency action" that it finds to be

8   "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the

9   law." 5 U.S.C. § 706(2)(A); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S.

10  402, 414 (1971); *see Yerger v. Robertson*, 981 F.2d 460, 465 (9th Cir. 1992).  The court's

11  review under the arbitrary and capricious standard is narrow.  *Id.*  The court may not

12  substitute its judgment for that of the agency.  *Id.*  Further, the court must be at its most

13  deferential when reviewing scientific judgments and technical analyses within the

14  agency's expertise.  *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1124 (9th

15  Cir. 2012).  The court only decides whether the agency's decision was based upon "a

16  consideration of the relevant factors and whether there has been a clear error of

17  judgment."  *Nev. Land Action Ass'n v. U.S. Forest Serv.*, 8 F.3d 713, 716 (9th Cir. 1993)

18  (citation omitted).

19       Summary judgment under Federal Rule of Civil Procedure 56 is an appropriate

20  mechanism to review agency action under the APA.  *See, e.g.*, *Nw. Motorcycle Ass'n v.*

21  *U.S. Dep't of Agric.*, 18 F.3d 1468, 1471-72 (9th Cir. 1994).  Under the APA, the court's

22  review is limited to the administrative record to determine whether the federal agency

1  considered relevant factors and reached conclusions that were not arbitrary or capricious.

2  *Id*. at 1472.  The purpose of the district court's review "is to determine whether or not as

3  a matter of law the evidence in the administrative record permitted the agency to make

4  the decision it did."  *Id.*; *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 769 (9th Cir.

5  1985).

6           **2.  NEPA**

7           Plaintiffs contend that the Corps violated NEPA in a number of ways when it

8  issued the FEIS and two records of decision evaluating both the Corps' long-range plan

9  for managing sedimentation on the Lower Snake River and its Current Immediate Need

10 Action for dredging parts of the River in 2015.  (*See* Plf. Mot. at 4-27.)   Congress

11 enacted NEPA to establish a process for federal agencies to consider the environmental

12 impacts of their actions.  *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,

13 435 U.S. 519, 558 (1978).  NEPA's purpose is to inform agency decision-makers and the

14 public about the potential environmental effects of proposed agency action, which in

15 some circumstances is accomplished through the development of an environmental

16 impact statement.  *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349

17 (1989).  Indeed, NEPA requires agencies to take a "hard look" at environmental

18 consequences.  *Id.* at 350.  NEPA, however, "does not mandate particular results, but

19 simply prescribes the necessary process."  *Id.*

20         Counsel on Environmental Quality regulations provide guidance to agencies

21 concerning NEPA implementation.  *See* 40 C.F.R. §§ 1500-08.  These regulations

22 encourage agencies to "tier" their environmental assessments by developing broad

1   analyses when proposing programs or policies and then engaging in more detailed, site-

2   specific assessments—"tiered" from the initial broader analysis—when implementing

3   specific projects.  *See id.* §§ 1502.20, 1508.28.   Inherent in NEPA and its implementing

4   regulations is a "rule of reason" that guides the court's evaluation of agency compliance

5   and whether an environmental impact statement "contains a reasonably thorough

6   discussion of the significant aspects of the probable environmental consequences."

7   *League of Wilderness Defs. Blue Mountains Biodiversity Project v. Allen*, 615 F.3d 1122,

8   1130 (9th Cir. 2010); *see also Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004).

9   The court must uphold the agency's decision "as long as the agency has 'considered the

10  relevant factors and articulated a rational connection between the facts found and the

11  choice made.'"  *Allen*, 615 F.3d at 1130 (quoting *Selkirk Conservation All. v. Forsgren*,

12  336 F.3d 944, 953-54 (9th Cir. 2003)).

13          **a.   A Reasonable Range of Alternatives**

14          The consideration of the environmental impacts of an agency's proposal and the

15  proposal's alternatives is "the heart of the environmental impact statement."  40 C.F.R.

16  § 1502.15.  NEPA regulations require an agency to "[r]igorously explore and objectively

17  evaluate all reasonable alternatives."  *Id.* § 1502.15(a).  An agency's failure to examine a

18  reasonable alternative renders an environmental impact statement inadequate.  *Alaska*

19  *Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1087 (9th Cir. 2013).

20          Plaintiffs argue that the Corps arbitrarily failed to consider a reasonable range of

21  alternatives in its FEIS when it decided to dredge sections of the Lower Snake River in

22  2015 in its first site-specific "immediate need action" under the PSMP.  (Plf. Mot. at

1   5-12.)  Plaintiffs also argue that the Corps arbitrarily failed to consider a reasonable range

2   of alternatives when the Corps concluded in its plan-level analysis of the PSMP that,

3   when sediment is already impairing navigation, dredging is the only sediment

4   management measure that can effectively reestablish the channel at the statutorily

5   prescribed dimensions.  (*See id.*)

6          The "rule of reason" guides the choice of alternatives and the extent to which an

7   agency must discuss each alternative in an environmental impact statement.  *City of*

8   *Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 142, 1155 (9th Cir. 1997).  An

9   agency "need not consider an infinite range of alternatives, only reasonable or feasible

10  ones."  *Id.*  "This is all NEPA requires—there is no minimum number of alternatives that

11  must be discussed."  *Cal. ex rel. Imperial Cty. Air Pollution Control Dist. v. U.S. Dep't of*

12  *the Interior*, 767 F.3d 781, 797 (9th Cir. 2014) (quoting *Laguna Greenbelt, Inc. v. U.S.*

13  *Dep't of Transp.*, 42 F.3d 517, 524 (9th Cir. 1994)).  The duty to show that an alternative

14  is reasonable or feasible rests upon Plaintiffs.  *See id.* ("Those challenging the failure to

15  consider an alternative have a duty to show that the alternative is viable.").

16         An agency derives its project alternatives from the environmental impact

17  statement's "purpose and need" section, which defines "the underlying purpose and need

18  to which an agency is responding in proposing the alternatives including the proposed

19  action."  *City of Carmel-by-the-Sea*, 123 F.3d at 1155; 40 C.F.R. § 1502.13.  The

20  reasonableness of an alternative is governed by a given project's "purpose and need."  *Id.*

21  Agencies enjoy considerable discretion in defining the purpose and need of a project.

22  *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1066 (9th Cir. 1998).

ORDER- 28

1    However, in doing so "an agency cannot define its objectives in unreasonably narrow

2    terms." *City of Carmel-by-the-Sea*, 123 F.3d at 1155.

3          In this case, sediment accumulation was impairing the navigation channel at the

4    downstream approach to Ice Harbor Dam's lock and the confluence of the Snake and

5    Clearwater Rivers.  (AR 50797 at 50835.)  Accordingly, the Corps identified a purpose

6    and need "to reestablish the federal navigation channel to the congressionally authorized

7    dimensions." (*Id.* at 50834.)  The Corps based that objective on Congress's authorization

8    for the navigation channel in the Flood Control Act of 1962:  "[T]he depth and width of

9    the authorized channel in the Columbia-Snake River barge navigation project shall be

10   established as fourteen feet and two hundred and fifty feet, respectively, at minimum

11   regulated flow."  Flood Control Act of 1962, Pub L. No. 87-874, 76 Stat. 1173, 1193

12   (1962); (*see* AR 50797 at 50838-89; AR 43335 at 43420.)

13         Plaintiffs attack the Corps' statement of the purpose and need of the project

14   arguing that Congress did not mandate that the Corps maintain the channel at a depth of

15   fourteen feet, but rather merely "authorized" that depth.  (Plf. Mot. at 10-12.)  This

16   argument fails as a matter of statutory construction.  At best, Plaintiffs' argument renders

17   the statute ambiguous by virtue of its simultaneous use of the terms "authorized" and

18   "shall."   Under *Chevron, U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844

19   (1984), "a court may not substitute its own construction of a statutory provision for a

20   reasonable interpretation made by the administrator of an agency."  In other words, if the

21   agency's statutory interpretation is reasonable, the court must defer to it.  *See INS v.*

22

1   *Aguirre–Aguirre*, 526 U.S. 415, 424 (1999).  Here, the Corps' interpretation of the Flood

2   Control Act of 1962 is reasonable, and accordingly, the court defers to it.[10]

3          "Courts evaluate an agency's statement of purpose under a reasonableness

4   standard, . . . and in assessing reasonableness, must consider the statutory context of the

5   federal action at issue."  *HonoluluTraffic.com v. Fed. Transit Admin.*, 742 F.3d 1222,

6   1230 (9th Cir. 2014) (citing 40 C.F.R. § 1502.13 and *League of Wilderness Defs. v. U.S.

7   Forest Serv.*, 689 F.3d 1060, 1070 (9th Cir. 2012)).  Indeed, "[w]here an action is taken

8   pursuant to a specific statute, the statutory objectives of the project serve as a guide by

9   which to determine the reasonableness of objectives outlined in an [environmental impact

10  statement]."  *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 866 (9th Cir.

11  2004) (citing *City of N.Y. v. U.S. Dep't of Transp.*, 715 F.2d 732, 743 (2d Cir. 1983)).

12  The Corps interprets the Flood Control Act of 1962 as setting the depth for navigational

13  channel maintenance at fourteen feet.  (AR 50797 at 50837-38.)  Based on this

14  interpretation, the Corps defines its purpose and need for the Current Immediate Need

15  Action "to re-establish the federal navigation channel to the congressionally authorized

16  dimensions."  (*Id.* at 50838.)  The Corps asserts that its interpretation of the statutory

17  directives it implements and its statement of purpose and need under NEPA in the

18  Current Immediate Need Action was reasonable in light of the congressional mandates

19  contained in the Flood Control Act of 1962 concerning the required depth of the channel.

20  _____

21     [10] Plaintiffs' reliance on *Forelaws on Board v. Johnson*, 743 F.2d 677, 683 (9th Cir.
    1984), is misplaced.  In that case, the Ninth Circuit was concerned because the agency was
    interpreting its statutory directives to create an exemption to NEPA, and not, as here, to define
22  the purpose and need of a specific project under NEPA.

1    (Def. Mot. at 13-14.)  As such, the Corps asserts that its interpretation is entitled to

2    deference by the court.  (*Id.*)  The court agrees.

3           Plaintiffs, however, argue that the Corps' interpretation of the statute and its

4    corresponding purpose and need to restore the channel to a depth of fourteen feet is

5    unreasonable.  Plaintiffs contends this because the Corps has repeatedly halted navigation

6    on the channel for weeks or even months to perform infrastructure repairs and also has

7    repeatedly operated the channel at less than fourteen feet. (Plf. Reply at 7 & n.7, 8 n.10

8    & n.11.)  However, the fact that the channel may sometimes operate at less than fourteen

9    feet without impairing navigation is fully consistent with the Corps' interpretation of the

10   Act, which requires a return to congressionally authorized dimensions only once

11   sediment accumulation impairs navigation, as it did here.  In addition, temporary

12   navigation closures to repair infrastructure have nothing to do with whether the channel

13   depth is impairing navigation when barges are operating.  The court concludes that the

14   Corps reasonably defined its purpose and need.

15          Having evaluated the Corps' purpose and need statement, the court now considers

16   whether the Corps considered a reasonable range of alternatives to dredging.  As its

17   regulations encourage, the Corps turned to the PSMP—its Plan-level analysis—to help it

18   identify reasonable alternatives for the Current Immediate Need Action.  *See* 40 C.F.R.

19   §§ 1502.20, 1508.28.  The Corps' Plan-level discussions in the FEIS included analyses of

20   //

21   //

22   //

1  a variety of sediment management measures,[11] but the Corps concluded that non-

2  dredging measures would not be effective in the short-term to remove accumulated

3  sedimentation where that sedimentation was already impairing navigation.[12]  (AR 50797

4  at 50874-904.)  Thus, the Corps analyzed only two alternatives specifically with respect

5  to the Current Immediate Need Action:  targeted dredging to remove the navigational

6  impairments and a "no action" alternative as required by NEPA.  *See* 40 C.F.R. §

7  1502.14(d); (AR 50797 at 50903-04.)  Plaintiffs assert that the Corps' consideration of

8  only these two alternatives was not reasonable considering the host of other measures the

9  Corps examined in the PSMP.  (Plf. Mot. at 6-10; Plf. Reply at 2-6.)

10         Plaintiffs, however, misconstrue the record.  Although is it true that the Corps

11  focused its analysis of the Current Immediate Need Action on targeted dredging and the

12  "no action" alternative, it is not correct that the Corps did not consider other management

13  measures.  The Corps extensively analyzed non-dredging alternatives in developing the

14  PSMP, including whether these alternatives would be effective where an immediate need

15  for action had arisen.  (*See* AR 42733 at 42755-57 (summarizing findings of a 600-page

16  report); AR 5498 at 5498; 5587 at 5587-93; 9965 at 9965-71; 11697 at

17  11697-701(meeting summaries of Local Sediment Management Group)); *see supra* n.11.

18  _____

19  [11] In the PSMP, the Corps considered a wide variety of alternatives to dredging for maintaining channel depth.  These alternatives include reservoir drawdown to flush sediments, sediment agitation, and the construction of bendway weirs.  (AR 50797 at 50880-82 (reservoir

20  drawdown), 50881 (sediment agitation and re-suspension), 50880 (bendway wiers); AR 27919 at 27919 (spur dikes).)

21  [12] After examining various alternatives, the Corps concluded that "only one (1) measure

22  can effectively manage sediment once it has deposited and is interfering with navigation—i.e., dredging."  (AR 45384 at 45410 (FEIS App'x A).)

1    Based on these analyses, as noted above, the Corps concluded that, although some of

2    these measures may offer long-term solutions to address or prevent sediment

3    accumulation, only dredging can effectively address sediment accumulation once

4    navigation is impaired.  (*See* AR 42407 at 42433-34.)  The longer-term sediment

5    management alternatives, therefore, did not meet the purpose and need of the Current

6    Immediate Need Action, and the Corps focused its project-specific analysis of

7    alternatives on measures that did.  (*See* AR 50797 at 50903-04.)  Plaintiffs would have

8    the court ignore the analyses contained in the PSMP.

9          Indeed, the Corps considered the alternatives that Plaintiffs assert are lacking in

10   the very FEIS that Plaintiffs challenge.  The FEIS contains 31 pages of discussion on the

11   practicality and effectiveness of various sediment management measures, including

12   reasons why they would not be effective in addressing immediate need navigational

13   impairments.  (AR 50797 at 50874-904.)  "So long as all reasonable alternatives have

14   been considered and an appropriate explanation is provided as to why an alternative was

15   eliminated, the regulatory requirement is satisfied."  *Native Ecosys. Council v. U.S.*

16   *Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005) (internal quotations and citation

17   omitted).  Plaintiffs may not agree with the Corps' conclusions, but the Corps' discussion

18   of alternatives complied with NEPA.[13]

19

20        [13] Plaintiffs' reliance upon *Western Watersheds Project v. Abbey*, 719 F.3d 1035, 1050

21   (9th Cir. 2013), is misplaced.  (Plf. Mot. at 9.)  In *Abbey*, the court held that the agency failed to
     take a hard look at environmental impacts related to a grazing permit where all of the agency's
     "alternatives" continued grazing at the same level as under the prior permit and the agency did

22   not include a "no-grazing" alternative.  *Id.* at 1050.  The court concluded that there was no

1            **b.  A Hard Look at Pacific Lamprey**

2            Plaintiffs also challenge the Corps' action under NEPA by asserting that the Corps

3    failed to take the requisite "hard look" at the effects of dredging on Pacific lamprey.  (Plf.

4    Mot. at 12-17.)  First, Plaintiffs assert that the 2011 survey of Pacific lamprey that the

5    Corps relied upon in its analysis was inadequate.  (*Id.* at 13-16.)  Second, they argue that

6    the Corps failed to "identify, evaluate, or disclose the lamprey's imperiled status."  (*Id.* at

7    16-17.)

8            In reviewing an agency's impact analysis under NEPA, a court's "role is to ensure

9    that the agency has taken a 'hard look'" at potential effects.  *Churchill Cty. v. Norton*,

10   276 F.3d 1060, 1072 (9th Cir. 2001) (citation omitted).  The Corps reviewed available

11   literature on lamprey behavior and location and found "no evidence that [adult] Pacific

12   lamprey have used or currently use the mainstem Snake River for spawning or rearing."

13   (AR 50797 at 50927-28.)  The Corps recognized, however, that the use of the mainstem

14   by larval juvenile lamprey was largely unknown.  (*See id.*)  The Corps, therefore, tested

15

16   meaningful difference between the four alternatives the agency considered.  *Id.* at 1051.  Here,
     however, it is undisputed that the Corps considered a "no action" alternative.  Unlike *Abbey*, the
17   Corps' "no action" alternative meaningfully differs from the Corps' proposed targeted dredging
     in its Current Immediate Need Action analysis.  Further, both *Abbey* and *'Ilio'ulaokalani*
18   *Coalition v. Rumsfeld*, 464 F.3d 1083 (9th Cir. 2006), another case on which Plaintiffs rely (Plf.
     Mot. at 9), involved situations where the agency had not considered an alternative at either the
19   plan or site-specific level.  *See Abbey*, 719 F.3d at 1050 ("We are troubled by [the agency's]
     decision not to consider a reduced- or no-grazing alternative at the site-specific level, having
20   chosen not to perform that review at the programmatic level."); *'Ilio'ulaokalani Coalition*, 464
     F.3d at 1097 (emphasizing that "[s]omewhere, the [agency] must undertake site-specific analysis,
21   including consideration of reasonable alternatives" either at the programmatic or site-specific
     level).  As discussed above, the Corps considered a variety of sediment control measures at the
22   PSMP or Plan level but determined that these alternatives were not suitable where sediment
     already impeded navigation as it did at the site-specific level here.  Thus, neither *Abbey* nor
     *'Ilio'ulaokalani Coalition* is analogous to the case at hand.

1    at 24 survey sites during July and September 2011, including at the confluence of the

2    Snake and Clearwater Rivers and the planned sediment disposal area for the Current

3    Immediate Need Action, and took a total of 646 samples.  (*Id.* at 50928; AR 50383 at

4    50514.)  The Corps found no lamprey in its survey.  (AR 50797 at 50928.)  Plaintiffs'

5    assertion that "the Corps refused to perform any detailed or meaningful evaluation . . . of

6    the impacts . . . on Pacific lamprey before dredging in 2015" (Plf. Mot. at 13) is belied by

7    the fact that the Corps actually surveyed for larval lamprey (AR 50797 at 50928; AR

8    50383 at 50514).

9         Nevertheless, the Corps acknowledged that its survey did not completely foreclose

10   the possibility that some juvenile lamprey could be present during dredging and disposal.

11   (*Id.*)  The Corps, therefore, informed its decision-makers and the public that, despite its

12   negative survey results, and although "it is unlikely that juvenile lamprey are present in

13   moderate or high numbers in the area to be dredged," larval lamprey could be present

14   during dredging and disposal and, if so, "may be impacted."  (*Id.* at 51026, 51029,

15   51036.)  This was the Corps' conservative conclusion based on its review of the literature

16   and actual surveying.[14]  This assessment meets NEPA's "hard look" requirement.

17

18   _____

19   [14] Plaintiffs assert that the Corps' statement in the FEIS about potential impacts to Pacific
     lamprey was "conclusory."  (Plf. Reply at 11-12.)  This is not a situation, however, where the
     agency simply assumed the presence of a species and a resulting impact.  The Corps reviewed

20   existing literature, (AR 50797 at 50927-28), commissioned an in-water survey (*id.* at 50928), and
     reached a reasoned conclusion that larval lamprey were not likely to be present at the planned

21   dredging sites and disposal areas (*id.* at 50.26-17).  The Corps also planned the dredging for
     winter months when juvenile lamprey were less likely to be present (*id.* at 51027, 51034) and
     planned to use a clamshell dredge to limit entrapment of mobile aquatic species (*id.* at 51022).

22   Contrary to Plaintiffs' assertions, the Corps' accurate statement that, if larval lamprey are present

ORDER- 35

1    In addition, Plaintiffs rely upon an email chain in which the scientist who

2    conducted the Corps' 2011 survey reported on results from a similar survey at the

3    confluence of the Columbia and Wind Rivers in 2012.  (*See* AR 22316 at 22316-17.)  The

4    Columbia-Wind confluence is 300 river miles and eight dams away from the area the

5    Corps dredged near the Snake-Clearwater confluence.  (Def. Reply at 8.)  Using the same

6    technology as the 2011 survey, the scientist conducting the Columbia-Wind survey

7    encountered lamprey.  (AR 22316 at 22316-17.)  The scientist suggests that the

8    technology utilized in the 2011 survey may be even more reliable on "the Snake" during

9    the winter months.   (*Id.* at 22317.)  In response, another Corps biologist forwarded the

10   scientist's email to several other Corps employees.  (*Id.* at 22316.)  The Corps' NEPA-

11   lead on the Lower Snake then asked whether sampling done on the Snake River should

12   be done again with additional "fine-tuning."  (*Id.*)

13       In response to the NEPA-lead's inquiry, the scientist did not state that the 2011

14   survey needed to be redone.  (*Id.*)  He did not state that the 2011 survey was unreliable.

15   (*Id.*)  He did not state that the results of the Columbia-Wind survey meant that there were

16   larval lamprey at the Snake-Clearwater confluence.  (*Id.*)  He stated that the larval

17   sampling, river bottom core sampling, and observations from prior dredging had not

18   shown the presence of larval lamprey at the Snake-Clearwater confluence.  (*Id.*; *see also*

19   AR 17522 at 17522 (Corps contractor stating confidence in the survey techniques).)  He

20   suggested that it would be "very worthwhile" to incorporate further sampling as part of

21

22   at the time of dredging activity, they may be harmed, does not undermine the Corps' "hard look"
     at the effects of its activity on Pacific lamprey.

1    redd surveys at the confluence and planned disposal area.[15]  (*See* AR 22316 at 22316.)

2    He did not, however, state that additional sampling was necessary.  (*See id.*)  If anything,

3    the emails Plaintiffs rely upon indicate the Corps' interest in improving its survey

4    methodology in the future, but the emails do not invalidate the 2011 survey or render the

5    Corps' decision to rely upon the 2011 survey unreasonable.[16]

6          Contrary to Plaintiffs' suggestion, the court cannot conclude that the foregoing

7    email exchange demonstrates a NEPA violation.  The Corps' decision to rely upon its

8    existing 2011 survey data was reasonable, and that decision is entitled to deference from

9    the court.  *See Native Ecosys. Council v. Weldon*, 697 F.3d 1043, 1051 (9th Cir. 2012);

10   *see also Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 511 (9th Cir.

11   2010) (finding no need for the most up-to-date methodologies); *Nw. Envtl. Advocates v.*

12   *Nat'l Marine Fisheries, Serv.*, 460 F.3d 1125, 1139 (9th Cir. 2006) (finding agency need

13

14   _____

15        [15] A "redd" is a salmon or steelhead spawning nest.  (Def. Reply at 9 n.9.)  The Corps did

16   not identify any redds at the Snake-Clearwater confluence.  (*See* AR 50797 at 51028.)

17        [16] Plaintiffs also assert that the Corps' failure to identify the lamprey as "imperiled" in its
     FEIS violated NEPA.  (Plf. Mot. at 16-17.)  Plaintiffs rely upon *Northern Plains Resource*
     *Council v. Surface Transportation Board*, 668 F.3d 1067, 1083 (9th Cir. 2011).  (Plf. Mot. at 16.)

18   That case, however, involved a situation where the agency had not performed any sampling prior
     to project approval.  *N. Plains Res. Council*, 668 F.3d at 1083-85.  Here, the Corps surveyed 24

19   sites and collected 646 samples, in which it found no evidence of larval lamprey, analyzed the
     results, and informed the public and its decision-makers of potential impacts prior to approving

20   the 2015 dredging activity.  Plaintiffs also rely upon *Half Moon Bay Fisherman's Marketing*
     *Association v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988), for the proposition that NEPA

21   requires baseline data.  (Plf. Reply at 11-12.)  Here, the Corps discussed the current status of the
     lamprey, including a review of existing literature, an in-water survey for the presence of juvenile

22   lamprey, and a consideration of its survey results.  (*See* AR 50797 at 50926-28.)  The Corps
     complied with NEPA's requirement to provide baseline data.

1   not engage in the most exhaustive analysis possible).[17]   As the Ninth Circuit has

2   cautioned, "NEPA does not require that we decide whether an environmental impact

3   statement is based on the best scientific methodology available, nor does NEPA require

4   us to resolve disagreements among various scientists as to methodology." *Salmon River*

5   *Concerned Citizens v. Robertson*, 32 F.3d 1346, 1359 (9th Cir. 1994) (alterations

6   omitted).   Rather, NEPA only requires the court to ensure that the agency's "procedures

7   resulted in a reasoned analysis and disclosure of the evidence before it." *Id.*   The court

8   concludes that the Corps did that here and fully discharged its obligations under NEPA.

9               **c.  A Hard Look at Climate Change**

10              Plaintiffs assert that the Corps violated NEPA by failing to account for the impacts

11  of climate change on sediment deposition in the Lower Snake River and "proceeding . . .

12  as if there will be zero increase in sediment reaching the navigation channel due to

13  climate change." (Plf. Mot. at 17-18.)  Specifically, Plaintiffs note a United States Forest

14  Service study that indicates that increased forest fires in the area will increase sediment

15  loading in the Lower Snake River.  (Plf. Reply at 12.)  Specifically, the Forest Service

16  has pegged this increase at "sediment yields roughly 10-times greater than those observed

17

18

19          [17] The cases Plaintiffs rely upon do not demonstrate otherwise.  Those cases involve situations in which the agency failed to consider an impact or in which it ignored or failed to recognize contradictory data.  *See Rybacheck v. EPA*, 904 F.2d 1276, 1293-95 (9th Cir. 1990)

20  (finding no NEPA violation and deferring to the agency's analysis); *Sierra Club v. Eubanks*, 335 F. Supp. 2d 1070, 1079 (E.D. Cal. 2004) (finding a NEPA violation where the agency failed to consider an adverse scientific opinion); *Carlton v. Babbit*, 26 F. Supp. 2d 102, 109-10 (D.D.C.

21  1998) (finding a violation of the Endangered Species Act ("ESA"), not NEPA, where the agency failed to consider species deaths); *Defs. of Wildlife v. Babbit*, 958 F. Supp. 670, 685 (D.D.C.

22  1997) (finding an ESA, not NEPA, violation for failure to consider scientific evidence).

1  during the 20th century."  (*Id.* (citing AR 45606 at 45627 (FEIS App'x D)).)  Although

2  the Corps cited this Forest Service study in its FEIS, Plaintiffs contend that the Corps

3  may not merely list likely effects of climate change on its project without incorporating

4  those likely effects into its decision-making.  (*Id.*)

5          The Corps responds that Plaintiffs once again ignore the Corps' actual assessment

6  and conclusions.  (Def. Mot. at 21.)  The Corps notes that it considered studies on

7  sediment yield, loading, accumulation, and erosion, including in relation to climate

8  change.  (*Id.* (citing AR 50797 at 50854 (table listing studies), AR 42733 at 43331-33,

9  AR 42629 at 42629-46).)  The FEIS summarized those findings and includes a subsection

10  on potential climate-based changes to sediment loading and transport.  (AR 50797 at

11  50851-58, 51108-13.)  Furthermore, the Corps acknowledged that "management of

12  sediment . . . may be affected by climate change."  (AR 50797 at 51108-09; AR 43335 at

13  43414-15; AR 60957 at 61003.)  The FEIS notes that increased wildfires in the watershed

14  may result in increased sediment loading from forested watersheds.  (AR 50797 at 50852,

15  50855-56, 50858.)  The Corps concludes, however, that it cannot assume that an increase

16  in sediment *loading* will directly relate to an increase in sediment *accumulation* that

17  would interfere with navigation or other Corps project purposes when considered in the

18  context of other climatic changes.  Specifically, the Corps states that "whether or not

19  [increased sediment loading] would affect sediment transport and accumulation when

20  considered in combination with changes in precipitation and tributary flows cannot be

21  reasonably predicted at this time."  (*Id.* at 51110.)

22

1    The Corps emphasizes that there is general uncertainty surrounding local impacts

2    from climate change.  (Def. Mot. at 22.)  "[A]ccurately predicting how future conditions

3    affect sediment accumulation in the [Lower Snake River] is not currently realistic or

4    feasible."  (AR 43335 at 43415; *see* AR 50383 at 50693; 50698-99; *see also* AR 50797 at

5    51112 ("[T]here remains considerable uncertainty about the magnitude, timing, and

6    patterns of change and the implications of climate change on management of water

7    resources.").)  Plaintiffs' climate change argument boils down to an assertion that the

8    Corps should have forecasted future climate change sediment yields at the PSMP stage,

9    despite the speculation inherent in such an exercise.[18]

10    The court "must defer to an agency's determination as to predictions within its

11    area of special expertise, especially when those predictions are 'at the frontiers of

12    science.'"  *Turtle Island Restoration Network v. U.S. Dep't of Commerce*, No. CIV. 12-

13    00594 SOM, 2013 WL 4511314, at *23 (D. Haw. Aug. 23, 2013) (quoting *Baltimore Gas*

14    *& Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983)).  Although an

15    agency may not omit ascertainable facts from an EIS, NEPA does not require agencies to

16    include speculative information.  *Tribal Vill. of Akutan v. Hodel*, 869 F.2d 1185, 1192 n.1

17    (9th Cir. 1988); *see also Protect Our Cmtys. Found. v. U.S. Dep't of Agric.*, 845 F. Supp.

18    2d 1102, 1109 (S.D. Cal.), *aff'd*, 473 F. App'x 790 (9th Cir. 2012); *WildEarth Guardians*

19    *v. Jewell*, 738 F.3d 298, 309 (D.C. Cir. 2013) ("Because current science does not allow

20

21    ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

22    [18] In light of the difficulty of accurately forecasting changes in sediment yields in the
navigation channel due to climate change, the Corps agreed to monitor sediment deposition
within the Lower Granite reservoir each year.  (*See* AR 47464 at 47543-44.)

1  for the specificity demanded by the Appellants, [the agency] was not required to identify

2  specific effects on the climate in order to prepare an adequate EIS.").  Based on the

3  foregoing, the court cannot conclude that the Corps' assessment of the effects of climate

4  change in the FEIS violated NEPA.

5      **d.  Cost Information**

6      Plaintiffs devote a significant portion of their briefing to arguing that the Corps

7  failed to produce a valid and accurate cost-benefit analysis.  (Plf. Mot. at 19-27.)  First,

8  the Ninth Circuit determined more than 40 years ago that NEPA does not require a

9  "formal and mathematically expressed cost-benefit analysis."  *See Trout Unlimited v.*

10  *Morton*, 509 F.2d 1276, 1286 (9th Cir. 1974); *see also* 40 C.F.R. § 1502.23 ("For

11  purposes of complying with the Act, the weighing of the merits and drawbacks of the

12  various alternatives need not be displayed in a monetary cost-benefit analysis and should

13  not be when there are important qualitative considerations.").  NEPA's regulations

14  require a cost-benefit analysis only if one is undertaken as a necessary part of an agency's

15  choice among different alternatives.  *See City of Salsalito v. O'Neill*, 386 F.3d 1186,

16  1214-16 (9th Cir. 2004); 40 C.F.R. § 1502.23.

17      Here, the Corps specifically found that a cost-benefit analysis was not necessary

18  for its choice among alternatives.  (AR 43335 at 43403.)  Indeed, Congress already made

19  the determination that the navigation channel should exist and at a prescribed depth.  *See*

20  Flood Control Act of 1962, Pub. L. No. 87-874, 76 Stat. 1173, 1193 (1962) ("[T]he depth

21  and width of the authorized channel in the Columbia-Snake River barge navigation

22  project shall be established as fourteen feet and two hundred and fifty feet, respectively,

1  at minimum regulated flow.").  Congress has reconfirmed that determination by

2  appropriating funds for 27 prior maintenance activities over the last 62 years, and again

3  by appropriating funds for the immediate maintenance dredging in 2015.  (*See* AR 50383

4  at 50428-29.)  "[O]nce Congress has authorized a project, it is not for the courts to review

5  its economic justification" under the guise of NEPA.  *S. La. Envtl. Council, Inc. v. Sand*,

6  629 F.2d 1005, 1015 (5th Cir. 1980).[19]

7        The Corps nevertheless acknowledges that it used economic indicators to

8  determine whether the navigation channel warranted continued maintenance.  (*See* AR

9  50797 at 50967; AR 60957 at 60986 (concluding that continued maintenance would yield

10 up to $25 million in benefits and $12.6 million in costs).)  The Corps, however, did not

11 engage in this exercise as part of its analysis of alternatives under NEPA.  (Def. Mot. at

12 24 (citing 40 C.F.R. § 1502.23).)  The Corps instead engaged in this analysis pursuant to

13 internal guidance and planning documents and after public commentators asked for such

14 an analysis.  (*See* Def. Mot. at 24 & n.23 (containing citations); *see also* AR 43335 at

15 43403).)

16       In performing this analysis, the Corps' relied upon its 2002 Lower Snake River

17 Juvenile Salmon Migration Feasibility Study.  (Plf. Mot. at 23-25.)  From this study, the

18

19     [19] Plaintiffs rely upon *Natural Resources Defense Council v. United States Forest Service*, 421 F.3d at 813, for the notion that the agency must incorporate an economic costs and benefit analysis in an environmental impact statement.  (*See* Plf. Mot. at 19-20.)  However,

20 *Natural Resources Defense Counsel* holds that an environmental impact statement relying on market demand economic information must not be misleading; it does not hold that economic

21 data must be included in an environmental impact statement.  *See* 421 F.3d at 813.  Rather, NEPA's regulations require disclosure of a cost-benefit analysis in an environmental impact

22 statement only if one is undertaken as a necessary part of an agency's choice among alternatives. *See City of Salsalito*, 386 F.3d at 1214-16; 40 C.F.R. § 1502.23.

1   Corps concluded that shipping by barge rather than by truck or rail results in a cost

2   savings of $8.45 per ton.  (AR 50797 at 50967.)  The Corps then multiplied this figure by

3   the "about 3 million tons" shipped annually on the Lower Snake River to conclude that

4   the current economic benefit of maintaining the channel is approximately $25 million

5   dollars per year.  (*Id.*)  The Corps estimated that navigation maintenance will cost an

6   average of $1 million to $5 million each year.  (*Id.*)  Based on these figures, the Corps

7   concluded that "ongoing channel maintenance is warranted."  (*Id.*)

8        Plaintiffs assert that the economic information the Corps disclosed was

9   misleading.  (Plf. Mot. at 23-27.)  They assert that the Corps' analysis overstates the

10  benefits while underestimating the costs.  (*Id.*)  In particular, Plaintiffs argue that the

11  2002 feasibility study is stale, that the Corps knew that the study's methodology

12  overstated the benefits of shipping by barge, and that the Corps failed to address these

13  known deficiencies in the FEIS but simply "blindly carried them forward."  (*Id.* at 24.)

14  The record, however, belies Plaintiffs' assertion.  The Corps acknowledged the date of

15  the report, compared the report's numbers to 2012 tonnage levels, and reaffirmed its

16  conclusion on transportation benefits.  (AR 60957 at 60984, 60986; AR 43335 at 43404.)

17  Indeed, after comparing the 2002 report's anticipated annual tonnage and cost savings

18  with actual values from 2012, the Corps concluded that tonnage remained high and, if

19  anything, cost savings per ton was higher than expected.  (*See* AR 60957 at 60983-84,

20  60986; AR 43335 at 43403-04.)

21        An agency errs in relying on old data only when the agency has not shown that the

22  data remains accurate.  *See N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d

1   1067, 1086-87 (9th Cir. 2011).  Here, in response to a public comment, the Corps' Center

2   for Expertise for Inland Navigation cross-checked the transportation savings number with

3   which Plaintiffs take issue—$8.45 per ton.  (AR 60957 at 60983-84.)  The Corps' expert

4   concluded that the $8.45 per ton figure was sound, stating that an even higher

5   transportation savings of $10.90 per ton was likely more representative based on more

6   recent research in the Columbia-Snake navigation system.  (*Id.*)  Plaintiffs urge the court

7   to ignore the $10.90 per ton figure because it appears in the Corps' response to comments

8   rather than in the FEIS.  (*See* Plf. Mot. at 24 n.19.)  The court, however, finds this chain

9   of events to be in accord with the purpose of the NEPA public comment process—the

10  public stated a concern and in response the Corps checked its assessment and found it to

11  be sound.  In addition, other studies in the record support the Corps' position that the

12  benefits of channel maintenance outweigh the costs.  (*See* AR 33953 at 33953-66.)

13  Accordingly, the court does not find that the Corps' reliance on the 2002 feasibility study

14  undermined the FEIS or created a NEPA violation.

15          Plaintiffs also object that the Corps looked at transportation benefits and tonnage

16  for the entire Lower Snake River, rather than just the Snake-Clearwater confluence, and

17  that the Corps did not analyze the costs of channel maintenance indefinitely into the

18  future.  (Plf. Mot. at 25-27.)  However, Plaintiffs' desire for an analysis of a different

19  scope is a methodology dispute that does not invalidate the FEIS.  *Weldon*, 697 F.3d at

20  1053 ("The mere fact that [the plaintiff] disagrees with the [agency's] methodology does

21  not constitute a NEPA violation.").  "When specialists express conflicting views, an

22  agency must have discretion to rely on the reasonable opinions of its own qualified

1   experts even if, as an original matter, a court might find contrary views more persuasive."

2   *Id.* at 1051.  Here, the Corps' methodology is entitled to deference, and the court cannot

3   conclude that the methodology it chose supports or constitutes a NEPA violation.

4        **3.  CWA**

5       Plaintiffs assert that the Corps violated the CWA by failing to complete a required

6   public interest analysis before deciding to proceed with its Current Immediate Need

7   Action of dredging during the winter of 2015.  (Plf. Mot. at 28-30.)  The CWA regulates

8   or prohibits the discharge of dredge or fill material into navigable waters of the United

9   States without a permit.  *See* 33 U.S.C. § 1344.  Plaintiffs rely upon 33 C.F.R. § 336.1(a)

10   which provides that, although the Corps does not issue permits to itself for its own

11   activities, "the Corps authorizes its own discharges of dredged or fill material by applying

12   all applicable substantive legal requirements."  33 C.F.R. § 336.1(a).  Plaintiffs assert that

13   "all applicable substantive requirements" include a "public interest review" that requires

14   "the consideration of the full public interest by balancing the favorable impacts against

15   the detrimental impacts" of the proposal.  *See* 33 C.F.R. § 320.1(a)(1).  The Corps,

16   however, declined to do so here, stating that "[t]he public interest associated with a

17   federal Civil Works project is established when authorized by Congress and confirmed

18   through O&M funding/appropriations."  (AR 47464 at 47638 (FEIS App'x G—Response

19   to Comment 9319).)

20       The Corps has issued two sets of regulations pursuant to its authority under 33

21   U.S.C. § 1344 to regulate discharges of dredged and fill material into navigable waters:

22   (1) requirements that relate to permit applications, 33 C.F.R. parts 320-330, and (2)

1 | requirements that apply to the Corps' authorization of its own activities, 33 C.F.R. parts

2 | 335-338.  The Corps does not process or issue permits for its own activities, 33 C.F.R.

3 | § 336.1(a), and accordingly, the first set of regulations under 33 C.F.R. parts 320-330 do

4 | not apply to the Corps' discharge of dredged material.  Thus, contrary to Plaintiffs'

5 | argument, the requirements contained in 33 C.F.R. § 320.1(a)(1) regarding a public

6 | interest review are not applicable to the Corps' activities here.

7 | Indeed, the Corps expressly addressed this issue when it promulgated 33 C.F.R.

8 | parts 335-338 in 1998.  The Corps explained that the public interest review requirement

9 | does not apply to the Corps' operation and maintenance activities because Congress—not

10 | the Corps—determines that such activities are in the public interest:

11 |
12 | 
13 | 
14 | 
15 | 
16 |

> The Corps is subject to the same Federal environmental laws and regulations as the general public even though the Corps does not issue a permit document to authorize its activities.  This rule reflects the requirement to meet the same standards (see § 336.1(a)).  There is, however, a somewhat different perspective between projects undertaken by the general public and Corps operations and maintenance activities.  When a private entity proposes to perform work requiring a Corps permit, the Corps must decide whether tha[t] work would be contrary to the public interest.  In contrast, this rule [33 C.F.R. parts 335-338] applies to operations and maintenance of Federal projects which have already been determined by the Congress to be in the public interest.

17 | Final Rule for Operations & Maint. of Army Corps of Eng'rs Civil Works Projects

18 | Involving the Discharge of Dredged Materials into Waters of the U.S. or Ocean Waters,

19 | 53 Fed. Reg. 14,902, 14,903 (Apr. 26, 1988).  Thus, the Corps has not interpreted 33

20 | C.F.R. § 336.1(a) to make the public interest review provisions of 33 C.F.R. § 320.4(a)

21 | applicable to maintenance dredging since the time the Corps promulgated those

22 | regulations in 1988.  Further, the Corps reiterated this interpretation when it explained

1  that it did not conduct a public interest review in this matter because the public interest in

2  the project was established when it was authorized by Congress.  (*See* AR 47464 at

3  47638 (FEIS App'x G—Response to Comment 9319).)

   The Corps' interpretation of its own regulations is controlling unless it is "plainly

5  erroneous or inconsistent with the regulation."  *Auer v. Robbins*, 519 U.S. 452, 461

6  (1997) (citations omitted).  This is particularly true where, as here, "there is no indication

7  that [the agency's] current view is a change from prior practice or a *post hoc* justification

8  in response to litigation."  *Decker v. Nw. Envtl. Def. Ctr.*, --- U.S. ---, 133 S. Ct. 1326,

9  1337 (2013).  That deferential standard is easily met here.

   The court agrees that Congress has determined that operation and maintenance

11  dredging, which was the subject of the Current Immediate Need Action, is in the public

12  interest.  Congress authorized construction of the Lower Snake River Projects in Section

13  2 of the Flood Control Act of 1945.  *See* 59 Stat. at 21.  Congress also required that the

14  navigation channel be established at fourteen feet deep by 250 feet wide at Minimum

15  Operating Pool, and provided the Corps with authority to maintain the channel at those

16  dimensions.  Flood Control Act of 1962, 76 Stat. at 1193.  The Corps has performed

17  dredging in the Lower Snake River on at least 17 occasions since 1961, when the

18  navigation channel was constructed for Ice Harbor Dam (the first of the four Lower

19  Snake River dams).  (*See* AR 50797 at 50842-43.)  Congress appropriated funds for all

20  prior Lower Snake River dredging actions, including the recently completed Current

21  Immediate Need Action in 2015.  (Def. Mot. at 29.)  If Plaintiffs believe that the Lower

22  Snake River navigation project is no longer in the public interest, their recourse is to

1  petition Congress, not this court.  The Corps' declination to conduct a public interest

2  review of the PSMP or the Current Immediate Need Action did not violate the CWA.

3  **IV.    CONCLUSION**

4  Based on the foregoing, the court DENIES Plaintiffs' motion for summary

5  judgment (Dkt. # 72) and GRANTS the Corps' and IPNG's motions for summary

6  judgment (Dkt. ## 75, 76) in favor of the Corps.

7  Dated this 9th day of February, 2016.

8

9

10  JAMES L. ROBART
United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

ORDER- 48